UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

'05 DEC 30  P 3:38

U.S. DISTRICT COURT
DISTRICT OF MASS.

---

SECURITIES AND EXCHANGE COMMISSION, :

    Plaintiff, :

   v. :

KARNIG H. DURGARIAN, JR., :
DONALD F. McCRACKEN,
RONALD B. HOGAN, VIRGINIA A. PAPA, :
KEVIN F. CRAIN, and SANDRA G. CHILDS, :

    Defendants. :

---

MAGISTRATE JUDGE _JLA_

**05  CA  12618  NMG**

Civil Action No.

**JURY TRIAL DEMANDED**

RECEIPT #_____
AMOUNT $_____ NA
SUMMONS ISSUED  6
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK._____
DATE_____ 12/30/05

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**Summary**

1. Beginning in January 2001, defendants Karnig H. Durgarian, Jr., Donald F.
McCracken, Ronald B. Hogan, Virginia A. Papa, Kevin F. Crain, and Sandra G. Childs
(collectively, "Defendants") -- all senior officers and employees of Putnam Fiduciary Trust
Company ("PFTC") -- engaged in a fraudulent scheme to conceal and cover up an error that had
occurred in a client's account. Instead of disclosing the error to the client and facing the
consequences, Defendants engaged in a fraudulent course of conduct to transfer the loss from one
client to others and then to conceal the error and the fraudulent transfer from the affected clients
and from PFTC's auditors.

2. On January 2, 2001, assets for an employee retirement plan sponsored by Cardinal
Health, Inc. ("Cardinal") were transferred to PFTC for investment in several mutual funds.

PFTC, however, delayed investing those assets until January 3, 2001. As a result of PFTC's one-day delay, the Cardinal plan was deprived of nearly $4 million in market appreciation.

3.      Rather than disclose that PFTC's delay caused the plan to lose nearly $4 million in market appreciation, Defendants instead schemed to shift the loss to others and to conceal their own conduct. First, Defendants made after-the-fact changes to the dates and the prices at which the plan had purchased and sold mutual fund shares, thereby shifting approximately $2.7 million of the plan's loss to shareholders of five Putnam mutual funds. When Defendants were unable to persuade another mutual fund complex to make similar after-the-fact changes, they caused the plan to bear the rest of the loss. Finally, Defendants failed to disclose the delay or any of the transactions to the plan and concealed their conduct through accounting adjustment entries and false certifications both to PFTC's outside auditors and in filings with the Commission.

4.      By engaging in the scheme set forth in this Complaint, each of Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. Additionally, defendant Durgarian violated Sections 34(b) and 37 of the Investment Company Act of 1940 ("Investment Company Act"). Finally, by engaging in the scheme set forth in this Complaint, each of Defendants aided and abetted PFTC's uncharged violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

5.      Unless restrained and enjoined, Defendants will continue to engage in acts, practices, and courses of business as set forth in this Complaint or in acts, practices, and courses of business of similar object and purpose. Accordingly, the Commission seeks: (i) entry of a permanent injunction prohibiting each defendant from further violations of the relevant

2

provisions of the federal securities laws; (ii) the imposition of a civil monetary penalty in light of the egregious nature of Defendants' violations; and (iii) other equitable relief as the Court in its discretion deems just.

## Jurisdiction

6. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], and Sections 42 and 44 of the Investment Company Act [15 U.S.C. §§ 80a-42 and 80a-44].

7. Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged herein.

8. The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t], Section 21 of the Exchange Act [15 U.S.C. § 78u], and Section 42 of the Investment Company Act (15 U.S.C. § 80a-42] to: (i) enjoin Durgarian, McCracken, Papa, Hogan, Crain, and Childs permanently; (ii) require Durgarian, McCracken, Papa, Hogan, Crain and Childs to pay civil monetary penalties; and (iii) obtain other equitable relief.

## Defendants

9. **Karnig Durgarian, Jr.**, during the relevant period, was Chief of Operations, the highest-ranking executive position, of PFTC. Defendant Durgarian was also a Senior Managing Director and a senior officer of PFTC's corporate parents, Putnam Investment Trust and Putnam, LLC ("Putnam"). From January 2002 through March 2004, defendant Durgarian was also

3

Principal Executive Officer of several Putnam mutual funds, including the Putnam Research

Fund, the George Putnam Fund of Boston, the Putnam Asset Allocation Fund: Growth Portfolio,

the Putnam Asset Allocation Fund: Balanced Portfolio, and the Putnam Asset Allocation Fund:

Conservative Portfolio. Defendant Durgarian's employment was terminated by Putnam in March

2004. Defendant Durgarian resides in Hopkinton, Massachusetts. During the Commission's

investigation that led to the institution of this action, defendant Durgarian asserted his Fifth

Amendment privilege against self-incrimination and refused to answer questions concerning the

allegations set forth in this Complaint.

10.     **Donald McCracken**, during the relevant period, was Head of Global Operations

Services for PFTC. The global operations services division of PFTC included, among other

things, the unit that performed fund accounting for the Putnam mutual funds, including the

Research Fund. Defendant McCracken was also a Managing Director. Defendant McCracken

reported to defendant Durgarian at all relevant times. Defendant McCracken resides in Melrose,

Massachusetts.

11.     **Ronald B. Hogan**, during the relevant period, was a vice president in the new

business implementation unit of PFTC. Defendant Hogan reported to defendant Childs at all

relevant times. Defendant Hogan resides in Saugus, Massachusetts.

12.     **Virginia A. Papa**, during the relevant period, was Director of Defined

Contribution Plan Servicing of PFTC. In that position, she oversaw PFTC's new business

implementation, trust operations, and plan administration units. Defendant Papa was also a

Managing Director. Defendant Papa reported to defendant Durgarian at all relevant times and

4

was the supervisor of defendants Crain and Childs. Defendant Papa resides in Newton,
Massachusetts.

13.    **Kevin Crain**, during the relevant period, was head of the plan administration unit
at PFTC. Defendant Crain was also a Managing Director, and he reported to defendant Papa at
all relevant times. Defendant Crain resides in Princeton, New Jersey.

14.    **Sandra Childs**, during the relevant period, had overall responsibility for PFTC's
compliance department and its new business implementation unit. Defendant Childs was also a
Managing Director. Defendant Childs reported to defendant Papa at all relevant times and was
the direct supervisor of defendant Hogan. Defendant Childs resides in Duxbury, Massachusetts.

### Related Parties

15.    **PFTC** is a wholly-owned subsidiary of Putnam. Among other things, during the
relevant period, PFTC functioned as the transfer agent, distribution disbursing agent, redemption
agent, and recordkeeper for Putnam mutual funds. During the relevant period, PFTC also had
contractual arrangements to perform administrative functions for employee defined contribution
plans, such as retirement and profit sharing plans, that were sponsored by various companies.
During the period of 1998 to 2004, PFTC administered employee defined contribution plans for
Cardinal.

16.    **Putnam Research Fund** is a series of the Putnam Investment Funds (formerly
Putnam Equity Funds), a Massachusetts business trust, and is an open-end management
investment company registered with the Commission.

17.    **George Putnam Fund of Boston**, a Massachusetts business trust, is an open-end
management investment company registered with the Commission.

5

18.    **Putnam Asset Allocation Funds**, a Massachusetts business trust, is an open-end management investment company registered with the Commission. It consists of a series of investment portfolios, each of which is represented by a separate series of shares of beneficial interest. The three portfolios are the Putnam Asset Allocation Fund: Growth Portfolio, the Putnam Asset Allocation Fund: Balanced Portfolio, and the Putnam Asset Allocation Fund: Conservative Portfolio.

19.    **Cardinal Health, Inc.**, based in Dublin, Ohio, is a health care company that provides products and services related to the health care industry. During the relevant period, Cardinal sponsored several employee defined contribution plans, including the Cardinal Health Profit Sharing, Retirement and Savings Plan, the Cardinal Health, Inc. Frozen Retirement Plan, the Cardinal Health, Inc. Profit Sharing & Retirement Savings Plan for Employees of Puerto Rico, and the Allegiance Retirement Plan for Union Employees of Hayward, California.

## **Background**

20.    A mutual fund is an investment company that pools money from many investors and invests the money in stocks, bonds, short-term money-market instruments, or other securities. The price shareholders pay for mutual fund shares is the fund's per share net asset value ("NAV"). Generally, a fund's NAV is calculated once a day and is determined by the total value of the assets in the mutual fund's portfolio as of the close of the markets divided by the number of outstanding shares of the mutual fund.

21.    Since at least 1991, PFTC has performed a wide variety of administrative, recordkeeping and back office functions for Putnam mutual funds. Among other things, PFTC establishes and maintains accounts evidencing the ownership, transactions, issuance and

6

redemptions of mutual fund shares issued by the Putnam mutual funds. It effects payments and distributions from the funds to shareholders, and it effects the redemption of securities issued by the funds and the payment of proceeds to shareholders.

·   22.    During the entire relevant period, PFTC provided these administrative, recordkeeping and back office functions as an agent for, among others, the following Putnam funds: the Research Fund, the George Putnam Fund of Boston, Putnam Asset Allocation Fund: Growth Portfolio, Putnam Asset Allocation Fund: Balanced Portfolio, and Putnam Asset Allocation Fund: Conservative Portfolio. As an agent of these funds, PFTC was required to act in the best interests of the funds.

23.    PFTC also provided administrative services to defined contribution plans, such as retirement and profit sharing plans ("DC Plans"), sponsored by various companies. PFTC's plan administration unit was headed by defendant Crain, who reported to defendant Papa.

24.    From 1998 through 2000, PFTC had a contractual arrangement to administer several of Cardinal's DC Plans. As of the end of 2000, PFTC had caused certain assets of the Cardinal DC Plans to be invested in Putnam mutual funds, including, among others: (1) George Putnam Fund of Boston, (2) Putnam Asset Allocation Fund: Growth Portfolio, (3) Putnam Asset Allocation Fund: Balanced Portfolio, and (4) Putnam Asset Allocation Fund: Conservative Portfolio.

### PFTC Becomes Trustee and Investment Manager for a New DC Plan

25.    In 1999, Cardinal merged with another health care company, Allegiance Health, Inc. ("Allegiance"). At the end of the year 2000, Cardinal was making arrangement to combine the assets of three Cardinal DC Plans with one Allegiance DC Plan into a single plan (the

7

"Combined Plan"). A trust was created to consist of all assets of the Combined Plan in the custody of PFTC, and PFTC was designated as the Trustee and investment manager to the trust.

26. As Trustee and investment manager, PFTC at all times had a fiduciary duty to act in the best interests of the Combined Plan and its participants. As Trustee, PFTC was further responsible for investing the assets of the Combined Plan, making payments on behalf of the Combined Plan, and carrying out investment directions of participants in the Combined Plan. In addition, as investment manager, PFTC had authority to exercise discretion regarding the management of the Combined Plan's assets, including authority to purchase, sell, exchange, convert, and otherwise trade securities.

27. Toward the end of the year 2000, in connection with the creation of the Combined Plan, Cardinal made arrangements for PFTC to have custody of the combined assets from the then-existing Cardinal and Allegiance DC Plans and to invest those assets, among other places, in several mutual funds.

28. Between on or about December 29, 2000 and January 2, 2001, assets of the Allegiance DC Plan that had been in the custody of another financial institution were liquidated and transferred to PFTC to an account for the Combined Plan.

29. On January 2, 2001, PFTC sold mutual fund shares owned by the Cardinal DC Plans, including shares of four Putnam mutual funds: the George Putnam Fund of Boston, Putnam Asset Allocation Fund: Growth Portfolio, Putnam Asset Allocation Fund: Balanced Portfolio, and Putnam Asset Allocation Fund: Conservative Portfolio. It then transferred the proceeds to an account for the Combined Plan.

8

30.     Once the assets of the Alliance and Cardinal DC Plans were combined in an account for the Combined Plan, PFTC was responsible for investing those assets, among other places, in several mutual funds. In the months leading up to January 2, 2001, Cardinal and Allegiance employees repeatedly informed employees of PFTC that the assets of the Combined Plan were to be re-invested as soon as possible.

### PFTC Fails to Invest Assets of the Combined Plan on Time and Causes the Combined Plan To Miss a Significant Investment Opportunity

31.     On January 2, 2001, PFTC had possession of the assets of the Combined Plan, including both the assets of the Allegiance DC Plan that had been transferred to PFTC and the proceeds of the mutual fund sales for the Cardinal DC Plans. However, PFTC did not cause the Combined Plan to invest in any mutual funds until one day later, on January 3, 2001. As a result of this one-day delay, the Combined Plan purchased various Putnam and non-Putnam mutual fund shares at their January 3 NAVs rather than their January 2 NAVs.

32.     On January 3, 2001, equity markets in the United States generally rose sharply. The Dow Jones average rose nearly three hundred points or 2.81% and the S&P 500 Index rose 64 points or 5.01%. The market movement had an impact on the mutual funds that PFTC purchased for the Combined Plan.

33.     Specifically, the NAV of the Research Fund, one of the mutual funds in which the Combined Plan invested, increased from $15.70 to $16.61 per share between January 2, 2001 and January 3, 2001. As a result of PFTC's one-day delay, PFTC purchased approximately 165,020 fewer shares of the Research Fund for the Combined Plan than it otherwise would have purchased at the lower January 2, 2001 NAV.

9

34. Similarly, the NAV of the Franklin Small Cap Fund, another of the mutual funds in which the Combined Plan invested, increased from $36.25 to $39.45 per share between January 2, 2001 and January 3, 2001. As a result of PFTC's one-day delay, PFTC purchased approximately 26,219 fewer shares of the Franklin Small Cap Fund for the Combined Plan than it otherwise would have purchased at the lower January 2, 2001 price.

## PFTC Tells Cardinal that it Invested the Combined Plan Assets at the January 2 NAV and Defendants Begin to Cover-up the Delay

35. On January 3, 2001, despite the one-day delay, a PFTC employee emailed a Cardinal employee that the transfer of assets occurred smoothly. On the same day, the Cardinal employee responded in a email, saying "The market is up and we look great being invested on the upswing."

36. On or about January 3 and 4, 2001, Defendants Hogan, Crain, Childs and others began discussing how to respond to the Cardinal employee's mistaken belief that the Combined Plan had benefitted from the January 3, 2001 market appreciation. At one such meeting on or about January 4, 2001, the potential loss to the Combined Plan from the one-day delay was estimated to be approximately $4 million. Defendants Hogan, Crain, Childs and others agreed that the Combined Plan should not bear the loss resulting from PFTC's one-day delay. In addition, defendant Papa was also informed about the one-day delay and the resulting lost investment opportunity.

37. Beginning on or about January 4 or early January 5, 2001, defendant Hogan, with the assistance of at least one person who reported to him, began concocting a series of transactions that, if executed, would partially compensate the Combined Plan for PFTC's one-

10

day delay, but would do so at the expense of other shareholders of Putnam mutual funds. Among other things, defendant Hogan proposed that PFTC execute "as of" trades on behalf of the Combined Plan.

38.    An "as of" trade is a backdated purchase or sale of a security that uses the price from a prior day rather than the current day's price. "As of" trades were typically used at PFTC to correct trading errors.

39.    "As of" trades can cause a reduction in the value of all shares in a mutual fund, including shares held by other shareholders. This reduction of value is often referred to as "dilution." For example, when the NAV for an "as of" date is lower than the current NAV, execution of an "as of" purchase results in more shares in the fund -- those newly purchased -- but the total assets of the fund are not as high as they would have been if the new shares had been purchased at the current NAV. Thus, after the "as of" trade is executed, the value of all outstanding shares of the mutual fund is lower.

40.    Because of the risk of dilution, PFTC had a policy to prevent mutual fund shareholders from being harmed when PFTC executed an "as of" trade. The policy -- referred to as the penny-per-share policy -- required that the party responsible for any error necessitating an "as of" trade must compensate the shareholders of any mutual fund that experiences dilution of the value of the fund's NAV of one penny per share or greater.

41.    During the relevant period, each of Defendants Durgarian, McCracken, Papa, Hogan, Crain, and Childs was aware of the penny-per-share policy.

11

## Durgarian and Other Defendants Scheme to Avoid Liability at the Expense of the Combined Plan and of Other Mutual Fund Shareholders

42.     During one or more meetings on or about January 5, 2001, Defendants Durgarian, McCracken, Papa, Hogan, Crain, and Childs, among others, met to discuss the loss to the Combined Plan resulting from PFTC's one-day delay in investing the Combined Plan's assets. Defendants Hogan and Papa described the one-day delay, the email to Cardinal, and Cardinal's response to the other Defendants. Other participants in the meetings also stated that Cardinal employees had expected the Combined Plan's assets to be invested on January 2 and that Cardinal employees believed that they had been invested on that day.

43.     During one or more meetings on or about January 5, 2001, attended by each of Defendants, defendant Hogan described the transactions that he had concocted, which, if executed, would partially compensate the Combined Plan for PFTC's one-day delay, but would do so at the expense of other shareholders of Putnam mutual funds. After discussion, Defendants agreed to execute defendant Hogan's plan and designated defendant Hogan to coordinate the transactions. Defendant Durgarian further stated that Cardinal should not be told about the delay and that PFTC would not bear the cost of making up the shortfall, even though he and each other Defendant knew that the harm to other fund shareholders would exceed one penny per share.

44.     Later on January 5, 2001, after the planning meetings among Defendants concluded, defendant Hogan began coordinating the transactions that Defendants had discussed and agreed to execute for the purpose of concealing and covering-up the one-day delay.

45.     First, defendant Hogan caused PFTC's trust operations and fund accounting units to reverse the January 2, 2001 sales of mutual fund shares owned by the then-existing Cardinal

12

DC Plans and then resell those same shares as of January 3, 2001, at a higher NAV. This transaction affected four Putnam mutual funds: the George Putnam Fund of Boston, the Asset Allocation Fund: Growth Portfolio, the Asset Allocation Fund: Balanced Portfolio, and the Asset Allocation Fund: Conservative Portfolio. By switching the dates of sales in these four mutual funds, Defendants generated proceeds of approximately $450,000 for the Combined Plan. The proceeds came at the expense of the other shareholders in the four Putnam mutual funds.

46.    Next, defendant Hogan caused PFTC's trust operations and fund accounting units to sell approximately 16,900 shares of the Putnam International Growth Fund that had been purchased in the Combined Plan's account on January 3, 2001. In spite of market increase for domestic securities on January 3, 2001, the NAV for the Putnam International Growth Fund had decreased from January 2 to January 3, 2001. Because of the decrease, the Combined Plan had purchased approximately 16,900 more shares in the Putnam International Growth Fund at the lower January 3 NAV than it would have been able to purchase at the higher January 2 NAV. By selling the additional 16,900 shares out of the Combined Plan's account, Defendants generated proceeds of approximately $410,000.

47.    Finally, defendant Hogan caused PFTC to reverse the January 3, 2001 purchases of the Research Fund shares by the Combined Plan. With the objective of re-purchasing the total number of that the Combined Plan would have had if PFTC had executed the purchases on January 2, 2001, defendant Hogan caused PFTC to re-purchase approximately 2,039,000 shares of the Research Fund as of January 2, 2001, approximately 920,000 shares as of January 3, 2001, and approximately 53,000 shares as of January 5, 2001.

13

48.     The gross loss to the Research Fund from these transactions was more than $2.7
million or 1.9 cents per share. Defendants offset a portion of this loss by using approximately
$860,000 of the cash Defendants generated from reversing the sales of shares of the four Putnam
mutual funds and selling the Combined Plan's shares of the Putnam International Growth Fund.

49.     The remaining net loss to the Research Fund (and its other shareholders) was
approximately $1.9 million or 1.3 cents per share. Defendants did not compensate the Research
Fund for this loss.

50.     Each of the transactions coordinated by defendant Hogan beginning on January 5,
2001 had been discussed and agreed-upon among all of Defendants during one or more meetings
earlier on or about January 5, 2001. Defendants further were aware that the impact of the "as of"
trades in the Research Fund would be a loss of more than one penny per share.

51.     None of Defendants disclosed the one-day delay or the scheme to conceal it to
Cardinal, to the Combined Plan or to participants in the Combined Plan. Similarly, none of
Defendants disclosed the one-day delay or the scheme to conceal it to any of the Putnam mutual
funds that were harmed by the "as of" trades, to the trustees of the mutual funds or to the mutual
funds' shareholders.

## Defendants Effect Accounting Adjustments
## To Conceal the Effect of Backdated Trades

52.     During one or more meetings on or about January 5, 2001, attended by each of
Defendants, defendant Durgarian also discussed with defendants Hogan and McCracken the
possibility of identifying ways to adjust the accounting for the Research Fund to hide the
remaining $1.9 million (or 1.3 cent per share) loss caused by the "as of" trade.

14

53.     During the relevant period, the Research Fund paid expenses from its net assets.
A portion of each expense was accrued on a periodic basis. From time to time, personnel in
PFTC's fund accounting unit reviewed the accruals to ensure they matched the actual expenses of
the fund. If there were discrepancies, personnel in the fund accounting unit typically made an
adjustment to the accruals. If the actual expenses were higher, the accruals would be increased
and the amount of Research Fund assets would be reduced by the amount of the increased
accrual. If actual expenses were lower, the expense accrual would be decreased, which would
make the pool of Research Fund assets larger.

54.     During one or more meetings on or about January 5, 2001, attended by each of
Defendants, defendant Durgarian directed defendant McCracken to cause personnel in the fund
accounting unit to analyze the expense accruals of the Research Fund to generate decreased
accruals and a corresponding increase in fund assets. The purpose of increasing the fund assets
was to cause the Research Fund's NAV to rise to conceal the NAV dilution caused by the "as of"
trade. Defendant McCracken agreed to "take care of it."

55.     On or about January 5, 2001, defendant McCracken directed an employee in
PFTC's fund accounting unit, who had also attended one or more meetings about the one-day
delay on January 5, 2001, to review the Research Fund expense accruals to identify expense
accrual adjustments that would result in a gain to at least partially offset the "as of" trading. The
employee reviewed the expense accruals and reported to defendant McCracken that she was
unable to identify sufficient adjustments to bring the net loss to the Research Fund below one
penny per share. Undeterred, defendant McCracken instructed the employee to find additional

15

adjustments anyway, responding: "Wrong answer. Go back. You can always find something with the expenses."

56.     In the early afternoon of January 5, 2001, the fund accounting employee identified adjustments that would decrease the expense accruals and therefore increase Research Fund's assets. She reported this information to defendant McCracken, and she and defendant McCracken then reported this information to the other Defendants. Defendant Durgarian expressed approval of the fund accounting employee's work, saying that "accountants are magicians." Following further discussion among Defendants, the fund accounting employee was instructed to delay the implementation of the expense adjustments, so that the adjustments would hit the books at the same time as the "as of" trades of the Research Fund shares. The purpose and effect of coordinating the timing was to force the total NAV change in the Research Fund -- netting the positive effect of the expense accrual adjustments against the negative effect of the "as of" trades -- to be less than one penny per share.

57.     At least some of the accrual adjustments were unwarranted and inappropriate, and all were executed with an improper motive and purpose. Nonetheless, when the accrual adjustments were netted against the "as of" trades, the net loss to the Research Fund fell to .96 cents per share.

## Defendants Attempt to Induce Franklin Resources, Inc. to Also Improperly Backdate Trades

58.     During one or more meetings on or about January 5, 2001, attended by each of Defendants, Defendants also discussed that the Combined Plan lost approximately $1 million of market appreciation from PFTC's one-day delay in investing in the Franklin Small Cap Fund,

16

which was a Franklin Resources Inc. ("Franklin") mutual fund, not a Putnam mutual fund. On or about January 5, 2001, Defendants agreed that PFTC employees, including defendant Hogan, would contact Franklin to attempt to have Franklin execute trades retroactively in the Franklin Small Cap Fund using the January 2 NAV, just as PFTC was planning to do with the Research Fund. After defendant Hogan and others contacted Franklin, Franklin refused to execute a backdated "as of" trade.

59.     On January 8, 2001, defendant Durgarian personally contacted a more senior Franklin employee to attempt to persuade Franklin to reconsider its refusal to backdate trades in the Franklin Small Cap Fund. Again, Franklin refused.

60.     Franklin told PFTC, including defendants Durgarian and Hogan, that its reason for not executing backdated "as of" trades was that other shareholders of the Franklin Small Cap Fund would bear the potential $1 million cost that would result from backdating the January 3 purchases to January 2, 2001.

61.     None of Defendants disclosed to Cardinal or to the Combined Plan that the Combined Plan had received January 3 NAVs for its trades in the Franklin Small Cap Fund or that the failure to trade at the lower January 2 NAV caused the Combined Plan to miss out on $1 million in market appreciation.

### Defendants Childs, Crain, Papa and Durgarian Continue to Cover Up The Scheme

62.     On or about each of January 18, 2002 and February 7, 2003, PFTC's outside auditor was conducting audits of the internal controls of the defined contribution plan servicing unit of PFTC for the years ended 2001 and 2002, respectively (the "Audits").

17

63.    In January 2001, defendant Childs was head of the compliance department at

PFTC. In January 2002 and February 2003, defendant Childs was head of several units of PFTC,

including the new business implementation unit.

64.    As a result of the meetings she attended on January 4 and 5, 2001, defendant

Childs knew about the one-day delay in investing the assets of the Combined Plan. She further

knew about transactions to cover up the delay, including the trade reversals, sales and "as of"

trades, the impact of these transactions on Putnam mutual funds, the expense accrual

adjustments, and the penny-per-share policy. She further knew about the failure to disclose the

one-day delay, its impact and the transactions to conceal and cover it up. She also knew that

PFTC failed to compensate the Combined Plan or any Putnam mutual fund for any loss caused

by the transactions.

65.    Despite her knowledge and participation in Defendants' fraudulent scheme, on or

about each of January 18, 2002 and February 7, 2003, defendant Childs falsely certified in

connection with the Audits that she was "unaware of any uncorrected errors, frauds or illegal acts

attributable to" PFTC that had affected its clients. These false certifications concealed

Defendants' conduct described herein from PFTC's outside auditors.

66.    As a result of the meetings he attended on January 4 and 5, 2001, defendant Crain

knew about the one-day delay in investing the assets of the Combined Plan. He further knew

about transactions to cover up the delay, including the trade reversals, sales and "as of" trades,

the impact of these transactions on Putnam mutual funds, the expense accrual adjustments, and

the penny-per-share policy. He further knew about the failure to disclose the one-day delay, its

impact and the transactions to conceal and cover it up. He also knew that PFTC failed to

18

compensate the Combined Plan or any Putnam mutual fund for any loss caused by the transactions.

67.     Despite his knowledge and participation in Defendants' fraudulent scheme, on or about each of January 18, 2002 and February 7, 2003, defendant Crain falsely certified in connection with the Audits that he was "unaware of any uncorrected errors, frauds or illegal acts attributable to" PFTC that had affected its clients. These false certifications concealed Defendants' conduct described herein from PFTC's outside auditors.

68.     As a result of the meetings she attended on January 4 and 5, 2001, defendant Papa knew about the one-day delay in investing the assets of the Combined Plan. She further knew about transactions to cover up the delay, including the trade reversals, sales and "as of" trades, the impact of these transactions on Putnam mutual funds, the expense accrual adjustments, and the penny-per-share policy. She further knew about the failure to disclose the one-day delay, its impact and the transactions to conceal and cover it up. She also knew that PFTC failed to compensate the Combined Plan or any Putnam mutual fund for any loss caused by the transactions.

69.     Despite her knowledge and participation in Defendants' fraudulent scheme, on or about each of January 18, 2002 and February 7, 2003, defendant Papa falsely certified in connection with the Audits that she was "unaware of any uncorrected errors, frauds or illegal acts attributable to" PFTC that had affected its clients. These false certifications concealed Defendants' conduct described herein from PFTC's outside auditors.

70.     Beginning in 2002, defendant Durgarian was a Principal Executive Officer of, among other funds, the Research Fund, the George Putnam Fund of Boston, the Putnam Asset

19

Allocation Fund: Growth Portfolio, the Putnam Asset Allocation Fund: Balanced Portfolio, and the Putnam Asset Allocation Fund: Conservative Portfolio. As a fund officer, defendant Durgarian had a fiduciary duty to act in the best interests of the shareholders of the Putnam mutual funds.

71.     As a result of the meetings he attended on January 5, 2001, defendant Durgarian knew about the one-day delay in investing the assets of the Combined Plan. He further knew about transactions to cover up the delay, including the trade reversals, sales and "as of" trades, the impact of these transactions on Putnam mutual funds, the expense accrual adjustments, and the penny-per-share policy. He further knew about the failure to disclose the one-day delay, its impact and the transactions to conceal and cover it up. He also knew that PFTC failed to compensate the Combined Plan or any Putnam mutual fund for any loss caused by the transactions. Defendant Durgarian further had directed that none of this be disclosed to the Combined Plan and that PFTC not compensate the Combined Plan or any Putnam mutual fund for any loss incurred. Despite his knowledge, defendant Durgarian repeatedly falsely certified that he had "disclosed to each registrant's auditors and the audit committee of each registrant's board of directors . . . any fraud, whether or not material, that involves management or other employees who have a significant role in each registrant's internal controls." Defendant Durgarian made such certifications on or around September 27, 2002, November 25, 2002 (3 separate certifications), March 26, 2003, May 27, 2003, September 23, 2003, and August 20, 2003. Defendant Durgarian caused each such certification to be filed with the Commission. In fact, no such disclosures were ever made. These false certifications as well as the lack of disclosure itself concealed Defendants' conduct described herein.