UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(Boston Division)

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>v.<br><br>KARNIG H. DURGARIAN, JR.,<br>DONALD F. McCRACKEN,<br>RONALD B. HOGAN, VIRGINIA A. PAPA,<br>KEVIN F. CRAIN, and SANDRA G. CHILDS,<br><br>                    Defendants. | Civil Action No.  05-12618 (NMG)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF DEFENDANT SANDRA G. CHILDS IN SUPPORT OF HER
MOTION TO DISMISS THE COMPLAINT**

Greenberg Traurig, LLP
One International Place
Boston, MA 02110

*Counsel for Sandra G. Childs*

DATED:  March 31, 2006

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................1

BACKGROUND..............................................................................3

ALLEGED VIOLATIONS...................................................................5

ARGUMENT.................................................................................5

I.  THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH
    RELIEF CAN BE GRANTED..........................................................5

II. THE COMPLAINT FAILS TO STATE A CLAIM AGAINST MS.
    CHILDS FOR VIOLATION OF SECTION 17(a) OF THE SECURITIES
    ACT, SECTION 10(b) OF THE EXCHANGE ACT, AND RULE 10b-5
    THEREUNDER...........................................................................7

    A.  The Complaint Fails to Attribute Any Material Misstatements
        To Ms. Childs........................................................................8

        1.  Ms. Childs' attendance at meetings held on January 4-5,
            2001 does not create liability under Section 10(b) of the
            Exchange Act and Section 17(a) of the Securities Act.........8

        2.  Ms. Childs' signatures on two letters in 2002 and 2003
            are not in connection with the offer, purchase, or sale of a
            security............................................................................10

        3.  The Complaint fails to attribute any material omission to
            Ms. Childs........................................................................12

    B.  The Complaint Fails To Sufficiently Allege Facts To Show The
        Existence Of A Fraudulent Scheme And That Ms. Childs
        Substantially Participated In Such A Scheme...........................13

        1.  Ms. Childs is not alleged to have participated in the
            purported "scheme to defraud" in January 2001.............14

        2.  Ms. Childs' signatures on the 2002 and 2003 SAS 70
            letters are not "in furtherance" of the purported January
            2001 scheme.....................................................................16

i

C.      The Complaint Fails To Allege Facts To Show That Ms. Childs
        Acted Recklessly or With Scienter......................................17

III.    THE COMPLAINT FAILS TO SUFFICIENTLY ALLEGE FACTS
        THAT MS. CHILDS AIDED AND ABETTED THE ALLEGED
        FRAUDULENT SCHEME.........................................................20

        A.      Ms. Childs Is Not Alleged To Have Provided Any "Substantial
                Assistance."...........................................................................21

        B.      Ms. Childs Is Not Alleged To Have "Actual Knowledge" Of
                The Alleged Fraud..............................................................22

IV.     THIS COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE......24

CONCLUSION...........................................................................24

## TABLE OF AUTHORITIES

### CASES

Aaron v. SEC, 446 U.S. 680 (1980) ................................................................7

Basic v. Levinson, 485 U.S. 224 (1988)........................................................12

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).........................................11

Brumbaugh, et al. v. Wave Systems Corporation, et al.,
  2006 U.S. Dist. Lexis 725 (D.Mass. 2006).........................................6, 12, 17

Cleary v. Perfectune, 700 F.2d 774 (1st Cir. 1983) ................................................20

Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999)...........................................6

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976)........................................7, 8, 12, 14, 17

In re Galileo Corp. Shareholders Litig., 127 F. Supp.2d 251 .......................................17, 18

Garvey, et al. v. Arkoosh, et al., 354 F. Supp.2d 73
  (D. Mass. 2005) ......................................................6, 7, 13, 17, 18

Geffon, et al. v. Micrion Corp., et al., 249 F.3d 29 (1st Cir. 2001) ............................17, 18

Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999).....................................6, 8, 17

Gross v. Summa Four, Inc., 93 F.3d 987 (1st Cir. 1996)................................................8, 19

In Re Global Crossing, Ltd. Sec. Litig., 322 F. Supp.2d 319
  (S.D.N.Y. 2004)................................................................9

In Re Lernout & Hauspie Sec. Litig. v. Lernout, 230 F. Supp.2d 152
  (D. Mass. 2002) ............................................9, 14, 15, 16, 17, 19

In Re Scholastic Corp. Sec. Litig., 252 F.3d 63 (2nd Cir. 2001).........................................9

Maldonado v. Dominguez, 137 F.3d 1 (1st Cir. 1998)................................................17, 18

Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005) ................................................6

Pegasus Holdings, L.P., et al. v. Veterinary Centers of America, Inc.,
  38 F. Supp.2d 1158 (C.D. Ca. 1998) ........................................16, 22

Rozanski v. Fleet Bank of New Yor, et al., 1996 U.S. Dist. LEXIS 9162 ........................11

Santa Fe Industries, Inc., v. Green, 430 U.S. 462 (1977) ....................................................14

The Roots Partnership, et al. v. Lands' End, Inc., et al., 965 F.2d 1411
    (7th Cir. 1992).........................................................................................................11

SEC v. Adoni, et al., 60 F. Supp.2d 401 (D.N.J. 1999) ......................................................11

SEC v. DCI Telecommunications, Inc., et al., 122 F. Supp.2d 495
    (S.D.N.Y. 2000) ................................................................................................12, 22

SEC v. Druffner, 353 F. Supp.2d 141 (D. Mass. 2005).....................5, 6, 15, 19, 20, 23, 24

SEC v. Fife, 311 F.3d 1 (1st Cir. 2002) ..............................................................................17

SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2nd Cir. 1996) ..............................................9

SEC v. Graystone Nash, Inc., 820 F. Supp. 863 (D.N.J. 1993)............................................7

SEC v. KPMG, LLP, et al., 2006 U.S. Dist. LEXIS 1283 (S.D.N.Y. 2006) ........................9

SEC v. Kushner Promotions, Inc., 2006 U.S. Dist. LEXIS 6466
    (S.D.N.Y. 2006) ........................................................................................15, 21, 22

SEC v. Peretz, 317 F. Supp.2d 58 (D. Mass. 2004)................................................20, 21, 22

SEC v. PIMCO Advisors Fund Management, LLC, 341 F. Supp.2d 454
    (S.D.N.Y. 2004).......................................................................................8, 9, 10, 11, 12

SEC v. Santos, 355 F. Supp.2d 917 (N.D. Ill. 2003) ..........................................................14

SEC v. Tambone, 2006 U.S. Dist. LEXIS 8120 ..........7, 8, 9, 10, 11, 13, 14, 20, 21, 23, 24

SEC v. Zanford, 535 U.S. 813 (2002)..................................................................................14

TicketMaster-New York, Inc. v. Alioto, 26 F.3d 201 (1st Cir. 1994) ....................................6

Wright v. Ernst & Young, LLP, 152 F.3d 169 (2nd Cir. 1998)..................................8, 9, 12

## <u>STATUTUES & RULES</u>

15 U.S. C. § 77q(a) ......................................................................................5, 7, 8, 11, 12, 20

15 U.S.C. § 78j...............................................3, 5, 7, 8, 9, 11, 12, 16, 17, 20, 21, 22, 23

15 U.S.C. § 80a-33(b) ..........................................................................................................5

15 U.S.C. § 80a-36 ..............................................................................................................5

17 C.F.R. § 240.10b-5..............................................5, 7, 11, 12, 13, 17, 20, 21, 22, 23

F.R.C.P. 12(b)(6) ................................................................................................5, 6, 17

F.R.C.P. 9(b) .............................................................................6, 8, 14, 15, 16, 17, 23, 24

Defendant Sandra G. Childs ("Childs"), formerly employed as a Managing Director of Defined Contribution Support Services with Putnam Fiduciary Trust Company ("PFTC"), a subsidiary of Putnam Investments, Inc. ("Putnam"),[1] respectfully submits this memorandum of law in support of her motion to dismiss the Complaint filed against her by the Securities and Exchange Commission ("Commission") on December 30, 2005, alleging violations of various anti-fraud statutes in the federal securities laws.

## PRELIMINARY STATEMENT

The Commission alleges that on January 2, 2001, assets for the defined contribution plans of Cardinal Health, Inc. and Allegiance Corporation (the "Combined Plan") were transferred to PFTC for investment into a Putnam "fund of funds" financial product,[2] but that PFTC wrongfully delayed investing those assets until January 3, 2001, thereby depriving the Combined Plan of nearly $4 million in market appreciation.

The Commission further alleges that to conceal this one day delay, PFTC and its officers improperly backdated certain mutual fund trades (commonly referred to as "as of" trades) and improperly made accounting adjustments in the expenses of certain Putnam funds. According to the Commission, these backdated trades, and the accounting adjustments to the various Putnam mutual funds, had the effect of shifting the approximately $4 million in costs from PFTC to the

---

[1]       Putnam Investments, Inc. is in turn a subsidiary of Marsh McLennan, Inc. *See* December 31, 2004 Marsh & McLennan Companies, Inc. Form 10-K for fiscal year ending December 31, 2004. PFTC provides, among other things, "administrative and trustee (or custodial) services including participant accounting, plan administration, and transfer agent services for employee benefit plans (in particular defined contribution 401(k) plans, IRA's and other clients…" Id.

[2]       The "fund of funds" financial product is essentially an umbrella fund that holds a group of underlying mutual funds, which in turn hold the underlying investments in securities. It is the two-tier construction and application of this product that caused the one-day investment delay referenced above.

1

Combined Plan and to certain Putnam mutual funds, resulting in the "dilution"[3] of the altered

Putnam mutual funds. As a result, the net asset value ("NAV") of those altered Putnam mutual

funds was materially misstated from January 2001 until February 2004. The Commission alleges

that this scheme was planned, discussed, and implemented by Defendants during a series of

meetings on January 4-5, 2001.

The underlying basis for the Commission's claims against Ms. Childs is simply that she

attended some undefined portion of the January 4-5, 2001 meetings and that, independent of

those events, over one year later, she affixed her signature to a letter to an accountant who was

reviewing PFTC's internal controls (not an accountant conducting a public audit). Ms. Childs is

not alleged to have done anything else. For those acts, the Commission charges that Ms. Childs

is guilty of securities fraud. These claims must fail. The Commission does not, and cannot,

attribute <u>any</u> alleged misstatements directly to Ms. Childs; it does not allege that Ms. Childs was

primarily responsible for the creation of any alleged misstatements made to Cardinal in January

2001; and it does not allege that Ms. Childs made any misstatements to any of the Putnam

mutual funds or their shareholders. Although this Court has instructed the Commission in

similar past cases that more is needed, the Commission still opted to pursue its claims against

Ms. Childs. As a result, Ms. Childs respectfully requests that this Court dismiss the

Commission's Complaint with prejudice.

Nor does the Commission make the required strong showing of scienter as to Ms. Childs.

Again, as this Court has emphatically instructed us in the past, scienter cannot be plead in the

First Circuit through conclusory allegations and bare inferences that a defendant "must have had

---

[3]   "Dilution" is the effect of a drop in earnings per share or book value per share, caused by the potential conversion of securities or by the potential exercise of warrants or options. *See* Rosenberg, Jerry M., *The Essential Dictionary of Investing & Finance*, Barnes & Noble Books (2004).

knowledge of the facts." This Court has made it known that it will not countenance complaints

that "offer too little" and fail to demonstrate the requisite fraudulent intent.

Finally, the Commission contends that Ms. Childs aided and abetted PFTC's uncharged

violations of the federal securities laws. As a threshold matter, the Complaint fails to allege facts

sufficient to establish a primary violation of Section 10(b) by PFTC. Even if the Commission

had adequately plead facts to support a primary violation of Section 10(b), (which it has not), the

Complaint does not allege any facts to show that Ms. Childs "knowingly provided substantial

assistance" in that primary violation -- i.e., that her acts proximately caused the harm on which

primary liability is predicated. Accordingly, the Commission's claim of aiding and abetting

must be dismissed.

## BACKGROUND

Ms. Childs worked for Putnam for approximately thirteen (13) years. She began her

employment with Putnam in July 1991 as the Vice President of Shareholder Services. Ms.

Childs remained in that position until 1994, when she became the Vice President of Business

Improvement. In 1996, Ms. Childs became the Senior Vice President of Product Support and

Development and remained in that position until 1999, when she became the Managing Director

of Defined Contribution Plan Administration ("DCPA") in charge of conversions and product

support and development. In that role, Ms. Childs' job responsibilities included overseeing

various groups and departments within DCPA that primarily dealt with the mechanics of

physically converting the administration of defined contribution plans to Putnam's processes and

systems. In January 2001, these groups included the following:

- Product Support and Product Development, which were responsible for user acceptance
  testing for all the Defined Contribution systems and implementation tasks on a day-to-
  day basis.

- <u>New Business Implementation</u>, which was a group responsible for converting new benefit plans into the Putnam system, as well as deconversion of outgoing plans, among other things.

- <u>Reporting and Testing</u>, which conducted non-discrimination testing and assistance with annual tax reporting; and

- <u>Compliance and Consulting for DCPA</u>, which was transferred under Ms. Childs purview in late 2000. This group had very limited compliance functions and dealt almost exclusively with qualified 401(k) plan and pension documents and the administration of those plans. Specifically, the group was responsible for making sure that all proposed changes to the plans complied with ERISA and IRS regulations to ensure the plan remained qualified.[4]

At no time during the relevant period did Ms. Childs oversee any groups that directly communicated with any of the defined contribution benefit plans as part of its primary function.[5] That function was entrusted to the Client Services group, which was not under Ms. Childs' supervision. Client Services was the front line in communicating with defined contribution clients, including the Cardinal Health Plan.

Ms. Childs was laid off from Putnam in July, 2004, when her job position was eliminated. The termination was entirely unrelated to the events presently at issue. In fact, Putnam conducted its own internal investigation after learning of the Cardinal Health Plan funding and conversion issue, and although a number of employees were fired by Putnam because of their alleged involvement with the Cardinal Health Plan funding alterations, **Ms.**

---

[4]     The Complaint misleadingly states that "in January 2001, defendant Childs was head of the compliance department at PFTC" and "had overall responsibility" for compliance at PFTC. *See* <u>Complaint</u> ¶¶ 14, 63. Ms. Childs was the head of Compliance and Consulting for DCPA, a position which was transferred under her purview in late 2000. The DCPA compliance department had very limited and specific compliance functions which are distinct from what one would typically expect from a "compliance department." The group's responsibilities were exclusively limited to providing timely updates to clients regarding legislative and regulatory changes. Simply put, the group was responsible for making sure that all plans complied with ERISA and IRS regulations to ensure that the plan remained "qualified." The majority of the compliance aspects which are at issue in this matter were handled by Putnam's Legal Department.

[5]     During the conversion process, the New Business Implementation Group would communicate with the defined contribution plans regarding the conversion of the defined contribution plan to Putnam. However, once the plan conversion was completed, the New Business Implementation Group would have no further contact.

4

Childs was notably not fired or even reprimanded by Putnam in even the slightest manner in connection with PFTC's investigation and remediation of this incident.[6]

## ALLEGED VIOLATIONS

Based on these allegations, the Complaint alleges that each of the Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.[7]   In addition, the Complaint alleges that each of the Defendants aided and abetted PFTC's violations of Section 10(b) of the Exchange Act and Rule 10b-5.  For these alleged violations, the Commission seeks an injunction against future violations and an unspecified amount of civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) [15 U.S.C. §§ 77t(d) and 78u(d)(3)].

## ARGUMENT

### I.   THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

A court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") when it appears, beyond doubt, that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *See* Securities and Exchange Commission v. Druffner, 353 F. Supp.2d 141, 147 (D. Mass. 2005).  While dismissal under Rule 12(b)(6) is subject to a strict standard, "plaintiffs complaint must rest on more than

---

[6]     The Commission announced that it would not bring any enforcement action against PFTC because of its "swift, extensive and extraordinary cooperation" in the Commission's investigation of the transactions that are the subject of the Complaint. *See* SEC Litigation Release No. 19517 (January 3, 2006). The Commission noted that PFTC's cooperation included, *inter alia,* (1) prompt self-reporting; (2) an independent internal investigation; (3) sharing the results of the investigation with the government (which included not asserting any applicable privileges and protections with respect to written materials furnished to the Commission staff); and (4) terminating and otherwise disciplining responsible wrongdoers. Id. Ms. Childs was included in this expansive investigation and, tellingly, was cleared of any wrongdoing.

[7]     The Complaint also alleges violations of Section 34(b) and Section 37 of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-33(b); 15 U.S.C. § 80a-36], against Defendant Durgarian individually.

conclusory allegations or farfetched inferences to survive a motion to dismiss." *See* <u>Cooperman</u> v. <u>Individual, Inc.</u>, 171 F.3d 43, 46 (1st Cir. 1999) (quoting <u>TicketMaster-New York, Inc. v. Alioto</u>, 26 F.3d 201, 203 (1st Cir. 1994); *see also* <u>Mezibov v. Allen</u>, 411 F.3d 712, 716 (6th Cir. 2005) (noting that unwarranted factual deductions, inferences, and legal conclusions "masquerading as facts" will not defeat a motion to dismiss).

To survive a motion to dismiss, claims alleging fraud must also comply with the strict pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. In the First Circuit, that standard for the Commission is nearly identical to that of the Private Securities Litigation Reform Act of 1995 [15 U.S.C. § 78u-4]. *See* <u>Garvey, et al. v. Arkoosh, et al.</u>, 354 F. Supp.2d 73, 80 (D. Mass. 2005) (noting that the pleading requirements for Rule 9(b) and the PSLRA are nearly identical). As such, this Court interprets Rule 9(b) to require that the complaint allege the "time, place, and content of the alleged misrepresentations with specificity." *See* <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 193 (1st Cir. 1999) (noting the complaint must specify (1) the allegedly fraudulent statements; (2) the identity of the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent).

The First Circuit has been notably strict and rigorous in applying the Rule 9(b) standard to securities fraud actions. Furthermore, the Complaint must also plead specific facts giving rise to a "strong inference" of fraudulent intent. *See* 15 U.S.C. § 78u-4(b)(3)(A) (2005); *see also* <u>SEC v. Druffner</u>, 353 F. Supp.2d at 150 (noting that while some circuits look for motive and opportunity when evaluating allegations of scienter, the First Circuit uses a fact-specific inquiry); *see also* <u>Brumbaugh, et al. v. Wave Systems Corporation, et al.</u>, 2006 U.S. Dist. LEXIS 725, *13-*14 (D. Mass. 2006) (noting that while a court continues to draw all reasonable inferences to plaintiffs in a 12(b)(6) motion to dismiss, those inferences supporting scienter must be strong

ones).  The failure of a complaint to comply with these pleading requirements mandates

dismissal.  *See* Garvey, et al., 354 F. Supp.2d at 80.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST MS. CHILDS FOR VIOLATION OF SECTION 17(a) OF THE SECURITIES ACT, SECTION 10(b) OF THE EXCHANGE ACT, AND RULE 10b-5 THEREUNDER.

The Complaint alleges that Ms. Childs committed primary violations of Section 17(a) of

the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

thereunder.  *See* Complaint at ¶¶ 76-83.  The elements of an action for securities fraud under

Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act are substantially the

same under the Supreme Court precedents.  *See* SEC v. Tambone, 2006 U.S. Dist. LEXIS 8120,

*8 (D. Mass. 2006) (citing Aaron v. SEC, 446 U.S. 680, 695, 100 S. Ct. 1945, 64 L. Ed.2d 611

(1980); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196, 96 S. Ct. 1375, 47 L. Ed.2d 668 (1976).[8]

Accordingly, to succeed on its claims, the Commission must show that Ms. Childs

engaged:

1)   in fraudulent conduct;

2)   in connection with the purchase or sale of securities;

3)   through the means or instruments of transportation or communication in interstate commerce or the mails; and

4)   with the requisite scienter.

Id. (citing SEC v. Graystone Nash, Inc., 820 F. Supp. 863, 870-71 (D.N.J. 1993)).  The

Commission has failed to allege facts to support these claims.

---

[8]   With respect to Section 17(a)(1), essentially the same elements must be established in connection with the "offer or sale" of a security as for Section 10(b) and Rule 10b-5 liability.  *See* Aaron v. SEC, 446 U.S. at 681. Scienter, however, need not be established for the SEC to obtain an injunction under Sections 17(a)(2) and 17(a)(3). Id.

### A.   The Complaint Fails To Attribute Any Material Misstatements to Ms. Childs.

The pleading requirements of Rule 9(b) as interpreted by the First Circuit mandate, at the very least, that the Commission plead with particularity those statements it alleges were fraudulent. *See* Fed. R. Civ. P. 9(b); *see also* Greebel, 194 F.3d at 193 (noting the strict and rigorous application of Rule 9(b) in securities fraud actions). Fraud, as defined by the securities laws, requires (1) an untrue statement of material fact; (2) the omission of a fact that rendered a prior statement misleading; or (3) the commission of a manipulative or deceptive act as part of a scheme to defraud. Id. at *9 (citing Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996)) (superseded by statute on other grounds).

### 1.   Ms. Childs' attendance at meetings held on January 4-5, 2001 does not create liability under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act.

In order to be liable for a primary violation of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act, a defendant "must have personally made either an allegedly untrue statement or a material omission." *See* Tambone, 2006 U.S. Dist. LEXIS 8120 at *10 (citing Wright v. Ernst & Young, LLP, 152 F.3d 169, 175 (2nd Cir. 1998) (noting that a defendant must actually make a false or misleading statement in order to be held primarily liable under Section 10(b)); *see also* SEC v. PIMCO Advisors Fund Managemeny, LLC, 341 F. Supp.2d 454, 466 (S.D.N.Y. 2004) (discussing liability under Section 10(b) of the Exchange Act).[9] Although some courts have held that a defendant may incur liability under Section 10(b) for a false statement not directly attributable to him/her, this has only occurred where the

---

[9]     In PIMCO, the court dismissed the primary Section 10(b) claims against defendant Kenneth Corba, the CEO of PEA Capital, LLC, which acted as an investment advisor to the PIMCO Funds, and the manager of two of the PIMCO funds, concluding that the complaint failed to assert that he had primary responsibility for the development or communication of any of the misleading statements. See PIMCO, 341 F. Supp.2d at 466-67. The court explained that, even though Mr. Corba was an executive of the company, he (1) had not "personally made misleading statements"; (2) was not "primarily responsible for communications with investors"; and (3) did not "personally [draft] the misleading disclosures..." Id.

defendant's participation was substantial enough so that he/she was deemed to have made the statement. *See* <u>SEC v. KPMG, LLP, et al.</u>, 2006 U.S. Dist. LEXIS 1283, *70 (S.D.N.Y. 2006) (noting that, in an SEC enforcement action, there is no requirement that a misstatement have been publicly attributed to a defendant for liability to attach, at least so long as the SEC is able to show that the defendant was <u>sufficiently responsible for the statement</u> -- in effect, caused the statement to be made -- and knew or had reason to know that the statement would be disseminated to investors).[10]

  This same issue was recently before this Court in <u>Tambone</u>, where the Court dismissed the primary Section 10(b) claims against defendants James Tambone and Robert Hussey, senior executives at Columbia Funds Distributor, Inc., a broker-dealer registered with the SEC, concluding that the complaint did not allege that defendants made any untrue or misleading statements of material fact with regard to the dissemination of prospectuses for Columbia Funds. *See* <u>Tambone</u>, 2006 U.S. Dist. LEXIS 8120 at *12-*16.  In doing so, the Court relied upon <u>Wright</u> and its progeny (including <u>PIMCO</u>), and concluded that the Commission failed to allege any facts to show that defendants played a role in preparing, drafting, or signing the allegedly misleading prospectuses.  <u>Id.</u> (noting that when a complaint omits facts that, if they existed, would clearly dominate the case, it is fair to assume that those facts do not exist).

---

[10] *See e.g.* <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1471 (2nd Cir. 1996) (imposing primary liability on CEO who had "hands-on involvement in the pertinent decisions" that facilitated the fraudulent scheme); <u>In Re Scholastic Corp. Sec. Litig.</u>, 252 F.3d 63 (2nd Cir. 2001) (imposing primary liability on vice president of company where he was "primarily responsible for Scholastic's communications with investors and industry analysts" and was "involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by Scholastic"); <u>In Re Global Crossing, Ltd. Sec. Litig.</u>, 322 F. Supp.2d 319, (S.D.N.Y. 2004) (noting plaintiff adequately alleged primary liability against Arthur Andersen, LLP, where public knew that Andersen was the company's auditor, and it was alleged that Andersen prepared, directed, controlled, helped create, or materially assisted in preparing the false financial disclosures made to the public); <u>In Re Lernout & Hauspie Sec. Litig.</u>, 230 F. Supp.2d 152, 166-67 (D. Mass. 2002) (refusing to dismiss claims against auditor where auditor's role was widely disseminated to the public and it was "appropriate to infer that investors reasonably attributed the statements" to the auditor).  Ms. Childs conduct in the present case stands in marked contrast to that of defendants' in the above-referenced matters, each of whom were alleged to have been centrally involved in the planning and execution of the fraudulent schemes at issue in those cases.  Ms. Childs performed no such functions in this case, nor has the Commission alleged facts to the contrary.

The holdings in <u>Tambone</u> and <u>PIMCO</u> are particularly relevant to this matter, where the Commission does not, and cannot, attribute <u>any</u> of the alleged misstatements or purported fraudulent activities occurring in January 2001 to Ms. Childs. Indeed, as the Managing Director of Deferred Compensation Plan Administration at PFTC, Ms. Childs was not responsible for communicating with Cardinal, either directly or indirectly, and was not even in a position to have made any of the alleged misstatements -- and the Complaint does not allege otherwise. The Complaint also does not allege that Ms. Childs was primarily responsible for the creation of any alleged misstatement made to Cardinal in January 2001 or for the creation of any alleged misstatement by any of the Putnam mutual funds with its shareholders in 2001. Despite two years of investigation and countless witness interviews, the Commission does not, and cannot, allege Ms. Childs' active involvement in any of the purported fraudulent activities occurring in 2001.

**2.    Ms. Childs' signatures on two letters in 2002 and 2003 are not in connection with the offer, purchase, or sale of a security.**

The best the Commission can do is allege that more than one year after the transactions at issue in January 2001, Ms. Childs, along with a number of other persons, signed two "SAS 70"[11] letters to Deloitte & Touche, LLP ("Deloitte"), on or about each of January 18, 2002 and February 7, 2003, in furtherance of the purported January 2001 fraudulent scheme. *See* <u>Complaint</u> ¶ 65. Specifically, the Commission focuses on certain language in the letters stating

---

[11]    The SAS 70 was developed by the American Institute of Certified Public Accountants ("AICPA") and "contains the professional standards for auditors to report on the controls of a service organization" such as PFTC. *See* Ernst & Young website, http://www.ey.com/global/Content.nsf/US/AABS_-_TSRS_-_Services_-_SAS_70. "A SAS 70 report is primarily an auditor-to-auditor communication and is designed to provide information and assurance to the auditors of the financial statements of user organizations to enable those auditors to obtain an understanding of the service organization's internal controls." <u>Id.</u> The SAS 70 is <u>not</u> a pre-determined set of control objectives or control activities that service organizations must achieve. *See* http://www.sas70.com/about.htm. Rather, it merely allows a service organization to have its control policies and procedures evaluated and tested by an independent party. <u>Id.</u> Likewise, a SAS 70 examination is <u>not</u> a "checklist" audit. <u>Id.</u>

that Ms. Childs was "unaware of any uncorrected errors, frauds or illegal acts attributable to" PFTC.[12] Id.

Those two letters cannot be credibly construed as being made "in connection with" the offer, purchase, or sale of a security -- a prerequisite for liability under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act. *See* Tambone, 2006 U.S. Dist. LEXIS 8120 at *9 (citations omitted); *see also* Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 755, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975) (Rule 10b-5 proscribes only fraud in connection with the purchase or sale of securities).  Indeed, it is not even clear that the Commission makes this assertion here.

However, if that is indeed what the Commission claims, then that claim must fail because it is beyond cavil for the Commission to assert that Ms. Childs' execution of the SAS 70 letters in 2002 and 2003, occurred "in connection with" the offer, purchase, or sale of a security. *See* PIMCO, 341 F. Supp.2d at 466; *see also* SEC v. Adoni, et al., 60 F. Supp.2d 401, 405 (D.N.J. 1999) (there must be some causal connection between the alleged fraud and the offer, purchase, or sale of a security); *see also* Rozanski v. Fleet Bank of New York, et al., 1996 U.S. Dist. LEXIS 9162, * (N.D.N.Y. 1996) (the "in connection with" requirement is not satisfied if the alleged fraud or misstatement occurred after the purchase or sale of securities) (citations omitted); The Roots Partnership, et al. v. Lands' End, Inc., et al., 965 F.2d 1411, 1420 (7th Cir. 1992) (noting that post-purchase statements cannot form the basis of Rule 10b-5 liability, because the statements could not have affected the price at which the plaintiff actually

---

[12]    These identical form letters were executed in connection with Deloitte's examination of Putnam's description of the DCPA services of PFTC for the period January 1, 2001 through December 31, 2001 and January 1, 2002 through December 31, 2002.  The letters were executed by Virginia A. Papa, Director of Defined Contribution Services, Philippe Bibi, Chief Technology Officer, Senior Managing Director, Ms. Childs, Managing Director, Support Services, and Kevin Crain, Managing Director, Plan Sponsor Services.  A true and accurate copy of the letters are attached hereto as Exhibits A and B.

purchased).  Specifically, to prevail, the Commission must show that the SAS 70 letters were in some way "reasonably calculated to influence the investing public" in its decision to purchase or sell its securities.  *See* SEC v. DCI Telecommunications, Inc., et al., 122 F. Supp.2d 495, 499 (S.D.N.Y. 2000) (noting that the "in connection with" requirement requires a plaintiff to allege that false information was disseminated into the marketplace in a manner reasonably calculated to influence the investing public); *see also* Wright, et al. v. Ernst & Young, LLP, 152 F.3d 169, 175 (2nd Cir. 1998) (noting that because Section 10(b) and Rule 10b-5 focus on fraud made in connection with the purchase or sale of securities, a defendant must "know or should know" that his representation would be communicated to investors) (citations omitted).  That is a scenario that simply does not exist here.

Aptly, if the Commission were indeed to make such an allegation to this Court concerning the two SAS 70 letters, it would be without precedent.  To our knowledge, SAS 70 review letters have **never** formed a basis for an action alleging violations of the securities laws -- and this is not a novel accounting rule.

### 3.    The Complaint Fails To Attribute Any Material Omission to Ms. Childs.

The Commission also alleges that Ms. Childs' "failure to disclose the one-day delay, its impact and the transactions to cover it up" is a material omission in violation of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act.  *See* Complaint ¶¶ 64, 76-79.  This allegation also fails to state a claim as a matter of law and should be dismissed.

A statement or omission will be considered material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  *See* SEC v. PIMCO, 341 F. Supp.2d at 464 (quoting Basic v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed.2d 194, 108 S. Ct. 978 (1988); *see also* Brumbaugh, et al., 2006 U.S. Dist. LEXIS 725 at *15

(noting there must be a reasonable likelihood that a reasonable investor would consider the information omitted important).  With respect to an alleged omission, a finding of materiality is not sufficient in and of itself -- there must also be a duty to disclose.  *See* <u>Garvey, et al.</u>, 354 F. Supp.2d 73, 80 (D. Mass. 2005) (noting that even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it).  Silence, absent a duty to disclose, is not misleading under Rule 10b-5.  *See* <u>Tambone</u>, 2006 U.S. Dist. LEXIS 8120 at *17 (quoting <u>Arkoosh</u>, 354 F. Supp. 2d at 81).

Here, Ms. Childs is not alleged to have made any statements in connection with the events of January 2001.  Moreover, as explained above in Section II(A)(2), any attempt to stretch Ms. Childs' year-later signature back in time to apply to the offer, purchase or sale of securities occurring in January 2001 would be not only without precedent, but straining all credulity and bounds of reason.  Accordingly, the Court should reject any such attempts by the Commission to make such an attenuated inference.

**B.     The Complaint Fails To Sufficiently Allege Facts To Show The Existence Of A Fraudulent Scheme And That Ms. Childs Substantially Participated In Such A Scheme.**

The gravamen of the Commission's Complaint is that all Defendants "knew" about and participated in a "fraudulent scheme" to backdate trades and shift expenses of Putnam mutual funds.  *See* <u>Complaint</u> ¶¶ 76-83.  In support of this contention, the Commission relies solely upon Defendants' attendance at an unspecified number of meetings held on January 4-5, 2001, where the scheme was allegedly "concocted" and "agreed" upon by the Defendants.  <u>Id.</u> at ¶¶ 37, 43.  The Complaint, however, fails to allege <u>any</u> facts to demonstrate both (1) the existence of a fraudulent scheme; and (2) Ms. Childs' substantial participation in the alleged scheme.

1.   **Ms. Childs is not alleged to have participated in the purported "scheme to defraud" in January 2001.**

To adequately plead a scheme to defraud, the Commission must allege facts to show that Defendants did something more than passively sit by, but instead actively and substantively "engaged in a manipulative device or contrivance." *See* Tambone, 2006 U.S. Dist. LEXIS 8120 at *20 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 nn. 20-21 (1976)); *see also* In Re Lernout & Hauspie Sec. Litig. v. Lernout, 230 F. Supp.2d 152, 173 (D. Mass. 2002) (acknowledging that a complaint alleging a fraudulent scheme will withstand a motion to dismiss *only* if it adequately alleges facts to show that the defendant "substantially participated" in the alleged manipulative or deceptive scheme).[13]   In Tambone, this Court held that the Commission's claim did not rise to the level of a scheme to defraud under the Supreme Court's definition and that market timing arrangements were not the kind of "sham transactions" which have been held to qualify as schemes to defraud. *See* Tambone, 2006 U.S. Dist. LEXIS 8120, at *22 (noting that market timing, standing alone, did not constitute a fraudulent device intended to defraud investors).   In doing so, the Court distinguished market timing from the cases cited to by the Commission, all of which involved some device that was clearly illegal.   Id. at *20-*22 (citing SEC v. Zanford, 535 U.S. 813, 122 S. Ct. 1899, 153 L. Ed.2d 1, (2002) (defendant broker-dealer engaged in wire fraud to misappropriate funds from his client' account); SEC v. Santos, 355 F. Supp.2d 917 (N.D. Ill. 2003) (defendants engaged in the bribery of a city treasurer to secure illegally the city's investment business); In Re Lernout, 236 F. Supp.2d at 173-74

---

[13]   The Supreme Court has concluded that "manipulation" is "virtually a term of art when used in connection with securities markets" and "refers generally to practices such as "wash sales, matched orders, or rigged prices that are intended to mislead investors by artificially affecting market activity." *See* In Re Lernout, 236 F. Supp.2d at 170 (citing Santa Fe Industries, Inc. v. Green, 430 U.S 462, 476, 97 S. Ct. 1292, 51 L. Ed.2d 480 (1977)).   While the PSLRA does not specifically address fraudulent scheme claims, Rule 9(b)'s admonition that the circumstances constituting fraud "shall be stated with particularity" applies to allegations of scheme participation.   Id. at 174 (noting the complaint must state with particularity, facts that give rise to a strong inference of scienter, rather than merely a reasonable inference).

(defendants allegedly entered into sham software licensing agreements in order to inflate artificially the companies' profits); *but see* Druffner, 353 F. Supp.2d at 150 (brokers employed manipulative device by opening customer accounts under fictitious names).

Here, the accounting adjustments and "as of" trades at issue are not per se illegal -- rather, they are a known, understood and accepted part of industry practice. Indeed, the Complaint acknowledges the concept of "as of" trades and notes that they "were typically used at PFTC to correct trading errors." *See* Complaint, at ¶ 38.[14] The Complaint also acknowledges that accounting adjustments were commonplace and that "personnel in the fund accounting unit typically made an adjustment to the accruals" to "ensure they matched the actual expenses of the fund." Id. at ¶ 53. Of critical note, the Commission does not allege any facts to show that the accounting adjustments were illegal or in any way fraudulent. Rather, the Commission merely states, in conclusory fashion, that "at least some" of the adjustments "were unwarranted and inappropriate." Id. at ¶ 57. Such vague and conclusory language is insufficient to establish a claim of securities fraud.

In any event, even assuming *arguendo*, that a fraudulent scheme is properly alleged, (which it is not), the Complaint does not include a single allegation as to how Ms. Childs "substantially participated" in such a scheme, let alone that she did so with the requisite scienter. *See* In Re Lernout, 236 F. Supp.2d at 174-75 (noting that under the First Circuit's strict application of the scienter requirement of Rule 9(b), it is not enough to show defendants "substantially participated" in the alleged fraudulent scheme, they must have done so with scienter) (citations omitted); *see also* SEC v. Kushner Promotions, Inc., et al, 2006 U.S. Dist.

---

[14]    The utilization of "as of" trades to correct original trade entries is an industry-wide practice that is widely accepted by financial institutions and acknowledged by the Commission . For example, SEC Release No. 34-46893 issued on November 22, 2002 states: "'As of' transactions (collectively referred to as 'corrective transactions') are used by participants to modify and correct original trade entries." *See* SEC Release No. 34-46893; File No. SR-NASD-2002-167 (Nov. 22, 2002).

LEXIS 6466, * (S.D.N.Y. 2006) (refusing to extend primary liability under Section 10(b) where defendant was not centrally involved in the planning and execution of the fraudulent scheme). All the Commission has alleged is that Ms. Childs was present at meetings on January 4-5, 2001, where the so-called "fraudulent scheme" was discussed -- *but there is no allegation that she took any action in connection with that purported scheme.* Id. at ¶¶ 42-43.  As a matter of law, allegations of mere attendance at certain meetings, however, are not enough to establish a functional relationship to a fraudulent scheme. *See* Pegasus Holdings, L.P., et al. v. Veterinary Centers of America, Inc., et al., 38 F. Supp.2d 1158, (C.D. Ca. 1998) (noting that conclusory allegations of "willful consent" in a fraudulent scheme are insufficient to state a cause of action without factual information as to how and when the non-speaking defendants "consented," and to whom they expressed, exhibited, or otherwise demonstrated their consent); *see also* In Re Lernout, 236 F. Supp.2d at 174 (noting that allegations of scheme participation must be stated with particularity under Rule 9(b)).  The Commission's conclusory allegation of "guilt by association" is therefore insufficient to establish a scheme to defraud or to satisfy the strict pleading requirements of Rule 9(b).  Accordingly, the Commission's claims against Ms. Childs should be dismissed.

**2.      Ms. Childs' signatures on the 2002 and 2003 SAS 70 letters are not "in furtherance" of the purported January 2001 scheme.**

The Commission's tenuous attempt to link Ms. Childs' signatures on the 2002 and 2003 SAS 70 letters to the purported January 2001 scheme is likewise unsubstantiated and insufficient. First, as set forth in Section II(B) above, the Commission fails to allege facts sufficient to demonstrate a scheme to defraud in conjunction with the alleged fraudulent activity in January 2001.  Second, as duly noted in Section II(A)(2) *supra,* the SAS 70 letters were signed by Ms. Childs between one and two years after the alleged fraud.  Those letters, therefore, cannot

credibly be construed to be "in furtherance" of the purported January 2001 scheme.  Such causal connection is too attenuated to satisfy justice and due process.

Finally, the Commission fails to allege that Ms. Childs executed the SAS 70 letters with "fraudulent intent," in accordance with the strict pleading requirements of Rule 9(b).  *See* In Re Lernout, 236 F. Supp.2d at 174-75 (requiring plaintiff to show that defendant substantially participated in the scheme with scienter).  Without the proper pleading and showing of these elements, the Commission's Complaint cannot stand.

### C.    The Complaint Fails to Allege Facts To Show That Ms. Childs Acted Recklessly or With Scienter.

In order to prevail on a claim alleging a violation of Section 10(b) of the Exchange Act and Rule 10b-5, the Commission must show that Ms. Childs had the requisite scienter, namely, the "intent to deceive, manipulate, or defraud."  *See* Geffon, et al. v. Micrion Corp., et al., 249 F.3d 29, 35 (1st Cir. 2001) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. at 193).  To satisfy the pleading requirement for scienter, the Commission must state with particularity, facts giving rise to a "strong inference" that Ms. Childs "acted with intent to deceive, manipulate or defraud or, at the least, acted recklessly."  *See* In Re Galileo Corp. Shareholders Litigation, 127 F. Supp.2d at 261-62 (observing that the standard for pleading scienter under the PSLRA does not differ from that which the First Circuit has historically applied).[15]

A mere reasonable inference of scienter is insufficient to survive a motion to dismiss.  Id. (quoting Greebel, 194 F.3d 185, 196-97 (1st Cir. 1999); *see also* Brumbaugh, et al., 2006 U.S. Dist. LEXIS 725, at *13-*14 (noting that while a court continues to draw all reasonable inferences to plaintiffs in a 12(b)(6) motion to dismiss, those inferences supporting scienter must be strong ones).  An allegation that defendants had the motive and opportunity to make false or

---

[15]    Under Sections 17(a)(2) and 17(a)(3) of the Securities Act, negligence is sufficient to establish liability. *See* Maldonado v. Dominguez, 137 F.3d 1, 7 (1st Cir. 1998); *see also* SEC v. Fife, 311 F.3d 1, 9 (1st Cir. 2002).

misleading statements is insufficient to support the "strong inference" of scienter required under

Rule 9(b) and the PSLRA.  *See* Geffon, et al., 249 F.3d at 36 (noting that a plaintiff must allege

some additional misconduct from which a jury can draw a reasonable inference of intentional

deception).  Likewise, the pleading of scienter may not rest on a bare inference that a defendant

"must have had" knowledge of the facts.  *See* Maldonado v. Dominguez, 137 F.3d 1, 9 (1st Cir.

1998) (noting that courts have uniformly held inadequate a complaint's general averment of the

defendant's "knowledge" of material falsity unless the complaint also sets forth specific facts

that make it reasonable to believe that the defendant knew that a statement was false or

misleading) (citation omitted).  Something more is required.

　　　In this case, the Commission has not alleged facts sufficient to support the "strong

inference" of knowing conduct or high degree of recklessness required to establish scienter in the

First Circuit.  *See* Geffon, et al., 249 F.3d at 35.  Rather, the Commission falls back on its "guilt

by association" argument against Ms. Childs, i.e., that she must have "known" about the

allegedly fraudulent scheme solely "as a result of the meetings she attended on January 4 and 5,

2001," where the problems surrounding the Cardinal Health conversions were discussed and

possible remedies floated -- including, but not limited to, the remedies at the heart of this case.

*See* Complaint, at ¶ 64.  A general averment such as this, however, is entirely insufficient to

show that Ms. Childs acted with the requisite scienter.  *See* Garvey, et al., 354 F. Supp.2d at 80

(noting general averments of a defendant's knowledge of material falsity are not sufficient).

Moreover, this conclusory allegation is but a version of a "must have known" formulation and,

as noted above, the pleading of scienter may not rest on a bare inference that a defendant "must

have had knowledge of the facts."  *See* In Re Galileo Corp., 127 F. Supp.2d at 264 (quoting

Maldonado, 137 F.3d at 9-10).

The Commission's contention that Ms. Childs executed the SAS 70 letters with fraudulent intent is equally flawed.  First, as set forth above, the SAS 70 letters were not executed "in connection with" the offer, purchase, or sale of a security, which is a prerequisite for liability under the anti-fraud provisions of the federal securities laws.  Second, the Complaint does not allege any facts that would give rise to a "strong inference" that Ms. Childs executed the SAS 70 letters with fraudulent intent.

In any event, even assuming *arguendo*, that the 2002 and 2003 SAS 70 letters were "in connection with" the offer, purchase, or sale of a security or "in furtherance" of the January 2001 scheme, (which they are not), the Commission must still set forth specific facts to show that Ms. Childs intended or knew that the letters were materially false or misleading.  *See* Gross v. Summa Four, Inc., et al., 93 F.3d 987, 993 (1st Cir. 1996) (noting that the complaint must set forth specific facts that make it reasonable to believe that the defendant knew that a statement was materially false or misleading).  To be construed as a material misrepresentation, the Commission must provide a factual basis giving rise to a "strong inference" that Ms. Childs signed the SAS 70 letters "with fraudulent intent."  *See* SEC v. Druffner, 353 F. Supp.2d at 149-50 (noting that scienter in securities fraud cases requires a "mental state embracing intent to deceive, manipulate or defraud").  The Complaint, however, does not include a single factual allegation to show that Ms. Childs knew, or had any reason to believe, that the SAS 70 letters were in any way false or misleading or that they were executed with the intention to "conceal" the purported events of January 2001.  Indeed, to even associate these letters with the past events of January 2001, requires an enormous inferential leap, and no small amount of creativity.  But this "leap" by the Commission is too clever by half -- it does not satisfy the strict pleading requirements of this Circuit.  Accordingly, because the Commission fails to allege, with

19

particularity, facts giving rise to a "strong inference" that Ms. Childs acted with fraudulent intent, the claims alleging primary violations of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act should be dismissed.

### III.   THE COMPLAINT FAILS TO SUFFICIENTLY ALLEGE FACTS THAT MS. CHILDS AIDED AND ABETTED THE ALLEGED FRAUDULENT SCHEME.

The Commission alleges that Ms Childs aided and abetted PFTC's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder "by knowingly rendering substantial assistance to PFTC's violations." *See* Complaint, ¶¶ 90-93. This claim must fail for some of the very same reasons that the Commission's claims for primary liability under Section 10(b) of the Exchange Act must fail -- namely, that the Commission does not allege facts sufficient to establish a primary violation of Section 10(b) by PFTC.

To establish aiding and abetting liability, the Commission must establish (1) a primary violation was committed; (2) Ms. Childs' had a general awareness that her role was part of an overall activity that is improper; and (3) Ms. Childs knowingly and substantially assisted in the primary violation. *See* Tambone, 2006 U.S. Dist. LEXIS 8120 at *22-*23 (citing Druffner, 353 F. Supp.2d at 150). Courts generally have held that, in the absence of a duty to disclose, a defendant should be held liable as an aider and abettor only if the plaintiff proves that the defendant had actual knowledge of the improper activity of the primary violator and of his role in that activity. *See* SEC v. Peretz, 317 F. Supp.2d 58, 64-65 (D. Mass. 2004) (quoting Cleary v. Perfectune, 700 F.2d 774, 777 (1st Cir. 1983) (concluding that the SEC failed to prove that the defendant had knowledge of the alleged securities fraud, and while he may have been negligent, he did not have the requisite scienter to aid and abet the securities fraud). When asserting a claim for aiding and abetting liability the "complaint must allege, with particularity, that the

20

defendants' silence or inaction was consciously intended to further the alleged principal violation." *See* Tambone, 2006 U.S. Dist. LEXIS 8120 at \*23-\*24. A defendant substantially assists a primary violation of Rule 10b-5 if his conduct is a substantial causal factor in the perpetration of the underlying fraud. *See* Kushner Promotions, Inc., et al, 2006 U.S. Dist. LEXIS 6466, at \*26-\*27 (noting that in alleging the requisite substantial assistance by an aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm on which primary liability is predicated).

### A.    Ms. Childs Is Not Alleged To Have Provided Any "Substantial Assistance."

Here, the Commission alleges that all Defendants aided and abetted "PFTC's uncharged violations" of Section 10(b) of the Exchange Act and Rule 10b-5. *See* Complaint, at p. 25. The Complaint, however, does not include any factual allegations regarding these "uncharged violations." Rather, Ms. Childs and this Court can only assume that the Commission attempts to impute liability to PFTC for Defendants' alleged primary violations of Section 10(b) discussed in Section II, *supra*. In any event, the Commission's failure to allege facts sufficient to establish a primary violation of Section 10(b) effectively precludes its claim for aiding and abetting liability.

In alleging the requisite substantial assistance by an aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm on which primary liability is predicated. *See* Kushner Promotions, Inc., et al, 2006 U.S. Dist. LEXIS 6466, at \*26-\*27. Even assuming *arguendo* that the Commission adequately established a primary violation of Section 10(b) of the Exchange Act by PFTC, which it has not, the Commission still fails to allege facts sufficient to show that Ms. Childs "knowingly provided substantial assistance" in the primary violation. *See* Peretz, 317 F. Supp.2d at 62-62. Indeed, Ms. Childs' mere attendance at the January 4-5, 2001 meetings, and the Commission's "guilt by association" implication therein,

does not amount to the "substantial assistance" required to warrant aiding and abetting liability. *See* Kushner Promotions, Inc., et al, 2006 U.S. Dist. LEXIS 6466, at *26-*27 (noting that a defendant substantially assists a primary violation of Rule 10b-5 if his conduct is a substantial causal factor in the perpetration of the underlying fraud); *see also* Pegasus Holdings, et al., 38 F. Supp.2d at 1164 (noting that allegations of attendance at certain meetings is not enough to establish a functional relationship to a fraudulent scheme).

To the extent that the Commission contends Ms. Childs' signatures on the SAS 70 letters support aiding and abetting liability, that view is equally flawed. First, as set forth in Section II *supra*, the Complaint fails to allege facts sufficient to support a primary violation of Section 10(b) -- namely, that Ms. Childs' execution of the SAS 70 letters was "in connection with" the offer, purchase, or sale of a security, or that they were "reasonably calculated to influence the investing public," or that they were done "in furtherance" of the purported January 2001 scheme. *See* DCI Telecommunications, Inc., et al., 122 F. Supp.2d at 499. Second, the First Circuit has clearly stated that the type of "knowing and substantial assistance" required to support aiding and abetting liability cannot be fulfilled by an event that is only tenuously connected -- in both time and substance -- to the alleged fraud at issue in this case. *See* SEC v. Peretz, 317 F. Supp.2d at 63 (concluding that defendant's lack of knowledge of the underlying violation, while negligent, did not support claims of aiding and abetting the underlying securities fraud). As such, the Commission's reliance on the 2002 and 2003 SAS 70 letters is insufficient to support its claim for aiding and abetting liability.

## B.   Ms. Childs Is Not Alleged To Have "Actual Knowledge" Of The Alleged Fraud.

The Complaint also fails to plead, with particularity, facts to show that Ms. Childs had "actual knowledge" of the improper activity of the primary violators (PFTC), or of her role in

that activity.  *See* <u>Tambone</u>, 2006 U.S. Dist. LEXIS 8120 at *23-*24 (noting that the SEC's complaint must allege, with particularity, that the defendants' silence or inaction was consciously intended to further the principal violation).  Moreover, the Commission has not alleged facts sufficient to demonstrate that Ms. Childs possessed the "conscious intent" necessary for her inaction to qualify as "knowing and substantial assistance."  <u>Id.</u>  The absence of a factual basis to show "knowing and substantial assistance" by Ms. Childs in the allegedly fraudulent scheme renders any such charges against her on that basis misplaced and inappropriate.  Accordingly, the Commission's claim against Ms. Childs for aiding and abetting PFTC's uncharged violations of Section 10(b) of the Exchange Act and Rule 10b-5, should be dismissed in its entirety.

This Court has repeatedly apprised the Commission of the strictures involved when bringing claims under the anti-fraud provisions of the federal securities laws -- most notably, the First Circuit's strict and rigorous application of Rule 9(b) requiring that a complaint plead specific facts giving rise to a "strong inference" of fraudulent intent.  *See* <u>Druffner</u>, 353 F. Supp.2d at 151 (dismissing the Commission's aiding and abetting claims for failure to allege facts that give rise to a "reasonable and strong" inference of scienter with respect to the defendants' clients); *see also* <u>Tambone</u>, 2006 U.S. Dist. LEXIS 8120 at *25 (dismissing the Commission's complaint for failure satisfy the Rule 9(b) particularity requirement because the Commission did not allege that defendants made any untrue or misleading statement of material fact).  Moreover, in ruling on <u>Tambone</u>, the Court stated that:  "The SEC has, once again, offered this Court too little to withstand the defendants' motion to dismiss."  *See* <u>Tambone</u>, 2006 U.S. Dist. LEXIS 8120 at *25.  This sentiment is fittingly applicable to the present matter as well.

## IV.     THIS COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

This Court has, in past opinions, apprised the Commission of the requirements to state a claim for fraud under the federal securities laws -- most notably, the First Circuit's strict and rigorous application of Rule 9(b) requiring that a complaint plead specific facts giving rise to a "strong inference" of fraudulent intent.  *See* Druffner, 353 F. Supp.2d at 151 (dismissing the Commission's aiding and abetting claims for failure to allege facts that give rise to a "reasonable and strong" inference of scienter with respect to the defendants' clients); *see also* Tambone, 2006 U.S. Dist. LEXIS 8120 at *25 (dismissing the Commission's complaint for failure satisfy the Rule 9(b) particularity requirement because the Commission did not allege that defendants made any untrue or misleading statement of material fact).  Yet, the Commission continues to submit claims to this Court that, arguably, ignore those plain and simple pleading requirements. As aptly stated by this Court a short time ago: "The SEC has, once again, offered this Court too little to withstand the defendants' motion to dismiss."  *See* Tambone, 2006 U.S. Dist. LEXIS 8120 at *25.  That is the case here.  Accordingly, it is respectfully requested that this Court dismiss the claims against Ms. Childs with prejudice.

## CONCLUSION

For the reasons set forth above, Ms. Childs respectfully requests that the Court grant her Motion to Dismiss the Commission's Complaint in its entirety.

Respectfully Submitted,

SANDRA G. CHILDS

By Her Attorneys,


/s/ John A. Sten_____
John A. Sten (BBO# 629577)
Jason C. Moreau (BBO# 648678)
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA 02110
Tel: (617) 310-6000


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 31, 2006.

/s/ Jason C. Moreau
Jason C. Moreau