UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | | |
|---|---|---|
| | : | |
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 05-12618 (NMG) |
| | : | |
| v. | : | |
| | : | |
| KARNIG H. DURGARIAN, JR., et al., | : | **ORAL ARGUMENT REQUESTED** |
| | : | |
| Defendants. | : | |
| | : | |

**JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTIONS
TO DISMISS BY DEFENDANTS KARNIG H. DURGARIAN, JR.,
DONALD F. McCRACKEN, RONALD B. HOGAN,
VIRGINIA A. PAPA, KEVIN F. CRAIN, AND SANDRA G. CHILDS**

Dated:  March 31, 2006

<u>**TABLE OF CONTENTS**</u>

Table of Authorities.................................................................................................iii

Introduction...........................................................................................................1

Statement of Facts..................................................................................................1

    A.      Background.............................................................................................1

    B.      The Alleged "One-Day Delay"................................................................3

    C.      "As of" Trades......................................................................................5

    D.      The Accounting Adjustments.................................................................8

Argument...............................................................................................................9

    I.      The SEC Fails to State Primary Violations of § 10(b) and § 17(a).................9

          A.      The SEC Does Not Allege Facts Sufficient to Establish
                  That the Defendants Engaged in Fraudulent Conduct........................10

                1.      The SEC Does Not Allege Actionable Misstatements.........10

                2.      The SEC Does Not Allege Actionable Omissions................12

                  3.      The SEC Does Not Allege "Clearly Illegal" Conduct
                        Sufficient to Establish a "Scheme to Defraud".....................15

                        a.      The SEC Must Allege Conduct That is Clearly
                                Illegal.......................................................................15

                        b.      Neither "As Of" Transactions Nor Accounting
                                  Adjustments Are Clearly Illegal.................................16

          B.      The SEC Does Not Allege That the Defendants Acted
                    with the Scienter Required Under § 10(b) and § 17(a)(1).................18

    II.     The SEC Fails to Allege Facts Establishing That the Defendants Were
          "Offerors" or "Sellers" for Purposes of § 17(a).............................................20

    III.    The SEC Fails to Allege PFTC's Primary Violation of § 10(b) with
          Sufficient Specificity to Establish the Defendants' Aiding and Abetting
          Liability.......................................................................................................23

           A.      The SEC Fails to Allege a Primary Violation by PFTC....................23

            B.      The SEC Fails to Allege the Defendants' Scienter............................25

IV.   The Alleged Certifications of Defendants Durgarian, Papa, Crain, and
       Childs Are Not Actionable Misstatements Because They Were Not Made
       "In Connection With" the Purchase or Sale of Securities................................26

       A.   The Alleged Certifications Occurred More Than a Year after
             the Transactions at Issue......................................................................27

       B.   The Alleged Certifications Were Not Publicly Disseminated.............29

Conclusion......................................................................................................................31

## TABLE OF AUTHORITIES

### CASES

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002)...............................................18

*In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005).................15

*Bamberg v. SG Cowen*, 236 F. Supp. 2d 79 (D. Mass. 2002) .........................................23

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).......................................20

*Buford White Lumber Co. Profit Sharing and Sav. Plan & Trust v. Octagon Props., LTD*, 740 F. Supp. 1553 (W.D. Ok. 1989) ...................................................21

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)...............................................................................................................20

*Citron v. Rollins Environmental Servs., Inc.*, 644 F. Supp. 733 (D. Del. 1986)..............28

*Clinton Hudson & Sons v. Lehigh Valley Cooperative Farmers, Inc.*, 73 F.R.D. 420 (E.D. Pa. 1977) ...............................................................................................28

*Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485 (6th Cir. 1990) .......................21, 22

*In re Credit Suisse First Boston Corp.*, 431 F.3d 36 (1st Cir. 2005) ...............................19

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)...................................................15, 18

*Fezzani v. Bear, Stearns & Co., Inc.*, 384 F. Supp. 2d 618 (S.D.N.Y. 2004) .................28

*Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595 (2d Cir. 1991) ......................28

*In re Focus Enhancements, Inc. Securities Litigation*, 309 F. Supp 2d 134 (D. Mass 2001)..........................................................................................................17

*Frymire-Brinati v. KPMG Peat Markwick*, 2 F.3d 183 (7th Cir. 1993)...........................30

*Fund of Funds, Ltd v. Arthur Andersen & Co.*, 545 F. Supp. 1314 (S.D.N.Y. 1982).................................................................................................................20, 22

*Garvey v. Arkoosh*, 354 F. Supp. 2d 73 (D. Mass. 2005)..........................................13, 18

*Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001) ....................................................18

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)........................10, 11, 18, 19

*Gross v. Summa Four, Inc.*, 93 F.3d 987 (1st Cir. 1996) ................................................13

*Gustafson v. Alloyed Co., Inc.*, 513 U.S. 561 (1995) ......................................................21

*In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161 (D. Mass. 2003)................... 16

*Loan v. FDIC*, 717 F. Supp. 964 (D. Mass. 1989) ........................................................ 22

*Marine Bank v. Weaver*, 455 U.S. 551 (1982)............................................................... 27

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) ....................................... 28

*O'Brien v. DiGrazia,* 544 F.2d 543 (1st Cir. 1976) ....................................................... 17

*Orton v. Parmetric Tech. Corp.,* 344 F. Supp. 290 (D. Mass. 2004).............................. 17

*Pinter v. Dahl*, 486 U.S. 622 (1988) ............................................................................. 21

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22 (1st Cir. 1987).............................................. 13

*Samuel M. Feinberg Testamentary Trust v. Carter*, 652 F. Supp. 1066 (S.D.N.Y.
   1987)........................................................................................................................... 28

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) ..................................................... 15

*SEC v. Cedric Kushner Promotions, Inc.*, ___ F. Supp. 2d ___, 2006 WL. 397903
   (S.D.N.Y. Feb. 17, 2006)................................................................................. 10, 23, 25

*SEC v. Druffner*, 353 F. Supp. 2d 141 (D. Mass. 2005)........................................... *passim*

*SEC v. Fife*, 311 F.3d 1 (1st Cir. 2002) ......................................................................... 18

*SEC v. KPMG LLP.*, 412 F. Supp. 2d 349 (S.D.N.Y. 2006) .............................. 10, 15, 25

*SEC v. Penn Central Co.*, 450 F. Supp. 908 (E.D. Pa. 1978).......................................... 27

*SEC v. PIMCO*, 341 F. Supp. 2d 454 (S.D.N.Y. 2004) ................................10, 13, 16, 19

*SEC v. Rana Research, Inc.*, 8 F.3d 1358 (9th Cir. 1993)............................................... 29

*SEC v. Santos*, 355 F. Supp. 2d 917 (N.D. Ill. 2003) ..................................................... 16

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ................................................ 5, 14, 19

*SEC v. Tambone*, __ F. Supp. 2d __, 2006 WL. 488570 (D. Mass. Jan. 27, 2006)   *passim*

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968)........................................ 29

*SEC v. Yuen*, 221 F.R.D. 631 (C.D. Cal. 2004) ............................................................. 15

*SEC v. Zandford*, 535 U.S. 813 (2002)........................................................................... 16

*Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996)............................... 21, 22

*In re Stone & Webster, Inc. Securities Litigation*, 414 F.3d 187 (1st Cir. 2005) ............. 18

*TSC Indus. v. Northway, Inc.*, 426 U.S. 438 (1976)....................................................... 13

*Troyer v. Karcagi*, 476 F. Supp. 1142 (S.D.N.Y. 1979) ..................................................28

*In re Victor Technologies Securities Lit.*, No. C-93-3906A, 1987 WL 60284
(N.D. Cal. Jan. 8, 1987) ...................................................................................21

*Vigilant Ins. Co. v. C.&F. Brokerage Servs.*, 751 F. Supp. 436 (S.D.N.Y. 1990)............28

*In re Websecure, Inc. Securities Litigation*, 182 F.R.D. 364 (D. Mass. 1998)................22

*Wheaton v. Mathews Holmquist & Assocs., Inc.*, 1995 WL. 12523 (N.D. Ill. Jan.
10, 1995) ..........................................................................................................21

*Wolford v. Equity Resources Corp.*, 424 F. Supp. 670 (S.D. Ohio 1976).......................29

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998).........................................29

**STATUTES**

15 U.S.C. § 77b(a)(3) ....................................................................................................20

Fed. R. Civ. P. 9(b)................................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6) ..............................................................................................1-5

**MISCELLANEOUS**

Mark Hulbert, "Uh-Oh.  Something Else is Stale at Mutual Funds", *N.Y. Times*,
Feb 12, 2006...........................................................................................................5

## INTRODUCTION

The six named defendants respectfully submit this joint memorandum of law in support of their motions to dismiss the Complaint in this action pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  Section I of this memorandum addresses the failure of the plaintiff Securities and Exchange Commission ("SEC") to properly allege fraudulent conduct — no actionable misstatements, omissions, or "clearly illegal" conduct sufficient to establish a "scheme to defraud" — and scienter under § 10(b) of the Securities Exchange Act of 1934 and § 17(a) of the Securities Act of 1933.  Section II addresses the SEC's failure to establish the defendants' status as "offerors" or "sellers" as required under § 17(a).  Section III addresses the SEC's failure to properly allege an underlying primary violation by Putnam Fiduciary Trust Company ("PFTC") and scienter by the named defendants, both required elements of an aiding and abetting claim under § 10(b).  Section IV addresses the SEC's failure to plead allegations sufficient to show that the certifications allegedly made by defendants Papa, Crain, and Childs in January 2002 and February 2003 and certifications allegedly made by defendant Durgarian from September 2002 to August 2003 satisfy the "in connection with" requirement of § 10(b) and the "in the sale of securities" requirement of § 17(a).[1]

## STATEMENT OF FACTS[2]

### A.    Background

At all times relevant to the allegations contained in the Complaint, PFTC, a wholly

---

[1] Defendants Durgarian, McCracken, Hogan, Crain, and Childs address in separate, individual memoranda additional grounds for dismissal, including their lack of involvement in any alleged scheme to defraud; lack of knowing and substantial assistance for purposes of aiding and abetting liability; and, in the case of defendant Durgarian, deficiencies in the Investment Company Act claims made against him alone.

[2] The factual assertions set forth herein are from the allegations in the Complaint which, for purposes of this motion only, are accepted as true.  *See* Fed. R. Civ. P. 12(b)(6).

owned subsidiary of Putnam, LLC ("Putnam"), acted as the transfer agent, distribution

disbursing agent, redemption agent, and recordkeeper for Putnam mutual funds, and had

contractual arrangements to perform administrative functions for employee defined contribution

plans sponsored by various companies.  Complaint ¶ 15.  All six defendants named in the

Complaint are former employees of PFTC.  They are:

> Karnig H. Durgarian, Jr. ("Durgarian"), who was the Chief of Operations of PFTC, as
> well as a senior officer of Putnam and a Principal Executive Officer of several Putnam
> mutual funds;
>
> Donald F. McCracken ("McCracken"), who served as the Head of Global Operations
> Services for PFTC;
>
> Ronald B. Hogan ("Hogan"), who served as a vice president in the new business
> implementation unit of PFTC;
>
> Virginia A. Papa ("Papa"), who served as the Director of Defined Contribution Plan
> Servicing of PFTC;
>
> Kevin F. Crain ("Crain"), who served as head of the plan administration unit of PFTC;
> and
>
> Sandra G. Childs ("Childs"), who served as head of the new business implementation
> unit of PFTC.

*Id.* ¶¶  1, 9-14.

All six defendants worked on the operations side of PFTC's business.  The Complaint

contains no allegations that any defendant was responsible for providing sales services to

investors in Putman mutual funds.[3]  Nor does the Complaint allege that any defendant was

responsible for communicating with investors in Putnam mutual funds about their investments.

From 1998 through 2000, PFTC had a contractual arrangement to administer several

defined contribution plans for Cardinal Health, Inc. ("Cardinal").  *Id.* ¶¶ 23-24.  In 1999,

---

[3] The SEC did not name as defendants any individuals who worked on the sales or client service
side of PFTC's business.

Cardinal merged with Allegiance Health, Inc. ("Allegiance"), and, by the end of 2000, Cardinal was making arrangements to have the assets of three Cardinal defined contribution plans (the "Cardinal DC Plans") combined with one Allegiance defined contribution plan (the "Allegiance DC Plan") to form a single plan (the "Combined Plan"). *Id.* In this regard, Cardinal arranged for PFTC to have custody of the combined assets of the then-existing Cardinal and Allegiance DC Plans and invest those assets in several mutual funds. *Id.* ¶ 27.

**B.     The Alleged "One-Day Delay"**

The allegations of wrongdoing set forth in the Complaint center around the SEC's contention that there was a "one-day delay" — from January 2 to January 3, 2001 — by PFTC in the investment of the assets of the Combined Plan in certain mutual funds, allegedly causing the Combined Plan "to miss a significant investment opportunity." *Id.* ¶ 31. The Complaint, however, does not contain any allegations that would establish a duty on the part of any of the defendants, or PFTC, to have caused the assets of the Combined Plan to be reinvested on January 2, as opposed to January 3 or some other date.

The pertinent chronology alleged in the Complaint is as follows. Between December 29, 2000 and January 2, 2001, assets of the Allegiance DC Plan were liquidated and transferred to PFTC to an account for the Combined Plan. *Id.* ¶ 28. On January 2, 2001, PFTC sold mutual fund shares owned by the Cardinal DC Plans, including shares of four Putnam mutual funds, and transferred the proceeds of those sales to an account for the Combined Plan. *Id.* ¶ 29. PFTC then caused the Combined Plan to invest in mutual funds on the next day — January 3. *Id.* ¶ 31.

The Complaint does not allege that the defendants, or anyone else at PFTC, made any statement or representation to Cardinal or Allegiance that the assets would be reinvested on a date certain: *i.e.*, on January 2; on the date that the funds became available for reinvestment; or

on any other specific date.  Nor does the Complaint allege that there was any contractual agreement between PFTC and Cardinal or Allegiance that required PFTC to invest the funds on January 2, 2001.  Further, the SEC does not allege that there was any statutory or regulation-based duty to invest the funds on that date.

The factual allegation that the SEC appears to rely upon to support its contention of a "one-day delay" is a non-date-specific request by unnamed Cardinal and Allegiance employees that the assets be reinvested "as soon as possible."  The Complaint alleges:

> In the months leading up to January 2, 2001, Cardinal and Allegiance employees repeatedly informed employees of PFTC that the assets of the Combined Plan were to be re-invested <u>as soon as possible</u>.

*Id.* ¶ 30 (emphasis added).  This allegation sets forth an expressed desire to have the assets reinvested swiftly, but it does not allege that PFTC was directed to reinvest the funds on January 2, or even within a certain amount of time after the funds became available for reinvestment. The SEC does not allege what PFTC's response was to this statement, let alone any agreement by PFTC to reinvest the assets on a specific date or within a specific time frame.  Notably, the Complaint does not allege that any of the defendants was a recipient of the alleged requests that the assets be reinvested "as soon as possible."

The arbitrary nature of the SEC's "one-day delay" theory is even more apparent in light of the sequence of events regarding the liquidation and reinvestment of the assets of the Allegiance DC Plan.  The Complaint alleges that the assets from the Allegiance DC Plan were liquidated and transferred to PFTC between December 29, 2000 and January 2, 2001.  *Id.* ¶ 28. Thus, some, or perhaps all, of the Allegiance DC Plan assets were available for reinvestment on December 29, 2000.  The SEC's contention that there was a "one-day delay" from January 2 to January 3, notwithstanding its own allegation that assets were available for reinvestment on

December 29, demonstrates that the SEC's theory was contrived in order to take advantage of the substantial one day run-up in stock prices that occurred on January 3, as opposed to any factual or law-based "delay."

### C.      "As of" Trades

The Complaint describes a "mutual fund" as "an investment company that pools money from many investors and invests the money" in various types of securities.  *Id.* ¶ 20.  The price that a shareholder pays for mutual fund shares is the fund's per share net asset value (the "NAV").  *Id.*  The SEC alleges that the NAV is calculated once each day, by totaling the value of all of the assets in the mutual fund's portfolio as of the close of the market, divided by the number of outstanding shares in the mutual fund.  *Id.*[4]  When the calculated NAV for a mutual fund is published each day, the published price is rounded to the nearest penny.  *See SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992).

The Complaint alleges that on January 3, 2001, "equity markets in the United States generally rose sharply," with the Dow Jones average rising nearly 300 points and the S&P 500 Index sixty-four points.  Complaint ¶ 32.  The NAVs of the Research Fund and the Franklin Small Cap Fund, two of the mutual funds in which the Combined Plan invested, rose from

---

[4] The SEC's explanation of how NAVs are calculated is, in fact, incorrect.  A recent Harvard Business School study found that rather than calculating the NAV based on the shares the portfolio holds that day, "it is standard practice for mutual funds to calculate their share values by applying that day's closing prices to what their portfolios held at the close of trading on the previous day."  Mark Hulbert, *Uh-Oh.  Something Else is Stale at Mutual Funds*, N.Y. Times, Feb. 12, 2006, at 6.  This approach to calculating asset values — called "trade date plus one" accounting — "is the norm in the U.S. fund industry."  *Id.*  In addition, it is broadly understood that investors in the mutual fund market accept a much greater range of imprecision in terms of the timing of when their investments take effect in comparison to investors in individual stocks.  Investors in individual stocks can profit (or lose value) based on when their purchases or sales occur in the course of a particular day, especially on a day when the market moves significantly higher or lower.  In contrast, mutual fund investors accept the risk that the market may plummet or surge on the date they choose to invest.  Mutual fund investors will have their investments valued at the end-of-the-day NAV, regardless of whether they placed their order at the beginning or end of a dramatic fluctuation in stock prices.

$15.70 to $16.61 per share and $36.25 to $39.45 per share, respectively, between January 2 and January 3.  *Id.* ¶ 33.

The Complaint further describes an e-mail exchange between an unnamed PFTC employee and an unidentified Cardinal employee on January 3, 2001.  The unnamed PFTC employee is alleged to have stated that the transfer of assets had "occurred smoothly."  *Id.* ¶ 35. Notably, the Complaint does not allege that the employee represented *when* the reinvestment of the Combined Plan's assets occurred, only that the transfer "occurred smoothly."  *Id.*[5]  In light of the totality of the allegations in the Complaint, this alleged statement is susceptible to several meanings as to when the assets were reinvested, which might include:

- entirely on January 2, 2001;

- entirely on January 3, 2001;

- over the course of January 2 and 3, 2001; or

- over the course of December 29, 2000, January 2 and January 3, 2001.

 The unnamed Cardinal employee then responded in an e-mail stating, "The market is up and we look great being invested in the upswing."  *Id.*  The SEC does not allege what, if anything, the unnamed PFTC employee stated in reply.  Nor is there any allegation in the Complaint linking any of the defendants to this e-mail exchange.

The Complaint alleges that on January 3 and 4, 2001, "Defendants Hogan, Crain, Childs and others began discussing how to respond to the Cardinal employee's mistaken belief that the Combined Plan had benefited from the January 3, 2001 market appreciation," *id.* ¶ 36, and that defendant Hogan began to develop "a series of transactions that, if executed, would compensate

---

[5] The Complaint does not quote from the PFTC employee's e-mail, but rather characterizes it, and its characterization is susceptible to multiple meanings, including that the liquidation occurred smoothly, the combination occurred smoothly, or that the reinvestment occurred smoothly.

the Combined Plan for PFTC's one-day delay, …" including the execution of "as of" trades on behalf of the Combined Plan. *Id.* ¶ 37.

The Complaint alleges that "as of" trades are backdated purchases or sales of securities that use the price from a prior date rather than the actual trade date. *Id.* ¶ 38. The Complaint alleges that "as of" trades can cause dilution in the value of shares in a mutual fund when the NAV for an "as of" date, or prior date, is lower than the actual trade date NAV. The SEC does not allege that the use of "as of" trades is fraudulent, unlawful, or in any way inappropriate. To the contrary, the Complaint alleges that "as of" trades were typically used by PFTC to correct trading errors. *Id.*[6]

The SEC describes an internal PFTC policy — referred to as the "penny-per-share policy" — which it alleges required the party responsible for any error necessitating an "as of" trade causing dilution in the NAV of a mutual fund of one penny per share or greater, to provide compensation. *Id.* ¶ 40. The SEC does not allege that this policy was required by law or regulation, or was ever communicated to Cardinal, Allegiance, or anyone else outside of PFTC. Nor does the SEC allege that PFTC had a duty to communicate this policy to Cardinal, Allegiance, or anyone else outside of PFTC.

Under the alleged PFTC policy, "as of" trades that dilute the share values of existing investors by less than a penny per share — or 0.99 of a penny — are permissible without any reimbursement to those shareholders whose shares are diluted. In this case, the SEC charges the defendants with engaging in a series of "as of" trades, the end result of which was to exceed the accepted PFTC policy limit (*i.e.*, 0.99) by 0.31 of a penny per share. *Id.* ¶¶ 45-51.

---

[6] As the SEC is no doubt aware, PFTC executed several hundred thousand "as of" transactions each year.

D.      **The Accounting Adjustments**

The Complaint further alleges that there were various "accounting adjustments" made by some of the defendants to partially offset the dilution of 1.3 cents per share that resulted from the "as of" trading by decreasing certain expense accruals and thereby increasing the affected fund's assets. *Id.* ¶¶ 52-57. The Complaint makes the assertion that "at least some of the accrual adjustments were unwarranted and inappropriate," without identifying which were "unwarranted and inappropriate" or even explaining what the SEC means by these conclusory terms. *Id.* ¶ 57. Nor does the SEC even allege that any of the defendants knew that any of the adjustments were "unwarranted and inappropriate." Significantly, implicit in this statement is the SEC's acknowledgement that at least some of the accrual adjustments were warranted and appropriate. The end result of these accounting adjustments was to diminish the *de minimis* (*i.e.*, 0.31 of a penny) extent to which the alleged PFTC internal policy was exceeded by the "as of" trades. Thus, taking these accounting adjustments into consideration, the alleged "as of" trades in this case did not exceed PFTC's alleged internal policy limit.

It must be noted that the extent to which the "as of" trades exceeded the PFTC policy was not enough to have had any impact on the published share price of any mutual fund. Because the published NAV for mutual funds is rounded to the nearest penny, a less than 0.31 of a penny impact would not in and of itself affect the published NAV share price. In other words, an acceptable dilution under the policy of 0.99 of a penny would result in the same exact published NAV price as a dilution of 1.3 of a penny. Hence, there is no impact to mutual fund investors as to the published NAV under either dilution scenario: the NAV will reflect a dilution of one (1.0) penny per share.

The remaining factual allegations in the Complaint concern certifications allegedly made

by defendants Childs, Crain, and Papa to PFTC's outside auditor in January 2002 and February 2003 and stating that they were "unaware of any uncorrected errors, frauds or illegal acts attributable to" PFTC that affected its clients, *id.* ¶¶ 62–69, and certifications allegedly made by defendant Durgarian between September 2002 and August 2003 stating that he had disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in each registrant's internal controls," *id.* ¶ 71.  The SEC claims that these certifications were false given the four defendants' knowledge of PFTC's use of "as of" trades and accounting adjustments that exceeded the internal penny-per-share policy by something less than 0.31 of a penny per share.  The validity, or lack thereof, as to that theory depends in part on whether there were any underlying errors, frauds, or illegal acts.  As demonstrated below, the allegations in the Complaint fail to establish any such underlying error, fraud, or illegal act.

## **ARGUMENT**

### I.      **THE SEC FAILS TO STATE PRIMARY VIOLATIONS OF § 10(b) AND § 17(a).**

In its First Claim, the SEC charges the defendants with primary violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.  In its Second Claim, the SEC charges the defendants with primary violations of § 17(a) of the Securities Act of 1933.  Section 10(b) and § 17(a) both require the plaintiff to plead and prove a material misstatement, omission, or scheme to defraud.  *SEC v. Tambone*, ___ F. Supp. 2d ___, ___, 2006 WL 488570, at *3 (D. Mass. Jan. 27, 2006) (citation omitted).  To state a claim under § 10(b), the alleged conduct must occur in connection with a purchase or sale of a security; under § 17(a), the alleged conduct must occur in the offer or sale of a security.[7]  In either case, the requisite level of scienter must be shown.  *Id.*;

---

[7] The SEC's failure to establish that the defendants were "offerors" or "sellers" under § 17(a) is

*SEC v. KPMG LLP.*,  412 F. Supp. 2d 349, 371 (S.D.N.Y. 2006).  Furthermore, Federal

Rule of Civil Procedure 9(b) imposes a heightened pleading standard on the SEC.  As this

Court has observed, the First Circuit "has been notably strict and rigorous in applying the

Rule 9(b) standard in securities fraud actions."  *Tambone*, 2006 WL 488570, at *2

(quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999)).

    The SEC has failed to allege with requisite specificity two required elements

under § 10(b) and § 17(a):  fraudulent conduct and scienter.  These failures require

dismissal.

### A.   The SEC Does Not Allege Facts Sufficient to Establish That the Defendants Engaged in Fraudulent Conduct.

    To establish that a defendant engaged in fraudulent conduct, the SEC must show

that he or she:  "1) made an untrue statement of material fact, 2) omitted a fact that

rendered a prior statement misleading, or 3) committed a manipulative or deceptive act as

part of a scheme to defraud."  *Tambone*, 2006 WL 488570, at *3 (emphasis in original,

citations omitted).  A defendant will be liable as a primary violator only if he or she

"personally" made an actionable misrepresentation, omission, or manipulative act.  *Id.* at

*4; *see also SEC v. Cedric Kushner Promotions, Inc.*, ___ F. Supp. 2d ___, 2006 WL

397903, at *6 (S.D.N.Y. Feb. 17, 2006) (stating that "[a]nything short" of actual

misrepresentation "is not enough to trigger liability under Section 10(b)") (citation

omitted); *SEC v. PIMCO*, 341 F. Supp. 2d 454, 466 (S.D.N.Y. 2004) (same).

### 1.   The SEC Does Not Allege Actionable Misstatements.

    Even though the SEC makes boilerplate allegations that the defendants made "untrue

statements of material fact," Complaint ¶¶ 77, 81, it does not allege any such misstatements with

addressed in § II, *infra*.

the required specificity.  Rule 9(b) requires that the SEC allege the "time, place, and content of

the alleged misrepresentation with specificity."  *Greebel v. FTP Software, Inc.*, 194 F.3d 185,

193 (1st Cir. 1999).  In particular, it must specify:  "1) the allegedly fraudulent statements, 2) the

identity of the speaker, 3) where and when the statements were made, and 4) how the statements

were fraudulent."  *Tambone*, 2006 WL 488570, at *2 (citing *SEC v. Druffner*, 353 F. Supp. 2d

141, 148 (D. Mass. 2005)).

The central allegations in the Complaint involve transactions that the defendants

allegedly knew about, directed, or executed in January 2001.  Specifically, the SEC alleges:

> • PFTC failed to invest the assets of the Combined Plan on January 2,
> 2001, and instead invested them on January 3.  *See* Complaint ¶¶ 25-34.

> • At a meeting or meetings on or about January 5, 2001, the defendants
> agreed to a series of "as of" transactions.  *See id.* ¶¶ 35-51.

> • Certain defendants also directed other personnel to effect accounting
> adjustments to bring the remaining 1.3 cent-per-share dilution caused by the "as
> of" transactions below 1.0 cent-per-share.  *See id.* ¶¶ 52-57.

> • Certain defendants tried, but failed, to persuade Franklin Resources Inc.
> to execute "as of" transactions also.  *See id.* ¶¶ 58-61.[8]

None of these allegations involves any material misstatement, let alone one sufficient to

establish liability under § 10(b) or § 17(a).  The SEC does not allege that any defendant made

statements of any kind to Cardinal, Allegiance, or any participants in the relevant mutual funds.

The SEC alleges that an unnamed "PFTC employee emailed a Cardinal employee that the

transfer of assets occurred smoothly," Complaint ¶ 35, but does not suggest that the employee

acted at the direction of, or even with the knowledge, of any defendant in this case.  The SEC

does not allege that any defendant falsely told anyone that the assets of the Combined Plan had

---

[8] The certifications allegedly made by defendants Childs, Crain, Papa, and Durgarian more than a
year later, between January 2002 and August 2003, are addressed in § IV, *infra*.

been invested on January 2, instead of January 3.[9]  It does not allege that any defendant denied that "as of" transactions or accounting adjustments occurred.

Furthermore, the SEC does not allege that any defendant — or, for that matter, anyone else at PFTC — ever represented that PFTC would not execute "as of" transactions, would execute "as of" transactions in only certain circumstances, or would not make the kind of accounting adjustments allegedly executed here.  Nor does the SEC allege that any such position or policy was communicated either publicly or privately to Cardinal, Allegiance, or any participants in the relevant mutual funds.  Likewise, the SEC does not allege that any defendant — or, for that matter, anyone else at PFTC — communicated the alleged "penny-per-share policy" to the public, Cardinal, Allegiance, or any of the participants in the relevant mutual funds.  Thus, even assuming that the defendants' alleged failure to follow the policy were material, the SEC could not establish liability against them based on a misrepresentation to investors or any other relevant party.

There are therefore no misrepresentations made by any defendant in or about January 2001 that could provide a basis for liability under § 10(b) or § 17(a).

### 2.      The SEC Does Not Allege Actionable Omissions.

In addition to claiming actionable misrepresentations, the SEC claims that all the defendants violated § 10(b) and § 17(a) by omitting "to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  Complaint ¶¶ 77, 81.  The SEC fails to allege facts in support of this theory as

---

[9] The SEC does not even allege that the anonymous PFTC employee acted deceptively.  It does not allege that the employee falsely told Cardinal that the assets had been invested on January 2.  Indeed, the Complaint merely alleges that Cardinal believed that the assets would be invested "as soon as possible," but does not allege that any defendant had a role in giving Cardinal that minimal understanding.  *See* Complaint ¶ 30.

well.

Again, this Court's recent decision in *Tambone* sets forth the controlling law:

> A duty to disclose "does not arise from the mere possession of non-public information. . . . Silence absent a duty to disclose is not misleading under Rule 10b-5." *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 81 (D. Mass. 2005). The First Circuit has identified three situations that trigger a duty to disclose:  1) when a corporate insider trades on confidential information, 2) when a corporation has made inaccurate, incomplete or misleading prior disclosures, and 3) when a statute or regulation requires disclosure. *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26-27 (1st Cir. 1987).

*Tambone*, 2006 WL 488570, at *6.

Here, the SEC does not allege that the defendants traded on confidential information. Nor does it allege that the defendants were required to make a disclosure under any particular statute or regulation.

The only conceivable basis for omission liability, therefore, would require an allegation that the defendants made inaccurate, incomplete, or misleading prior disclosure that they were duty-bound to clarify or correct.  As this Court has held, "an individual owes a duty to clarify a misleading statement only if that statement is attributable to the individual." *Id.* (citing *Druffner*, 353 F. Supp. 2d at 148; *PIMCO*, 341 F. Supp. 2d at 467).  As explained in § I.A.1, *supra*, however, the SEC has failed to identify any specific statements personally made by the defendants that gave rise to such a duty.

Furthermore, even assuming that the defendants' alleged failure to disclose the "as of" transactions otherwise qualified as an actionable omission, that alleged omission does not satisfy the materiality requirement of §10(b) and § 17(a).  The Supreme Court has held that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important."  *TSC Indus. V. Northway, Inc.*, 426 U.S. 438 449 (1976); *see Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir. 1996); *see also Garvey*, 354 F. Supp. 2d at 80.

Established case law, as well as the SEC's stated position in other cases, makes clear that the degree to which the defendants allegedly violated the penny-per-share policy — by less than 0.31 of a penny — is not material.

In *SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992), the D.C. Circuit considered whether a mutual fund's failure to disclose a liability in the amount of $694,000 was material.  The SEC argued that the non-disclosure was material because the impact to the affected funds exceeded one penny per share.  The court stated the SEC's position as follows:

> A penny per share is *per se* material, according to the SEC, because mutual funds are priced and reported in the newspapers to a penny per share.

*Id.* at 643.  The D.C. Circuit did not agree.  The court ruled, "[w]e cannot imagine that a reasonable investor would think the difference between $99.54 and $99.53 a share important." *Id.* at 643.  The court further noted that "the head of the SEC's mutual fund division [then Gene Gohlke] did not assert that a penny per share would necessarily affect investment decisions.  He also admitted that the SEC would consider allowing a mutual fund with high share prices to round its NAV to the nearest nickel or dime."  *Id.*

Thus, while it is instructive that the Court in *Steadman* found that the penny per share impact in that case was not material as a matter of law, it is even more compelling that *the SEC itself* drew the line of materiality at a penny per share or more, for the reason that "mutual funds are priced and reported in the newspapers to a penny per share."  *Id.*  Applying that reasoning here, the SEC would be obliged to concur that any omission by defendants was not material because the extent to which the "as of" trades exceeded the PFTC policy — less than 0.31 of a penny — was too small to affect the published NAV of any mutual fund.  There was therefore no duty to disclose for which the defendants may be held liable now.

**3.      The SEC Does Not Allege "Clearly Illegal" Conduct Sufficient to Establish a "Scheme to Defraud."**

The final theory under which the SEC seeks to establish the defendants' liability as primary violators of § 10(b) and § 17(a) rests on the premise that they engaged in a "scheme to defraud."  The SEC fails, however, to allege an actionable scheme under the controlling case law.

**a.      The SEC Must Allege Conduct That is Clearly Illegal.**

Courts allow "scheme to defraud" claims to proceed only in limited circumstances.  In particular, they do not permit plaintiffs to allege such schemes "as a means to get around the pleading requirements for the individual Defendants."  *SEC v. Yuen*, 221 F.R.D. 631, 636 (C.D. Cal. 2004); *see also SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 377 (S.D.N.Y. 2006) ("The SEC does not posit how, in any concrete manner, the misstatements it alleges could be construed as a device or scheme."); *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005) ("Courts have held that a plaintiff may not cast claims of misrepresentations as claims under Rule 10b-5(a) and (c) and thus evade the pleading requirements imposed in misrepresentation cases.") (citation omitted).

To plead a scheme to defraud, the SEC must allege that the defendants "engaged in a manipulative device or contrivance."  *Tambone*, 2006 WL 488570, at *7 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 nn.20-21 (1976)).  According to the Supreme Court, "manipulation" refers to patently illegal practices such as "wash sales, matched orders, or rigged prices that are intended to mislead investors by artificially affecting market activity."  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

In *Tambone*, this Court held that the alleged market timing arrangement at issue there was not such a scheme.  "The defect in the SEC's allegations," it explained, "is that market

timing arrangements are not the kind of sham transactions which have been held to qualify as schemes to defraud." *Tambone*, 2006 WL 488570, at *8. *Accord PIMCO*, 341 F. Supp. 2d at 468 (holding that "the market timing agreement . . . , standing alone, could not be considered *per se* a fraudulent device intended to defraud investors," since "[t]he SEC does not allege, nor could it, that market timing practices are *per se* illegal").

In *Tambone*, the Court contrasted the alleged marketing timing with other cases involving "some device that was clearly illegal":

> *See SEC v. Zandford*, 535 U.S. 813 (2002) (defendant broker-dealer engaged in wire fraud to misappropriate funds from his clients' account); *SEC v. Santos*, 355 F. Supp. 2d 917 (N.D. Ill. 2003) (defendants engaged in the bribery of a city treasurer to secure illegally the city's investment business); *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173-74 (D. Mass. 2003) (defendants allegedly entered into sham software licensing agreements in order to inflate artificially the companies' profits). This Court's decision in *Druffner* also demonstrates the limits of the SEC's argument because the broker defendants in that case employed a manipulative device by using numerous broker identification numbers and opening nearly 200 customer accounts under fictitious names. All of the aforementioned schemes fit into the category of manipulative devices envisioned by the Supreme Court. The SEC's allegations in this case clearly do not.

*Tambone*, 2006 WL 488570, at *7.

**b.    Neither "As Of" Transactions Nor Accounting Adjustments Are Clearly Illegal.**

As in *Tambone*, the as-of transactions and accounting adjustments alleged by the SEC in this case do not involve "clearly illegal" conduct.

The SEC does not allege, nor could it, that the use of "as of" transactions, *see* Complaint ¶¶ 37-39, is illegal *per se*. Indeed, it acknowledges in its Complaint that "'[a]s of' trades were typically used at PFTC to correct trading errors." Complaint ¶ 38. Under the governing case law, such transactions cannot be considered *per se* a fraudulent device.

Similarly, the SEC does not and cannot contend that the accounting adjustments, *see* Complaint ¶¶ 52-56, were inherently illegal. The SEC acknowledges that as a matter of general

practice, personnel in PFTC's fund accounting unit regularly adjusted the expense accruals of the Research Fund both upwards and downwards "to ensure that they matched the actual expenses of the fund." *Id.* ¶ 53. The SEC does not describe any of the adjustments at issue in this case with particularity. It concludes by alleging that "[a]t least some" of the adjustments "were unwarranted and inappropriate." *Id.* ¶ 57 (emphasis added). It does not, however, allege that any defendant knew that any "unwarranted and inappropriate" adjustment had been made, and it does not explain what it means by those terms.[10] Such vague and equivocal allegations do not establish a scheme to defraud. It must be presumed that the adjustments were neither fraudulent nor unlawful, because if they had been, the SEC would have so alleged. *See O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976) ("When a complaint omits facts that, if they existed, clearly would dominate the case, it is fair to assume that those facts do not exist."). Because the SEC does not describe any of the adjustments, identify those that it contends were "unwarranted and inappropriate," or explain why, it fails to meet its pleading obligations under Rule 9(b).

More broadly, the SEC does not suggest that the supposed one-day delay in investing the Combined Plan's assets — *i.e.*, the SEC's stated reason for the execution of the "as of" transactions and accounting adjustments in the first place — was anything other than an error by unnamed PFTC employees. There is no claim that the defendants intentionally delayed the transactions for a fraudulent purpose. What the SEC challenges is the steps that the defendants allegedly took to correct this perceived error. Having acknowledged that prior to these events

---

[10] The SEC does not even allege that any of the adjustments violated generally accepted accounting principles ("GAAP"). Even if it had, such a violation would be insufficient to support the "strong inference" of scienter required by the applicable case law. *See Orton v. Parmetric Tech. Corp.*, 344 F. Supp. 2d 290, 306 (D. Mass. 2004); *In re Focus Enhancements, Inc. Securities Litigation*, 309 F. Supp. 2d 134, 150 (D. Mass. 2001).

PFTC regularly used "as of" transactions "to correct trading errors," *id.* ¶ 38, and from "time to time" made adjustments to either increase or decrease expense accruals, *id.* ¶ 53, the SEC cannot now maintain a § 10(b) or § 17(a) claim on the theory that these acts in this particular context were inherently unlawful. Its "scheme to defraud" theory must therefore be rejected.

**B.      The SEC Does Not Allege That the Defendants Acted
with the Scienter Required Under § 10(b) and § 17(a)(1).**

The Complaint also fails to allege the scienter required for violations of § 10(b) and § 17(a)(1) in a manner consistent with the strict pleading standards adopted by the First Circuit. *See Garvey*, 354 F. Supp. 2d at 80; *Druffner*, 353 F. Supp. 2d at 150. A complaint "must set forth facts giving rise to a 'strong inference' that the defendants acted with the required state of mind." *In re Stone & Webster, Inc. Securities Litigation*, 414 F.3d 187, 204 (1st Cir. 2005). In other words, it "must allege facts which give rise to an inference of scienter that is 'both reasonable and strong.'" *Druffner*, 353 F. Supp. 2d at 149-50 (quoting *Greebel v. FTP Software*, 194 F.3d 185, 195-96 (1st Cir. 1999)). Scienter has been defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The SEC therefore must allege (and ultimately prove) that the defendants "consciously intended to defraud" or acted "with a high degree of recklessness." *SEC v. Fife*, 311 F.3d 1, 9 (1st Cir. 2002). Allegations concerning defendants' motive and opportunity alone are insufficient to establish this element. *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 & n.7 (1st Cir. 2001); *Druffner*, 353 F. Supp. 2d at 150.

Here, the SEC has not pleaded specific facts giving rise to a strong inference of fraudulent intent. It has not shown that the alleged conduct occurred in a "context" where the defendants had an intent to defraud, *see Greebel*, 194 F.3d at 197-98, or where the "mix of facts" show circumstances indicating a fraudulent intent. *Compare Aldridge v. A.T. Cross Corp.*, 284

F.3d 72, 82-84 (1st Cir. 2002) (allegations of intentional nondisclosure of contract terms, violation of accounting standards, financial incentives beyond usual arrangements and defendants' jobs being in jeopardy gave rise to strong inference of scienter), *with Greebel*, 194 F.3d at 197-98 (mere act of trading on material, non-public information is insufficient to allege scienter for insider trading claim, as trades must be in context where defendants had incentives and trading was unusual).

Without more, the SEC's allegations are insufficient to establish fraudulent intent. The SEC does not allege, for example, that defendants acted with the fraudulent purpose of profiting from the conduct alleged. *See SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992) ("If we were to conclude that the appellants meant to defraud investors, we would have to believe that they did so for the sheer joy of it rather than for profit."). Neither does it allege that the defendants were acting to cover up a prior violation of law, since there is no claim that PFTC had a duty to invest the assets of the Combined Fund on January 2, as opposed to January 3.

To the contrary, the SEC acknowledges at the outset of the Complaint that defendants were responding to "an error that had occurred in a client's account," *id.* ¶ 1, and that in so responding to this "error" they used tools that were routinely used by PFTC to correct trading errors and for other legitimate purposes. *See id.* ¶¶ 38, 53. Where the underlying alleged conduct is not *per se* illegal, the fraudulent purpose must be especially clear for a securities fraud claim to proceed. *See, e.g.*, *PIMCO*, 341 F. Supp. 2d at 468-70; *see also In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 49 (1st Cir. 2005) ("Scienter allegations do not pass the 'strong inference' test when, viewed in light of the complaint as a whole, there are legitimate explanations for the behavior that are equally convincing."). Because the SEC in this case does not allege specific facts giving rise to a strong inference of fraudulent intent, the claims for

19

primary violations of § 10(b) and § 17(a)(1) must be dismissed.

## II.    THE SEC FAILS TO ALLEGE FACTS ESTABLISHING THAT THE DEFENDANTS WERE "OFFERORS" OR "SELLERS" FOR PURPOSES OF § 17(a).

In addition to the SEC's failure to allege fraudulent conduct and, for subsection (a)(1), scienter, there is another independent ground for dismissing the § 17(a) claims:  the SEC fails to allege that defendants were offerors or sellers of any securities.  Without that status, they cannot be held liable under § 17(a).

Section 17(a) and § 10(b) belong to two different "landmark pieces of securities legislation."  *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 170-71 (1994).  While the 1934 act "is general in scope but chiefly concerned with the regulation of post-distribution trading," the 1933 Act "is a far narrower statute chiefly concerned with disclosure and fraud in connection with offerings of securities — primarily . . . initial distributions of newly issued stock from corporate issuers."  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752 (1975).  This difference in statutory scope is reflected in the text of § 17(a) and § 10(b).  In particular, while § 10(b) prohibits fraud "in connection with the purchase or sale of any security," § 17(a) prohibits only fraud "in the offer or sale of any securities."

Section 17(a) thus applies to a significantly smaller set of actors in the industry:  those who have directly participated in effecting a sale.  *See, e.g.*, *Fund of Funds, Ltd v. Arthur Andersen & Co.,* 545 F. Supp 1314, 1353 (S.D.N.Y. 1982) ("Federal courts at all levels have agreed . . . that § 17(a) is limited in its application to offerors or sellers.").  Section 2(a)(3) of the 1933 Act defines the term "sale" or "sell" as including "every . . . solicitation of an offer to buy, a security or interest in a security, for value."  15 U.S.C. § 77b(a)(3).  In *Fund of Funds*, the court rejected an effort to hold a mutual fund's outside accountant, Arthur Andersen, liable under

§ 17(a):

> [T]here is no basis in this record for finding AA to be a seller.  AA was not an agent for the redeeming shareholders and did not promote the redemptions. . . .  Although AA's conduct with respect to the revaluation was casually related to the price rise in FOF's shares, extending liability to the auditors of a mutual fund because their decisions affect the market price of the outstanding shares simply goes beyond the purview of section 17.

*Id.* at 1354.  Similarly, in *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485 (6th Cir. 1990), the

Sixth Circuit affirmed the dismissal of a § 17(a) claim filed against brokers who were accused of

"churning" a customer's account to generate inflated sale commissions.  *Id.* at 493.

Courts interpreting related provisions in the 1933 Act — § 12(1) and § 12(2), both of

which provide private remedies for conduct by a person who "offers or sells a security" — have

given the same narrow interpretation to that language.[11]  In *Pinter v. Dahl*, 486 U.S. 622 (1988),

the Supreme Court rejected the argument that being a "substantial factor" in causing the sale of a

security was sufficient to establish liability under § 12(1).  The statute's failure, it reasoned, "to

impose express liability for mere participation in unlawful sales transactions suggests that

Congress did not intend that the section impose liability on participants collateral to the offer or

sale."  *Id.* at 650.  In *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996), the First

---

[11] In *SEC v. Druffner*, this Court considered cases interpreting the terms "offer" and "sell" under § 12 in the course of determining the meaning of those terms under § 17, but cautioned that they may not necessarily have the same meaning.  *See* 353 F. Supp. 2d at 152 n.2.  Because § 12 and § 17 are set forth in the same statute, use substantially the same language, and are intended to accomplish the same purpose (*i.e.*, to provide a remedy for fraud in the security sales process), cases interpreting § 12 should guide this Court's interpretation of § 17.  *See Buford White Lumber Co. v. Octagon Props., LTD,* 740 F. Supp. 1553, 1569 (W.D. Ok. 1989) ("'Offer' and 'sell' have the same definition for Section 17(a) as they have for Section 12."); *Wheaton v. Mathews Holmquist & Assocs., Inc.*, No. 94 C 1134, 1995 WL 12523, at *14 (N.D. Ill. Jan. 10, 1995) ("This Court agrees . . . that . . . 'offer' and 'sell' have the same definition for purposes of Section 17(a) of the Federal Securities Act as they do for Section 12 of the Federal Securities Act."); *In re Victor Technologies Securities Lit.*, No. C-93-3906A, 1987 WL 60284, at *8 (N.D. Cal. Jan. 8, 1987) (same "seller or offeror" restriction under § 12(2) applies to claims under § 17(a)); *see generally Gustafson v. Alloyed Co., Inc.*, 513 U.S. 561, 568 (1995) ("A term [within a single act] should be construed, if possible, to give it consistent meaning throughout the Act.  That principle follows from our duty to construe statutes, not isolated provisions.").

Circuit affirmed the dismissal of a § 12(2) claim against the issuer in a firm commitment underwriting.  "A defendant," it ruled, "must be directly involved in the actual solicitation of a securities purchase in order to qualify, on that basis, as a Section 12 seller."  *Id.* at 1215. Preparation of documents or "participation in 'activities' relating to the sale of securities" is not enough.  *Id.* at 1216.  *See also In re Websecure, Inc. Securities Litigation*, 182 F.R.D. 364, 368 (D. Mass. 1998) (dismissing § 12(2) claim because "plaintiffs failed to allege that any of them purchased a security directly from" defendant underwriter); *Loan v. FDIC*, 717 F. Supp. 964, 968 (D. Mass. 1989) ("Nowhere in the complaint does plaintiff allege that any of the individual defendants played any part in soliciting the sale of the bank's securities.").

Here, the SEC fails to allege that any defendant was directly involved in a sale or solicitation of an offer to buy securities.  While it makes the conclusory claim that "each of Defendants" acted "in the offer or sale of securities," Complaint ¶ 81, it does not allege specific facts demonstrating "the kind of relationship between defendant and [purchaser] that could establish statutory seller status."  *Shaw*, 82 F.3d at 1216.  The SEC does not allege that any defendant was directly involved in the actual solicitation of a securities purchase, or that anyone at Cardinal or Allegiance directly purchased securities from them.  In fact, the Complaint alleges just the opposite.  *See* Complaint ¶¶ 21-22 (alleging that during relevant period PFTC performed "administrative, recordkeeping and back office functions").  At most, defendants were collateral participants in the sale of securities, and collateral participation in a sale is insufficient to establish liability under § 17(a).  *See Craighead*, 899 F.2d at 493; *Fund of Funds*, 545 F. Supp. at 1354.  Because the SEC has not alleged facts sufficient to establish the defendants' status as "offerors" or "sellers," as well as for the reasons set forth in § I, *supra*, the § 17(a) claims must be dismissed.

**III.   THE SEC FAILS TO ALLEGE PFTC'S PRIMARY VIOLATION OF § 10(b) WITH SUFFICIENT SPECIFICITY TO ESTABLISH THE DEFENDANTS' AIDING AND ABETTING LIABILITY.**

In its Fifth Claim the SEC asserts that "[b]y rendering substantial assistance to PFTC's violations, each of Defendants aided and abetted PFTC's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder."  Complaint ¶ 93.

"To establish aiding and abetting liability, a plaintiff must establish:  1) a primary violation was committed, 2) the defendants had a general awareness that their conduct was part of an overall activity that was improper, and 3) the defendants knowingly and substantially assisted in the primary violation."  *Tambone*, 2006 WL 488570, at *8 (citing *Druffner*, 353 F. Supp. 2d at 150); *see also SEC v. Cedric Kushner Promotions, Inc.*, ___ F. Supp. 2d ___, 2006 WL 397903, at *8 (S.D.N.Y. Feb. 17, 2006).  As with its primary violation claims, the SEC must satisfy the heightened pleading standard of Rule 9(b) in alleging a claim of aiding and abetting securities fraud.  *See Bamberg v. SG Cowen*, 236 F. Supp. 2d 79, 91 (D. Mass. 2002) (citations omitted).

**A.   The SEC Fails to Allege a Primary Violation by PFTC.**

Here, the SEC's claim fails because it does not properly allege an underlying primary violation of § 10(b) by PFTC.  In fact, it says almost nothing at all about what PFTC purportedly did wrong, other than the conclusory assertion that PFTC violated § 10(b) "[a]s set forth herein." Complaint ¶ 93.  The defendants and this Court are left to guess as to whether PFTC's "uncharged violations" are nothing more than the same conduct for which the defendants are allegedly liable under the First Claim, and the SEC is charging aiding and abetting liability as a "backup" in case the Court (appropriately) concludes that the requirements for primary liability have not been satisfied; or whether the SEC is referring to some other violations by PFTC that

relate to or resulted from the conduct "set forth herein."  In either case, the SEC's conclusory statement falls far short of what is required to establish aiding and abetting liability under Rule 9(b).

In the Complaint, the SEC discusses the role of PFTC in relation to particular Putnam mutual funds.  *See* Complaint ¶¶ 15, 21-22.  It also describes the services that PFTC provided for the Cardinal Plans, *id.* ¶¶ 23-24, and its responsibility for the combination and investment of the Cardinal and Allegiance Plans, *id.* ¶¶ 25-30.  However, while the SEC alleges that from 1998 to 2000 PFTC had a "contractual arrangement" to administer the Cardinal plans, *id.* ¶ 24, it does not state the terms of that contract, suggest that any terms were violated, or explain why any such violation would have been fraudulent.  Likewise, while the SEC alleges that PFTC "did not cause" the assets of the Combined Plan to be invested until January 3, 2001, *id.* ¶ 24, it does not explain how that failure amounted to fraudulent conduct.  Finally, the SEC alleges that on January 3, "despite the one-day delay, a PFTC employee emailed a Cardinal employee that the transfer of assets occurred smoothly," *id.* ¶ 35, but, as explained earlier, the SEC does not allege any facts specifically showing that this communication was falsely made.

The remaining allegations in the Complaint involve the alleged acts and statements of the named defendants, and as discussed in § I, *supra*, none of these allegations provides a sufficient basis for liability under § 10(b).  *A fortiori*, there is no basis for imputing any fraudulent act by one named defendant to PFTC for the purpose of establishing a primary violation as an element of an aiding and abetting charge against the others — even assuming that § 10(b) liability could be established through such attenuated reasoning.

Furthermore, the Complaint does not allege facts sufficient to satisfy the scienter requirement for PFTC.  In *Druffner*, this Court dismissed an aiding and abetting claim that was

based on uncharged primary violations by the defendant brokers' clients. 353 F. Supp. 2d at
150-51. The Court explained that even though the complaint contained information "from which
one may infer" that the clients were aware of the suspect transactions, "the complaint does not
allege facts that give rise to a 'reasonable and strong' inference of scienter with respect to the
defendants' clients." *Id.* at 151. Similarly, the SEC here does not allege facts giving rise to a
"reasonable and strong" inference of scienter on behalf of PFTC. The named defendants cannot
be charged with aiding and abetting under § 10(b) when the SEC has failed to allege the required
element of PFTC's underlying primary violations.

### B.    The SEC Fails to Allege the Defendants' Scienter.

Even assuming that the Complaint sets forth a primary violation by PFTC, the SEC fails
to allege facts establishing the requisite higher level of scienter for the defendants to have aided
and abetted that primary violation. *See SEC v. Cedric Kushner Promotions, Inc.*, ___ F. Supp.
2d ___, 2006 WL 397903, at *8-9 (S.D.N.Y. Feb. 17, 2006). The 1995 amendment to the
Exchange Act, codified at § 20(e), requires the SEC to show "knowing misconduct," as opposed
to a high level of recklessness, for aiding and abetting liability. *Id.* at *9; *accord SEC v. KPMG
LLP*,  412 F. Supp. 2d at 382-83.[12] The SEC does not allege such knowing misconduct here. As
discussed in § I, *supra*, it does not allege any actionable misstatements, and the defendants had
no duty of disclosure. Furthermore, the SEC fails to "allege, with particularity, that the
defendants' silence or inaction was consciously intended to further the principal violation." *See
Tambone*, 2006 WL 488570, at *8. It does not, for example, allege that the defendants "threw
'in [their] lot with the primary violators' and 'benefited' from the alleged silence." *Id.* (citation

---

[12] Section 20(e) provides that "any person that <u>knowingly provides substantial assistance</u> to
another person in violation of a provision of this title, or of any rule or regulation issued under
this title, shall be deemed to be in violation of such provision to the extent as the person to whom
such assistance is provided" (emphasis added).

omitted).  In fact, the Complaint does not allege that the defendants benefited in any way from their alleged conduct.  The SEC has therefore failed to plead a proper claim for aiding and abetting liability.

**IV.     THE ALLEGED CERTIFICATIONS OF DEFENDANTS DURGARIAN, PAPA, CRAIN, AND CHILDS ARE NOT ACTIONABLE MISSTATEMENTS BECAUSE THEY WERE NOT MADE "IN CONNECTION WITH" THE PURCHASE OR SALE OF SECURITIES.**

The SEC alleges that in January 2002 and February 2003 defendants Childs, Crain, and Papa made certifications to an outside auditor that they were "unaware of any uncorrected errors, frauds or illegal acts attributable to" PFTC that had affected its clients.  *See* Complaint ¶¶ 62-69. The SEC asserts that these certifications were false because these three defendants were aware of "uncorrected errors, frauds or illegal acts attributable to" PFTC, implicitly referring to the January 2001 events.

The SEC also alleges that between September 2002 and August 2003, defendant Durgarian certified that he had "disclosed to each registrant's auditors and the audit committee of each registrant's board of directors . . . any fraud, whether or not material, that involves management or other employees who have a significant role in each registrant's internal controls."  Complaint ¶ 71.  The SEC asserts that these certifications were false because defendant Durgarian did not in fact disclose "any fraud, whether or not material, that involves management or other employees who have a significant role in each registrant's internal controls."

The SEC's assertions, however, merely beg the question of whether the steps taken in January 2001 to correct the "error that had occurred in a client's account," Complaint ¶ 1, actually constituted fraud or an illegal act.  As explained in § I, *supra*, the allegations in the

Complaint fail to establish any such underlying fraud or illegal act.

Furthermore, even assuming that the certifications were false, they fail to satisfy another required element:  the "in connection with" requirement of § 10(b) and the "in the sale of securities" requirement of § 17(a).  "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud."  *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982).  Rather, the SEC must also allege facts establishing that the four defendants made their statements "in connection with" the purchase or sale of securities for purposes of § 10(b).  It must demonstrate an even closer nexus between the alleged fraud and the sale of securities under § 17(a).  *See SEC v. Penn Central Co.*, 450 F. Supp 908, 916 (E. D. Pa. 1978) ("Quite clearly, the omission of the words 'in connection with' makes the scope of § 17(a) narrower than § 10(b) in that the former requires a closer relationship between the fraud and the securities transaction.").

Here, the SEC fails to satisfy these elements for two independently sufficient reasons: first, the four defendants made their alleged statements more than a year after the transactions in this case occurred; and second, the SEC does not allege that three of the defendants knew or should have known that their statements to the auditor would be disseminated to the public, or that they were in fact so disseminated.

### A.      The Alleged Certifications Occurred More Than a Year after the Transactions at Issue.

All of the transactions at issue in this case — namely, the transactions that occurred in connection with the conversion of the Cardinal plans and the Allegiance plans into a single Combined Plan between December 29, 2000 and January 2, 2001, *see* Complaint ¶¶ 25-30; and the investment of the Combined Plan in various mutual funds in January 2-5, 2001, *see id.* ¶¶ 31-57 — occurred more than a year before the four defendants' first alleged certification to the

auditor in late January 2002.

Courts have uniformly held that the "in connection with" element requires that a defendant's fraudulent conduct occur *prior to or contemporaneously with* the purchase or sale of securities.  In other words, "[w]here the only manipulative or deceptive acts identified in a complaint occur after a challenged securities purchase or sale, a court must dismiss the complaint as failing to state a cause of action for federal securities fraud."  *Samuel M. Feinberg Testamentary Trust v. Carter*, 652 F. Supp. 1066, 1080 (S.D.N.Y. 1987).  *See, e.g.*, *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (plaintiff did not adequately plead violation where allegedly false statement "was made *after* the contracts were signed, and, obviously, could not have induced [the plaintiff] to sign the contract"); *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 598 (2d Cir. 1991) (no claim for securities fraud stated where purchase of securities was completed before alleged fraud occurred); *Fezzani v. Bear, Stearns & Co., Inc.*, 384 F. Supp. 2d 618, 639 (S.D.N.Y. 2004) (allegedly fraudulent confirmation notices and statements could not establish liability because "the stock purchases has already been made"); *Vigilant Ins. Co. v. C.&F. Brokerage Servs.*, 751 F. Supp. 436, 439 (S.D.N.Y. 1990) ("In the case at bar, . . . the fraud occurred after the transaction was complete.  It was not related to the investment value of the security."); *Citron v. Rollins Environmental Servs., Inc.*, 644 F. Supp. 733 (D. Del. 1986) (dismissing action based on alleged misrepresentations that postdated plaintiff's purchase of stock); *Troyer v. Karcagi*, 476 F. Supp. 1142, 1148 (S.D.N.Y. 1979) (because "in connection with" element requires "a causal connection between a defendant's misstatements or omissions and the plaintiff's purchase," allegation that defendant induced "retention" of funds already in plaintiffs' accounts did not state claim); *Clinton Hudson & Sons v. Lehigh Valley Cooperative Farmers, Inc.*, 73 F.R.D. 420, 425 (E.D. Pa. 1977) (allegedly false

statements and financial reports issued five years after purchase of stock failed to satisfy "in connection with" element); *Wolford v. Equity Resources Corp.*, 424 F. Supp. 670, 671 (S.D. Ohio 1976) (dismissing claim where alleged misrepresentations by defendant accounting firm occurred more than year after purchases forming basis of complaint).

Here, defendants Durgarian, Papa, Crain, and Childs made the first of their allegedly false statements more than a year after the transactions at issue in the Complaint. The SEC cannot argue that the statements induced or otherwise caused any relevant purchase or sale to occur. They are therefore not actionable under § 10(b) or § 17(a).

**B.      The Alleged Certifications Were Not Publicly Disseminated.**

Second, it is well established that a misrepresentation must be in some way "reasonably calculated to influence the investing public." *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968). The statement must therefore be disseminated to the public in a medium "such as a press release, annual report, investment prospectus or other such document in which an investor would presumably rely." *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993).

Here, the SEC alleges that defendants Papa, Crain, and Childs made false statements in connection with "audits of the internal controls of the defined contribution plan servicing unit of PFTC." Complaint ¶ 62. The SEC does not allege that these three defendants knew or should have known that the results of the audits were going to be disseminated to the public. It does not even suggest that the audits — addressing the "internal controls of the defined contribution plan servicing unit" — related to the other conduct at issue in the case. The SEC thus fails to establish that these three defendants' alleged misstatements in relation to these audits occurred "in connection with" any purchase or sale of securities. *See Wright v. Ernst & Young LLP*, 152

F.3d 169, 175 (2d Cir. 1998) ("[B]ecause § 10(b) and Rule 10b-5 focus on fraud made in connection with the sale or purchase of securities, a defendant must 'know or should know' that his representation would be communicated to investors.") (citations omitted); *Frymire-Brinati v. KPMG Peat Markwick*, 2 F.3d 183, 189 (7th Cir. 1993) (certification of financial statement did not satisfy "in connection with" requirement where auditor did not authorize use of statement in any registration statement, prospectus, or equivalent document).

Because none of the certifications alleged by the SEC in this case occurred more than a year after the allegedly wrongful transactions, and because the SEC does not allege that defendants Papa, Crain, and Childs knew or should have known that their statements would be publicly disseminated, they cannot be said to have occurred "in connection with" the purchase or sale of securities for purposes of establishing liability under § 10(b), or *a fortiori* under the stricter nexus requirement of § 17(a).

## CONCLUSION

For the reasons stated above and in defendants' individual memoranda, the SEC's

Complaint should be dismissed.

Respectfully submitted,

KARNIG H. DURGARIAN, JR.  
By his attorney,

/s/ Frank A. Libby, Jr.  
Frank A. Libby, Jr., BBO #299110  
Sharon Lahey, BBO #662084  
Kelly, Libby & Hoopes, PC  
175 Federal Street  
Boston, MA  02110  
(617) 338-9300

DONALD F. McCRACKEN,  
By his attorney,

/s/ Gary S. Matsko  
Gary S. Matsko, BBO #324640  
Davis, Malm & D'Agostine, PC  
One Boston Place  
Boston, MA  02108  
(617) 367-2500

RONALD B. HOGAN,  
By his attorneys,

/s/ Jamie L. Wacks  
Bruce A. Singal, BBO #464420  
Jamie L. Wacks, BBO #641183  
Donoghue, Barrett & Singal, P.C.  
One Beacon Street, Suite 1320  
Boston, MA  02108  
(617) 720-5090

VIRGINIA A. PAPA,  
By her attorneys,

/s/ Michael J. Connolly  
Michael J. Connolly, BBO #638611  
Kelley A. Jordan-Price, BBO #565964  
Hinckley, Allen & Snyder, LLP  
28 State Street  
Boston, MA  02109  
(617) 345-9000

KEVIN F. CRAIN,  
By his attorneys,

/s/ Anthony Mirenda  
Anthony Mirenda, BBO #550587  
Robert E. Toone, BBO #663249  
Foley Hoag LLP  
155 Seaport Blvd.  
Boston, MA  02210  
(617) 832-1000

SANDRA G. CHILDS,  
By her attorneys,

/s/ John A. Sten  
John A. Sten, BBO #629577  
Jason Moreau, BBO #648678  
Greenberg Traurig LLP  
1 International Place  
Boston, MA  02110  
(617) 310-6000

Dated:  March 31, 2006

31

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on March 31, 2006.

/s/ Anthony Mirenda