## United States District Court
## District of Massachusetts

|  |  |  |
|---|---|---|
| SECURITIES EXCHANGE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | **Civil Action No.** |
| KARNIG H. DURGARIAN, JR., DONALD | ) | **05-12618-NMG** |
| F. MCCRACKEN, RONALD B. HOGAN, | ) | |
| VIRGINIA A. PAPA, KEVIN F. | ) | |
| CRAIN, SANDRA G. CHILDS | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

### MEMORANDUM & ORDER

**GORTON, J.**

This case involves a securities enforcement action brought against former officers and employees of Putnam Fiduciary Trust Company ("Putnam"), a subsidiary of Putnam Investments, which provides record-keeping and administrative services for mutual funds and retirement and defined contribution plans sponsored by various companies. The six defendants are: Karnig Durgarian, Jr. ("Durgarian"), formerly Putnam's Chief of Operations as well as Principal Executive Officer of several Putnam mutual funds, Donald McCracken ("McCracken"), former Head of Global Operation Services, Ronald B. Hogan ("Hogan"), former vice president in the

-1-

58

new business implementation unit, Virginia A. Papa ("Papa"), former Director of the Defined Contribution Plan Servicing unit, Kevin Crain ("Crain"), former head of the plan administration unit and Sandra Childs ("Childs"), former head of both the compliance and new business implementation units. Currently pending before this Court are: 1) motions of all six defendants to dismiss all counts, 2) a motion of the SEC to amend its complaint if the Court grants, in whole or in part, the motions to dismiss and 3) a motion of Defendant Durgarian to strike two items referenced in the complaint.

## I.    **Background**

The Complaint alleges that on January 2, 2001, Putnam failed to invest certain assets of the retirement and defined contribution plans of Cardinal Health, Inc. and Allegiance Health, Inc. (collectively, "the Combined Plan"), as requested. Putnam made the investment one day later, on January 3. As a result of the delay, the Combined Plan missed out on an estimated $4 million market appreciation that it would have earned if the funds had been invested on January 2. Despite the delay, an email from a representative of the Combined Plan to an unknown employee at Putnam indicated that representatives of the Combined Plan were under the impression that the money had been invested on January 2 and had benefitted financially from the market

appreciation.

The SEC filed a complaint against the defendants on December
30, 2005, alleging that the defendants violated various
securities laws in an effort to conceal the fact that the
Combined Plan's assets had not been invested on January 2.
According to the facts alleged by the SEC, all of the defendants,
as well as some other uncharged individuals, met numerous times
to discuss the situation. At those meetings, defendant Durgarian
stated that the one-day delay was not to be disclosed to the
Combined Plan and that Putnam would not bear the cost of the
shortfall. In order to make up the shortfall, Hogan revealed a
plan he devised which would move money from other Putnam mutual
funds to the Combined Plan through the use of "as of" trades. By
using those funds to make up the shortfall, the Combined Plan
would not realize that it had not capitalized on the market
appreciation. The Complaint alleges that all of the defendants
agreed to the plan and Durgarian directed Hogan to execute the
necessary trades.

An "as of" trade is a backdated purchase or sale of a
security that utilizes the net asset value ("NAV") from a prior
day rather than the current day's NAV. The NAV is the price
shareholders pay for mutual fund shares which is calculated by
dividing the total value of the assets in a fund's portfolio by
the fund's outstanding shares. An "as of" trade is the purchase

or sale of mutual fund shares at an NAV different than the
present NAV and results in an artificial dilution (or increase)
in the overall value of the fund.

Proper uses of "as of" trading to correct trading errors are
not themselves illegal. In order to protect mutual fund
shareholders from being harmed by such "as of" trades, Putnam had
a "penny-per-share" policy which required that the party
responsible for the error which necessitated the "as of" trade to
compensate for any harm if the value of the fund's per share NAV
was reduced by at least one penny per share.

In this case, the SEC alleges that the harm caused by the
"as of" trades exceeded the penny-per-share policy and resulted
in significant losses to Putnam's other mutual funds: $2.7M to
the Research Fund, and a combined loss of $450,000 to the George
Putnam Fund of Boston and three portfolios within the Asset
Allocation Fund.

In order to conceal the costs of the "as of" trades to the
unknowing shareholders of the mutual funds, the defendants
allegedly agreed to further the fraudulent scheme by using
various accounting adjustments to hide the incurred losses.
Durgarian directed McCracken to find accounting adjustments that
could be used to move money back into those mutual funds so that
the net losses would drop below one penny-per-share and conceal
the dilution caused by the "as of" trades. According to the

allegations, McCracken successfully directed his employees to identify accounting adjustments.

The Complaint alleges that the defendants also took further steps to conceal the fraudulent scheme. Following the execution of the "as of" trades and accounting adjustments, Durgarian made several periodic certifications to the SEC that he had

disclosed to each registrant's auditors and the audit committee of each registrant's board of directors ... any fraud, whether or not material, that involves management or other employees who have a significant role in each registrant's internal controls.

Those certifications were filed with the SEC on numerous occasions in 2002 and 2003. Furthermore, in 2003, in response to an unrelated Putnam internal audit of the defined contribution plan servicing unit, defendants Childs, Crain and Papa made similar certifications to the auditors. The Complaint alleges that the four certifying defendants knew about the "as of" trades and the accounting adjustments and that therefore, the certifications were false.

The alleged fraud first came to the attention of Putnam and the SEC in January, 2004 when defendant Crain left a message for an internal Putnam auditor which sparked an internal investigation. The investigation resulted in a correction to the price of the Research Fund, disclosure of the conduct to the Combined Plan investors, termination of the employment of defendants Durgarian, Papa and Hogan, and compensatory payments

-5-

to the mutual funds, the Combined Plan and all affected
shareholders.

The Complaint alleges three claims against all six
defendants: 1) Violation of the Securities Exchange Act Section
10(b), 2) Violation of Securities Act Section 17(a) and 3) Aiding
and Abetting Putnam's Uncharged Violations of the Securities
Exchange Act Section 10(b). Moreover, the SEC alleges against
defendant Durgarian, additional claims of violating the
Investment Company Act Sections 34(b) and 37.

## II. **Motions to Dismiss**

Each of the defendants has filed an individual motion to
dismiss the charges against him or her. The defendants have
filed a joint memorandum with respect to the three claims alleged
against the group and, except for defendant Papa, have filed
individual memoranda of law in support of their separate motions.
Durgarian also filed a separate memorandum of law to address the
two claims brought against him alone.

All of the defendants contend that the Complaint should be
dismissed pursuant to Fed.R.Civ.P. 9(b), failure to state fraud
claims with particularity, and Fed.R.Civ.P. 12(b)(6), failure to
state a claim upon which relief can be granted.

-6-

## A. Heightened Pleading Standard

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The instant enforcement action by the SEC involves claims of securities fraud, and thus, the heightened pleading requirements apply. The First Circuit Court of Appeals has interpreted the Rule 9(b) requirements to include "specification of the time, place, and content of an alleged false representation." Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999)(quoting McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228 (1st Cir. 1980)). In applying that standard to securities fraud actions, this circuit has been notably strict and rigorous. Greebel, 194 F.3d at 193.

Given the number of defendants and the several claims brought by the SEC, the Court will address the heightened pleading standard only with respect to those individual claims that fail to meet its requirements.

## B. Legal Standard

A court may not dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Judge v. City of Lowell, 160 F.3d 67, 72 (1st Cir. 1998)(quoting Conley v. Gibson,

355 U.S. 41, 45-46 (1957)). In considering the merits of a
motion to dismiss, the court may look only to the facts alleged
in the pleadings, documents attached as exhibits or incorporated
by reference in the complaint and matters of which judicial
notice can be taken. Nollet v. Justices of the Trial Court of
Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000) aff'd, 248 F.3d
1127 (1st Cir. 2000).

Furthermore, the court must "assume the truth of all well-
pleaded facts and indulge all reasonable inferences that fit the
plaintiff's stated theory of liability." In re Colonial Mortg.
Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003). If the facts in
the complaint are sufficient to state a cause of action, a motion
to dismiss the complaint must be denied. See Nollett, 83 F.
Supp. 2d at 208.

## C.  Claim One: Section 10(b) of the Securities Exchange Act and Rule 10b-5

Claim One charges all of the defendants with violation of
Section 10(b) of the Securities Exchange Act and Rule 10b-5,
issued thereunder. The Court begins with the text of Section
10(b):

> It shall be unlawful for any person, directly or indirectly,
> by the use of any means or instrumentality of interstate
> commerce or the mails, or of any facility of any national
> securities exchange ...
>
> (b) To use or employ, in connection with the purchase or
> sale of any security registered on a national securities
> exchange or any security not so registered, any manipulative
> or deceptive device or contrivance in contravention of such

-8-

rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b-5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. Ch. II § 240.10b-5. The defendants contend that the SEC fails to allege facts sufficient to establish fraudulent conduct in support of any of the activities prohibited by Rule 10b-5.

### 1.  Material Misstatements

The Complaint asserts that all of the defendants made "untrue statements of material fact", yet, except with respect to defendant Durgarian, the SEC fails to allege with sufficient particularity any specific material statements made by the other defendants.  The Court concludes, therefore, that the Complaint alleges material misstatements only against Durgarian.

With respect to claims against him, the SEC alleges that on September 27 and November, 25, 2002, and on March 26, May 27,

-9-

August 20 and September 23, 2003, Durgarian falsely certified
that he had disclosed

> any fraud, whether or not material that involves management
> or other employees who have a significant role in [the
> fund's] internal controls.

The materiality of the certifications is not disputed; the
certifications were submitted to the SEC and, thus, were
available to the public and investors.  See SEC v. Texas Gulf
Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968)(establishing that a
material misrepresentation is one that is reasonably expected to
be disseminated to the public and influence investors).

Although Durgarian concedes that the certifications are
material, he challenges their falsity.  He contends both that
they were true and that the SEC has failed to allege that they
were false.  In order for his certifications to have been false,
the January, 2001, actions of the defendants must have
constituted a fraud.  According to Durgarian, because the SEC
fails to allege the fraudulent scheme itself, it cannot
demonstrate that his certifications of the absence of any fraud
are false.  While appealing in logic, his argument is ultimately
to no avail because, as the Court hereinafter concludes, the SEC
has sufficiently alleged a scheme to defraud.  Accordingly, the
SEC has also adequately alleged that Durgarian made material
misstatements in his certifications.

## 2. Material Omissions

The SEC alleges that all of the defendants failed to disclose material facts necessary to make "statements made, in light of the circumstances under which they were made, not misleading."

A statement or omission is material if there is "substantial likelihood that a reasonable investor would consider it important in making an investment decision." See SEC v. PIMCO Advisors Fund Mgmt LLC, 341 F. Supp. 2d 454, 464 (S.D.N.Y. 2004)(citing Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). For a material omission to rise to the level of a § 10b violation, the SEC must also demonstrate that the defendant had a duty to disclose. See Garvey v. Arkoosh, 354 F. Supp. 2d 73, 80 (D. Mass. 2005)("[s]ilence, absent a duty to disclose, is not misleading").

In this case, the SEC alleges that the defendants failed to disclose material information to both the Combined Plan and the Putnam mutual funds that were affected by the transactions. The SEC contends that none of the defendants informed representatives of the Combined Plan that its assets had not been invested until January 3 and that the fund was only partially compensated for the shortfall by shifting money from other mutual funds. With respect to the mutual funds, the SEC contends that none of the defendants informed those funds that Putnam had transferred money

-11-

into another client's account.

First, the defendants dispute the materiality of the alleged omissions. They argue that the alleged losses are not sums that a reasonable shareholder would consider important and, therefore, are immaterial. In support, the defendants direct the Court's attention to a decision by the District of Columbia Circuit Court of Appeals which ruled that a penny-per-share difference was not material. SEC v. Steadman, 967 F.2d 636, 643 (D.C. Cir. 1992)("We cannot imagine that a reasonable investor would think the difference between \$99.54 and \$99.53 a share important.") The Court finds the case to be unpersuasive because Steadman involved allegations that an investment fund had failed to book liabilities for penalties resulting from their failure to register under state Blue Sky laws. Id. While the court stated that a failure to disclose the penalties would translate into a penny-per-share loss, which is immaterial, it went on to state that the materiality of the sum, \$694,000, was not disputed by either party. Steadman, 967 F.2d at 644. Similarly, in this case, the Complaint alleges that the defendants acted in a manner that caused significant losses, including their failure to inform the Combined Plan of an estimated \$4M loss and the scheme to conduct "as of" trades which caused an aggregate \$2.7M loss to the Research Fund. Those losses are clearly material.

Second, the defendants contend that the SEC fails to allege that they had an individual duty to disclose the information. On that point, the Court agrees with the defendants that the SEC has failed to plead with sufficient particularity.

Absent a duty to disclose, there can be no primary violation based on material omission. The SEC contends, generally, that the defendants' fiduciary duties arise out of Putnam's fiduciary duties to the Combined Plan and the mutual funds based on Putnam's status as an agent and trustee. The Complaint alleges that Putnam was an agent for the Combined Plan and the mutual funds and was designated as a Trustee of a trust the res of which was assets transferred by the Combined Plan.

By applying principles of agency law, the SEC argues that each of the defendants, as employees of Putnam and sub-agents to the Combined Plan and the mutual funds, also had a fiduciary duty to disclose. Under Massachusetts law, employees of an agent can be sub-agents in a fiduciary relationship toward a principle, and the sub-agents can be subject to liabilities of the agent. Frontier Mgmt Co., Inc. v. Balboa Ins. Co., 658 F. Supp. 987, 990 (D. Mass. 1986)(citing Rayden Engineering Corp. v. Church, 337 Mass. 652 (1958)). Because this is a securities fraud case, however, merely alleging that the defendants were employees is insufficient to meet the heightened pleading standard. The Complaint provides little or no detail with respect to the

-13-

individual defendants and the nature of their work in relation to
the affected principals, the Combined Plan and the Putnam mutual
funds.  Other than providing the executive titles of each of the
defendants, the Complaint does not illuminate the nature of those
relationships.  As such, the Court finds that the SEC fails to
plead the alleged violation with the required degree of
particularity.

### 3.    **Fraudulent Scheme or Device**

The central dispute before this Court is whether the alleged
conduct is a violation of Rules 10b-5(a), a device, scheme or
artifice to defraud, and (c), an act which operates as a fraud or
deceit.  As opposed to a Rule 10b-5(b) claim, no false or
misleading statement is required, rather primary liability is
based on the use of a "fraudulent device" in connection with the
sale of securities.  17 C.F.R. Ch. II § 240.10b.

The SEC alleges that the defendants engaged in a fraudulent
scheme to transfer losses from one client to others and then
conceal both the underlying error and the fraudulent transfer.
The alleged scheme comprised two parts: first, transferring money
through "as of" trades to the Combined Plan at the expense of
non-consenting mutual funds and then, covering up the losses to
the mutual funds through improper accounting adjustments and
false certifications.

-14-

The defendants contend that the SEC's allegations of fraud fail because the bases for the alleged scheme, the particular individual transactions, "as of" trades and the accounting adjustments, are not clearly illegal. Rather, as conceded by the SEC in the Complaint, they are accepted practices in the industry. The defendants argue that the SEC, therefore, fails to allege an actionable scheme because the actions themselves are not obviously illegal.

In support, the defendants cite language found in a recent decision by this Court, SEC v. Tambone, 417 F. Supp. 2d 127 (D. Mass. 2006). Tambone involved an allegation of fraud based on a market timing arrangement that was not disclosed to investors. This Court held that the SEC's allegations did not fall within the category of manipulative devices envisioned by the Supreme Court:

> The defect in the SEC's allegations is that market timing arrangements are not the kind of sham transactions which have been held to qualify as schemes to defraud.

Id. at 136. Rather, market timing arrangements themselves had been explicitly determined to be not fraudulent devices. Id. (citing PIMCO, 341 F. Supp. 2d at 468). As such, this Court distinguished the market timing arrangements at issue with those cases cited by the SEC by characterizing those cases as involving "some device that was clearly illegal". Tambone, 417 F. Supp. 2d at 135-36 (citing cases).

-15-

The defendants have interpreted the cited comment as tantamount to a new requirement that a scheme to defraud must be based on conduct that is clearly illegal. That interpretation overstates this Court's description of the cases cited by the SEC and the defendants cite no authority to support such a broad application of the holding in Tambone; neither the statute nor the accompanying rules require a showing of illegality.

Given the confusion surrounding its discussion in Tambone, the Court hastens to clarify its understanding of the statute. The statute explicitly requires the SEC to allege that the defendants engaged in some kind of "manipulative device or contrivance." 15 U.S.C. § 78j. See also Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 n. 20-21 (1976). In Santa Fe Industries, Inc. v. Green, the Supreme Court defined manipulation as:

> virtually a term of art when used in connection with securities markets ... [and] refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.

430 U.S. 462, 476 (1977)(internal quotation marks omitted). While the defendants are correct to note that wash sales, matched orders and rigged prices are illegal, they are used by the Supreme Court as examples of practices which "are intended to mislead investors." It was that intent to mislead that caused the Supreme Court to stress that the purpose of Section 10(b) was

-16-

to "prohibit the full range of ingenious devices that might be used to manipulate securities prices." Id. at 477.

Applying this understanding of the statute, United States District Judge Patti Saris held that Section 10(b) and Rule 10b-5 made liable participation in a

>   manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors ....

In re Lernout & Hauspie Securities Litigation, 236 F. Supp. 2d 161, 173 (D. Mass. 2003). In analyzing the SEC's alleged scheme to defraud, the Court must determine whether such a device was used and whether there was the requisite intent to mislead. The legality of a particular device is obviously an important factor to consider when determining whether a deceptive practice was implemented but it is not itself conclusive.

Moreover, the terms of Rule 10b-5(c) militate against requiring a fraudulent scheme to involve clearly illegal conduct. Section (c) prohibits "any act, practice, or course of business which operates as a fraud or deceit". While the Complaint concedes that the "as of" trades and accounting adjustments, alone, are not per se illegal, the SEC appropriately focuses on the improper usage of such trades to conceal the Combined Plan's shortfall by transferring money from unknowing and unconsenting owners of mutual funds rather than admitting an error or incurring costs at Putnam. The SEC is correct when it accuses

-17-

the defendants of myopic consideration of "as of" trades and
accounting adjustments.  It is not the fact that such trades or
adjustments were made that is the alleged scheme but rather the
deceptive purpose that underlies those trades and adjustments.

The SEC alleges that all of the defendants met in January,
2001 to discuss a plan to conceal from the Combined Plan the fact
that the mutual fund investments were not made on a certain day
and thus did not receive the benefit of the equity market
upswing, resulting in a loss of approximately $4M.  The complaint
alleges that the defendants created a scheme by which the $4M
shortfall would be accounted for through "as of" trades,
deflecting the cause of the error away from Putnam and the loss
away from the Combined Plan.

While "as of" trades themselves are not illegal, the SEC
alleges that they were utilized for the purpose of deceiving the
Combined Plan investors, to hide the facts and to prevent those
investors from realizing that the subject investment was not
timely made.  While it is true that Putnam has a policy of
allowing such "as of" trades to correct trading errors, the
complaint alleges that the legitimate policy was abused by the
defendants for the purpose of deceiving Cardinal, the Combined
Plan and other Putnam mutual funds which ultimately bore the cost
of those "as of" trades.

-18-

In order to conceal the effect of the "as of" trades, the defendants allegedly made account adjustments and false certifications. Again, the SEC alleges that the timing of the adjustments was intended to coincide with the "as of" trades in order to conceal further the defendants' manipulative actions. None of those actions nor the resulting negative financial impact, was revealed to the investors of the adversely-affected mutual funds or to Cardinal or the Combined Plan. The defendants' arguments that the SEC insufficiently alleged a fraudulent scheme is unavailing.

### 4. Substantial Participation and Scienter

In order to state a claim that a defendant is a "primary violator", the complaint must allege not only a fraudulent scheme but also facts to demonstrate that the defendant under consideration "substantially participated" in the alleged scheme and acted with scienter. See In re Lernout, 230 F. Supp. 2d at 174. In other words, the SEC must allege how each of the defendants' actions had a principal purpose and effect upon creating a false appearance in fact in furtherance of the scheme to defraud. See Quaak v. Dexia S.A., 357 F. Supp. 2d 330, 342 (D. Mass. 2005).

Furthermore, with respect to alleged securities fraud violations, the SEC must also "set forth facts giving rise to a 'strong inference' that the defendants acted with the required

state of mind." In re Stone & Webster, Inc., Securities Litigation, 414 F.3d 187, 204 (1st Cir. 2005). The SEC must allege facts that each defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud". Ernst, 425 U.S. at 193 n.12. In doing so, the SEC must allege more than mere motive and opportunity. In re Cabletron Systems, Inc., 311 F.3d 11, 39 (1st Cir. 2002) (motive and opportunity, combined with other circumstances, may create the requisite inference of scienter); Geffon v. Micrion Corp., 249 F.3d 29, 36 & n.7 (1st Cir. 2001).

At times, the Complaint makes particular reference to each of the defendants but on other occasions, refers to them collectively. In order to disentangle the allegations, the Court examines each of the defendants, individually.

### a) Karnig H. Durgarian

The Complaint alleges Durgarian's involvement throughout the entire scheme. In addition to attending the January, 2001, meeting and agreeing with the others to execute the scheme, he allegedly directed Hogan and McCracken to conceal the shortfall through the "as of" trades and account adjustments and explicitly stated that Putnam would not bear the cost. Thereafter, he allegedly expressed his approval of the successful account adjustments, stating that "accountants are magicians" when the adjustments succeeded in concealing the "as of" trades. The

-20-

Complaint sufficiently alleges that Durgarian knew of the shortfall in the Combined Plan and the losses suffered by the Putnam mutual funds as a result of the "as of" transactions and provides a strong indication that Durgarian acted with the intent to deceive, manipulate or defraud.

Thus, the SEC has pled with sufficient particularity Durgarian's substantial participation in the alleged fraudulent scheme as well as strong support for an inference that he acted with fraudulent intent.

### b)   Donald F. McCracken

With respect to the "as of" trades, there is little beyond the allegation that McCracken attended the January, 2001, meeting to indicate his alleged involvement. However, the Complaint does allege that McCracken was actively involved in directing and executing the expense account adjustments allegedly intended to mask the losses resulting from the "as of" trades.   While involvement with the account adjustments, alone, may not constitute substantial participation, the SEC clearly alleges that McCracken attended the January, 2001, meeting and knew of the scheme then devised and thus, acted in furtherance of it.

Contrary to McCracken's argument that the deception alleged in the Complaint is unrelated to the adjustment of expenses, the SEC clearly alleges that he participated in the January, 2001 meetings and knew about the need to conceal the diluted NAV

resulting from the "as of" trades. The Complaint even alleges that he told Durgarian that he would "take care of it" and goes on to outline how McCracken directed employees to identify appropriate expense accrual adjustments and rejected an employee's answer that she could not identify sufficient adjustments. While the SEC does not specify exactly which specific expense adjustments were made or which were unwarranted and inappropriate, it provides enough specificity with regard to McCracken's role in directing the adjustments and his improper intent to further the deception. Moreover, in outlining all of those acts, the Complaint sufficiently alleges that McCracken acted with the requisite state of mind embracing an intent to deceive required to support a securities fraud violation.

### c) Ronald B. Hogan

As the alleged architect of the "as of" transactions, Hogan is clearly purported to be a substantial participant in the alleged scheme to defraud. While Hogan responds that the "as of" transactions which he allegedly coordinated are not illegal per se, the SEC clearly alleges that he attended the January, 2001 meeting and was aware of the shortfall caused by the one-day delay. Hogan was, therefore, also aware of how his actions executing the transactions would further the scheme to conceal the shortfall from the investors in the Combined Plan. Furthermore, the Complaint makes clear that Hogan also allegedly

-22-

discussed the need for expense adjustments to conceal the "as of" trades.

By reference to the prior discussion about the legality of the "as of" transactions and account adjustments, Hogan is still liable for the actions that he allegedly took to advance the scheme to defraud. The SEC alleges that he devised and then implemented the transactions required to further the deception. Describing Hogan as the alleged "architect" of the transaction scheme, the SEC has sufficiently alleged both his substantial participation and a reasonably strong inference that he acted with fraudulent intent.

### d) Kevin F. Crain, Virginia A. Papa and Sandra G. Childs

The Court finds that, beyond their attendance at the January, 2001, meeting, the Complaint identifies no explicit acts taken by defendants Crain, Papa and Childs ("these defendants") in furtherance of the fraudulent scheme. While the Complaint contends generally that all of the defendants listened, discussed and then agreed upon the fraudulent scheme, there are no explicit details outlining specific actions taken by these defendants.

In order to constitute a primary violation of securities laws on the basis of a scheme to defraud, the SEC must make an explicit allegation of a manipulative act committed by the defendant in furtherance of the scheme. Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177

-23-

(1994). While the other defendants are named for their roles in devising, approving or implementing the scheme, the Complaint makes only vague allusions regarding the involvement of these defendants. They persuasively contend that the SEC has inappropriately lumped them together with the other three defendants and that the generalized allegation of attending a meeting is insufficient to demonstrate substantial participation in the alleged scheme.

The Complaint does not, however, end there. While there are no specific allegations of actions taken by these defendants in the creation or execution of the "as of" transactions or the accounting adjustments, the Complaint includes an entire section dedicated to a discussion of their alleged false certifications.[1] The SEC alleges that these defendants advanced the scheme by continuing to conceal the "as of" transactions and accounting adjustments by issuing false certifications to an outside auditor.

In January and February, 2003, Putnam's outside auditor conducted audits, in an unrelated matter, of the defined contribution plan servicing unit of Putnam for the 2001 and 2002 years. These defendants and Durgarian certified that they were "unaware of any uncorrected errors, frauds or illegal acts

---

[1] Although Durgarian also signed those certifications, the focus here is on the defendants, Crain, Papa and Childs.

attributable to" Putnam that had affected its clients. The SEC alleges that because all of the defendants were in attendance at the January, 2001, meeting and, therefore, aware of the cover-up scheme the certifications were not only false but were also intended to conceal the conduct from the auditors.

The Court agrees with the contention of these defendants that the alleged false certifications bearing their signatures are too attenuated to link them to the fraudulent scheme. The SEC provides no allegation linking the signatures to the fraud other than its general assertion that the defendants attended the meeting. The referenced certification letters are the only overt acts alleged in the Complaint against these defendants and, therefore, the only basis on which their substantial participation in the scheme, and thus their liability as primary violators, is predicated.

The Court concludes that the SEC's allegations are insufficient to demonstrate either substantial participation in the scheme or to create a strong inference that the defendants Childs, Craine and Papa acted with the requisite scienter in signing those certifications. See SEC v. Druffner, 353 F. Supp. 2d 141, 149-50 (D. Mass. 2005)(liability requires proof of a "mental state embracing intent to deceive, manipulate or defraud"). Therefore, the claims alleging primary violations of Section 10(b) of the Securities Exchange Act against defendants

Childs, Crain and Papa will be dismissed.

**D.  Claim Two: Securities Exchange Act, Section 17(a)**

In Claim Two, the SEC charges all of the defendants with primary violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).  The requirements for establishing a violation of Section 17(a) are nearly the same as those required for a claim under Securities Exchange Act Section 10(b) and Rule 10b-5 thereunder, although there is no requirement for the SEC to demonstrate scienter with respect to subsections (a)(2) and (a)(3).  See Aaron v. SEC, 446 U.S. 680, 681 (1980).

In the preceding section, the Court found that the SEC has not sufficiently alleged substantial participation in a fraudulent scheme against defendants Childs, Crain and Papa.  For the same reasons, the claims against these defendants alleging violation of Section 17(a) will be dismissed.  As for the defendants, Durgarian, McCracken and Hogan, their first defense is that there can be no liability because the Complaint fails to allege that they were offerors or sellers of securities.

The Court begins by reference to the statute which states:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly-

(1) to employ any device, scheme or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements

-26-

made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Defendants contend that the language in Section 17(a) prohibits fraud only "in the offer or sale of any securities", in contrast to Section 10(b) of the Securities Exchange Act, which prohibits fraud "in connection with the purchase or sale of any security". (emphasis added).

In support of its interpretation, the defendants attempt to distinguish Section 17(a) from Section 10(b) and assert that the language should be interpreted narrowly to apply only in cases involving a securities seller, as in the case of Section 12(1) and (2). Despite the strenuous and persistent effort of the defendants, the Court ultimately is unpersuaded.

First, Section 17(a) imposes liability against "any person [who commits a fraud] in the offer or sale" of a security, 15 U.S.C. § 77q(a)(emphasis added), as opposed to Section 12 which imposes liability against "any person who [fraudulently] offers or sells a security", 15 U.S.C. § 77l(2)(emphasis added). While the provisions are similar, the subtle difference supports the SEC's interpretation. Section 12 makes clear that "offers or sells a security" directly modifies "any person". In contrast, Section 17(a) is not as limited; it imposes liability on "any person" who commits particular actions "in the offer or sale" of

-27-

securities. While, on its face, the distinction appears obscure, one need only refer to Section 10(b) to realize that it also applies to more than just sellers when it refers to: "any person ... in connection with the purchase or sale of any security."

Second, with specific reference to the distinction between Section 17(a) ("in the offer or sale") and Section 10(b) ("in connection with"), the Supreme Court has stated that it has "on occasion used the terms interchangeably." United States v. Naftalin, 441 U.S. 768, 773 n.4 (1979). In Naftalin, the Supreme Court explained that the Section 17(a) language was "expansive enough to encompass the entire selling process, including the seller/agent transaction." Id. at 773; see also SEC v. Morris, 2005 WL 2000665 at *7 (S.D. Tex. Aug. 18, 2005)(rejecting the same distinction between Section 17(a) and 10(b) and noting that Section 17(a) does not require proof that fraud occurred at any particular phase of selling).

The Court concludes that in alleging the elements of liability for Section 10(b), the SEC has also sufficiently alleged liability under 17(a), and, therefore, defendants Durgarian, McCracken and Hogan may be found liable for the alleged fraudulent scheme on that count.

## E. Claim Five: Aiding and Abetting Putnam's Uncharged Violations)

The fifth claim charges all of the defendants with aiding and abetting Putnam in violating Securities Exchange Act Section

-28-

10(b) and Rule 10b-5, thereunder, by knowingly rendering substantial assistance in those violations.  The SEC has not charged Putnam with those alleged violations.

The three principal elements required to establish liability for aiding and abetting a violation of Section 10(b) and Rule 10b-5 are: 1) that a securities violation was committed by a primary wrongdoer, 2) that the aider and abettor provided substantial assistance to the primary violator and 3) that the aider and abettor provided such assistance knowingly or recklessly.  See Druffner, 353 F. Supp. 2d at 150; see also Graham v. SEC, 222 F.3d 994, 1000 (D.C. Cir. 2000)(citing cases) (recognizing those three principal requirements, although the elements have been "variously formulated").

The Court finds that the allegations in the Complaint, if proven, support the conclusion that Putnam is liable for primary violations of Section 10(b) and Rule 10b-5, thereunder.  The Complaint alleges that 1) Putnam made material omissions and violated its fiduciary duty to the Combined Plan and the Putnam mutual funds and 2) Putnam, through its employees, engaged in the aforementioned scheme to deceive and defraud investors.  The Court concludes that both of those claims are supported by sufficient factual allegations in the Complaint.  Although the material omissions claim against the individual defendants, was not pled with the requisite particularity, the Complaint

sufficiently alleges Putnam's relationship to the Combined Plan
(as agent and trustee) and the Putnam mutual funds (as agent).

The scienter of corporate entities such as Putnam is
"ascertained through the mental state of its management". PIMCO,
341 F. Supp. 2d at 471. The Complaint alleges sufficient facts
to support a strong inference that the defendants, executives at
Putnam, acted with the intent to conceal the shortfall from the
Combined Plan and the losses resulting from the improper "as of"
trades. As such, the aiding and abetting claims against the
defendants cannot be dismissed for failure to allege a primary
violation.

The second and third elements require proof that the alleged
aiders and abetters provided substantial assistance and acted
with the requisite scienter. Similar to the Court's conclusion
with respect to Section 10(b) liability, the Court finds that the
SEC has failed to allege sufficiently that defendants Childs,
Crain and Papa provided knowing and substantial assistance
regarding either the fraudulent scheme or the material omissions.
The Complaint alleges only general statements about their
attendance at the meetings, agreement to the plan and failures to
make appropriate disclosures to the Combined Plan and the Putnam
mutual funds. As alleged, such conclusory statements are
insufficient to make those defendants secondarily liable. In
contrast, the Complaint does provide specific examples of

-30-

affirmative conduct by defendants Durgarian, McCracken and Hogan
to support the charge of secondary liability.

The Court will, therefore, allow the motions to dismiss
Claim Five with respect to defendants Childs, Crain and Papa
only.

## F. Investment Act Claims Against Durgarian

Defendant Durgarian, alone, moves the Court to dismiss the
two additional claims against him. Count III alleges violation
of Investment Company Act ("ICA") § 34(b), Destruction and
Falsification of Reports and Records, and Count IV alleges
violation of ICA § 37, Larceny and Embezzlement.

### 1. Section 34(b) Claim

In Count III of the Complaint, the SEC asserts a claim
against Durgarian for violation of the ICA § 34(b) based on
materially false and misleading statements "in a registration
statement, application, report, account record or other document
filed or transmitted pursuant" to the Act. The statute provides:

It shall be unlawful for any person to make any untrue
statement of material fact in any registration, statement,
application, report, account, record or other document filed
or transmitted pursuant to this subchapter .... It shall be
unlawful for any person so filing, transmitting, or keeping
any such document to omit to state therein any fact
necessary in order to prevent the statements made therein,
in the light of the circumstances under which they were
made, from being materially misleading.

15 U.S.C. § 80a-33(b).

-31-

As an initial matter, the Court rejects Durgarian's contention that the claim is not pled with sufficient particularity. The SEC alleges in its complaint that Durgarian made false certifications on September 27 and November 25, 2002 (three separate certifications), and March 26, May 27, August 20 and September 23, 2003. On all of those occasions, Durgarian filed certifications with the Commission stating that he had

disclosed ... any fraud, whether or not material, that involves management or other employees who have a significant role in each registrant's internal controls.

Having indicated the time, method and content of the alleged false misrepresentations, the SEC has met the Rule 9(b) pleading requirements with respect to this count.

Durgarian also contends that the count should be dismissed because the SEC fails to allege any untrue statement of material fact or actionable omission. The Court finds that argument unpersuasive. Unlike the internal audit certifications made by defendants Crain, Papa and Childs, Durgarian's allegedly false certifications were submitted to the SEC and thereafter, made available to the public and investors. Therefore, if proven to be false, Durgarian's certifications are clearly material. The Court also rejects Durgarian's final argument that the alleged accounting adjustments and "as of" trades were not clearly illegal and that, therefore, his certifications were not false. Because the Court has already concluded that the SEC has alleged

-32-

facts sufficient to withstand a motion to dismiss with respect to the alleged scheme to defraud, the Court concludes that the SEC is entitled to pursue its § 34 claim. Accordingly, the Court will deny defendant Durgarian's motion to dismiss this count.

## 2. Section 37 Claim

In Count IV of the Complaint, the SEC asserts a claim against Durgarian for violation of the ICA § 37. That section states:

Whoever steals, unlawfully abstracts, unlawfully and willfully converts to his own use or to the use of another, or embezzles any of the moneys, funds, securities, credits, property, or assets of any registered investment company shall be deemed guilty of a crime, and upon conviction thereof shall be subject to the penalties provided in section 80a-48 of this title. A judgment of conviction or acquittal on the merits under the laws of any State shall be a bar to any prosecution under this section for the same act or acts.

15 U.S.C. § 80a-36(b). Section 80a-48 provides a penalty that "upon conviction [a violator will] be fined not more than $10,000 or imprisoned not more than five years, or both".

Directing the Court to the statutory language "guilty of a crime" and "upon conviction", Durgarian argues that this section is a criminal statute and does not create a civil cause of action or civil remedies. As such, prosecution in these proceedings would result in a deprivation of those protections afforded to defendants in criminal proceedings, in violation of the constitutional right to due process. See, e.g., Append v. New Jersey, 530 U.S. 466 (2000)(a finding beyond a reasonable doubt

-33-

as to every element of a crime). The SEC argues that other
federal courts have recognized a civil cause of action for
Section 37 violations. See, e.g., SEC v. Lawbaugh, 359 F. Supp.
2d 418 (D. Md. 2005), Seidel v. Lee, 1996 WL 578449, at *5 (D.
Del. Aug. 16, 1996), SEC v. Commonwealth Chem. Securities, 410 F.
Supp. 1002 (S.D.N.Y. 1976).

In support of his reading of the statute, Durgarian
analogizes the present SEC enforcement action with those
involving claims under the ICA brought by private investors.
See, e.g., Forsythe v. Sun Life Financial, Inc., 417 F. Supp. 2d
100, 108 (D. Mass. 2006)(no private right of action under
Sections 34(b), 36(a), 48(a)); Yameen v. Eaton Vance
Distributors, Inc., 394 F. Supp. 2d 350, 352 n.1. (D. Mass.
2005)(no private right of action under Section 36(a)).  In
rejecting an implied private right of action in those cases, the
Court looked to the Supreme Court's holding in Alexander v.
Sandoval, 532 U.S. 275 (2001) which requires that any implied
right of action must be found in the "text and structure" of the
statute to insure that the court did not create a cause of action
"no matter how desirable that might be as a policy matter, or how
compatible with the statute." Id. at 286.

The Court concludes that those cases are unpersuasive in the
present context.  Unlike those cases which involved actions
brought by private investors and litigants seeking to impose

liability through the ICA, this case involves an enforcement action brought by the SEC. In Forsythe, another session of this District Court recognized the SEC's unique role, stating that "the responsibility for the overall enforcement of the ICA statutory scheme is not given to private individuals but rather to the SEC." 417 F. Supp. 2d at 107. Moreover, broad authority for the SEC to investigate and enforce compliance is underscored by the language in Section 80a-41, which states:

> The Commission may make such investigations as it deems necessary to determine whether any person has violated or is about to violate any provision of this subchapter or of any rule, regulation ....
>
> Whenever it shall appear to the Commission that any person has engaged or is about to engage in any act or practice constituting a violation ... [the Commission] may in its discretion bring an action ... to enjoin such acts or practices and to enforce compliance with this subchapter or any rule, regulation, or order hereunder.

15 U.S.C. § 80a-41(a),(d).

In this case, the SEC seeks to use its authority to "permanently restrain[] and enjoin[] defendant Durgarian from violating, directly or indirectly, ... [Section] 37 of the Investment Company Act." The Court finds that while Section 37 provides for criminal penalties, the SEC may bring a civil action seeking to enjoin a defendant under this section.

With respect to the elements of a Section 37 violation, the Court finds that the SEC has alleged sufficient facts in support of its claim. As used in Section 37, a conversion "includes use

-35-

in an unauthorized manner or to an unauthorized extent of
property placed in one's custody for limited use." Commonwealth
Chem. Securities, 410 F. Supp. at 1019.  As applied in this case,
the Court finds that the SEC's allegation of fraud contains
sufficient facts from which one might infer that the alleged
willful misconduct of Durgarian, in moving and manipulating the
assets of mutual funds to conceal the shortfall in the Combined
Plan and resulting in a financial loss to the funds, constitutes,
if proven, a conversion of assets.


### III. **Additional Motions**

In a separate motion, Defendant Durgarian moves the Court,
pursuant to Fed.R.Civ.P. 8(a) and 12(f) to strike two allegations
made in the Complaint involving: 1) the termination of
Durgarian's employment by Putnam LLC, one of the corporate
parents to Putnam,  and 2) Durgarian's invocation of his
constitutional privilege against self-incrimination during his
deposition taken by the SEC.  Durgarian contends that the
references are gratuitous and superfluous.

The Court has broad discretion to strike comments which are
not "substantive elements of the cause of action."  Alvarado-
Morales v. Digital Equip. Corp., 843 F.2d 613, 618 (1st Cir.
1988).  However, such motions are "narrow in scope, disfavored in
practice, and not calculated readily to invoke the court's

-36-

discretion." Boreri v. Fiat, S.p.A., 763 F.2d 17, 23 (1st Cir. 1985). Rule 12(f) motions are not typically granted without a showing of prejudice to the moving party. See 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 at 421-22 (3d ed. 2004).

The subject allegations are related to the controversy at hand and the Court finds that there is no showing of undue prejudice. Durgarian's termination from employment is relevant because the Complaint alleges that it resulted from an internal investigation into the alleged fraudulent activity. While adverse inferences drawn from Durgarian's invocation of the Fifth Amendment would be barred in a criminal proceeding, this is a civil enforcement action and no such privilege exists. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)("the Fifth Amendment does not forbid adverse inferences against parties ... where the privilege is claimed by a party to a Civil cause") (internal quotation removed).

Therefore, the Court will deny the motion to strike the subject assertions in the Complaint.

In a separate motion, the SEC moves the Court for leave to file an amended complaint in the event the Court allows any of the motions to dismiss. The Court concludes that there is no basis for allowing the SEC to file an amended Complaint. The SEC provides no indication of what additional information would be

included in an amended complaint nor why the Court should grant

such leave.   The Court agrees with the defendants that the SEC is

not entitled to a "blank check" leave to amend.

#### ORDER

For the foregoing reasons, the motions to dismiss of

defendants Crain (Docket No. 25), Papa (Docket No. 35) and Childs

(Docket No. 36) are, **ALLOWED,** but the motions to dismiss of

defendants Durgarian (Docket No. 33), McCracken (Docket No. 27)

and Hogan (Docket No. 31) are **DENIED.**   The motion of defendant

Durgarian to strike certain references from the complaint (Docket

No. 28) and the SEC's motion for leave to file an amended

complaint (Docket No. 43) are **DENIED.**

**So ordered.**

_Nathaniel M. Gorton_

Nathaniel M. Gorton
United States District Judge

Dated: March 6 , 2007

-38-