# United States Court of Appeals
## For the First Circuit

No. 08-1172

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellant,

v.

VIRGINIA A. PAPA, KEVIN F. CRAIN, and SANDRA G. CHILDS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before
Boudin, Stahl and Howard,
Circuit Judges.

Tracey A. Hardin, Senior Counsel, Securities and Exchange Commission, with whom Brian G. Cartwright, General Counsel, Andrew N. Vollmer, Deputy General Counsel, Jacob H. Stillman, Solicitor, and Katharine B. Gresham, Assistant General Counsel, were on brief for appellant.

Anthony Mirenda, with whom Robert E. Toone, Jennifer A. Cardello, Jennifer S. Behr and Foley Hoag LLP were on brief, for appellee Kevin F. Crane.

Anthony Mirenda for appellees Virginia A. Papa and Sandra G. Childs.

Kelley A. Jordan-Price, Michael J. Connolly, Laura B. Angelini and Hinckley, Allen & Snyder LLP on brief for appellee Virginia A. Papa.

John A. Sten, Jason C. Moreau and Greenberg Traurig, LLP on brief for appellee Sandra G. Childs.

February 6, 2009

**BOUDIN, Circuit Judge.** This is an appeal by the Securities and Exchange Commission ("SEC") from a judgment of the district court dismissing with prejudice a civil complaint against three individuals charging them with violations of the securities laws. On the grant of a motion to dismiss, well-pleaded facts in the complaint are taken as true, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007), so our description of events is largely drawn from the complaint.

Putnam is a well-known money management firm. One of its entities, Putnam Fiduciary Trust Company ("PFTC"), acts as an administrator of employee-defined contribution plans and Putnam mutual funds. Cardinal Health, Inc., a PFTC client who utilized PFTC to run its employee-defined contribution plans, decided to merge with Allegiance Health, and in late 2000 the two companies arranged to combine their defined contribution plans, creating a trust with PFTC as the trustee and investment manager.

In this role, PFTC was responsible for investing the merged plan's assets, making payments on its behalf, and carrying out investment instructions. On January 2, 2001, the assets of the Cardinal and Allegiance plans were combined into a single new combined account; this was done by selling the assets of the old Cardinal and Allegiance accounts and transferring the proceeds from those sales to the new combined account. PFTC had been directed to

invest the combined assets in several mutual funds as soon as possible.

In fact, PFTC did not make the investments until January 3, 2001, causing the combined plan to miss a sharp upswing in the markets. Had the same funds been invested on January 2, the value of the holdings of the combined plan would have been almost $4 million greater. Told on January 3 that the investments had been made (but not told of the one-day delay), a Cardinal employee rejoiced, saying that "[t]he market is up and we look great being invested on the upswing."

PFTC officials took a set of steps designed to offset much of the "loss" to the combined account resulting from the delay and to conceal the misadventure and its repair. These activities gave rise to the present law suit. According to the SEC's complaint, at least six employees of PFTC were in some measure responsible:

> Karnig Durgarian, Jr., the highest ranking executive of PFTC and of various Putnam mutual funds, in several of which the combined plan assets were invested on January 3;
>
> Virginia A. Papa and Donald McCracken, two senior officers of PFTC who reported directly to Durgarian;
>
> Kevin Crain and Sandra Childs, both unit heads reporting to Papa; and
>
> Ronald B. Hogan, an officer in Childs' unit who reported to her.

-3-

According to the SEC, Crain, Childs, Hogan and perhaps others met on January 3 or 4, 2001, and agreed that the combined plan should be protected from losses resulting from the one-day delay.  On January 4 or 5, Hogan began to work out possible transactions to achieve this end.  On or about January 5, all six defendants met and Hogan described a plan to cover the loss by using "as-of" transactions--backdated purchases or sales of securities that use the price from an earlier day rather than the price current on the date the transaction occurred.

Such as-of trades can dilute the value of other shares in a mutual fund, but (we are told) they are not necessarily illegal and are used to correct trading errors.  However, to prevent harm to its mutual fund shareholders from dilution that may be caused by as-of trades, PFTC had an internal policy, known as the penny-per-share policy, requiring the party responsible for the error necessitating the as-of trade to compensate mutual fund shareholders for any dilution of value beyond a penny per share.

Each participant in the January 5, 2001, meeting, the SEC asserts, knew that the transactions would harm the other mutual fund investors and that the harm would exceed a penny per share.  Nevertheless, says the SEC, "[a]fter discussion, Defendants agreed to execute Hogan's plan."  Durgarian said that Cardinal should not be informed about the delay in making the original investments and that PFTC would not bear the cost of the shortfall.

-4-

Hogan thereafter executed several transactions involving Putnam funds. The first, which serves as an example, involved reversing on the books some January 2, 2001, sales by Cardinal (made in liquidating its old account) and restating the sales as occurring on January 3, crediting the new combined account with the higher value that those shares had on the later date. This generated $450,000 for the combined plan at the expense of the Putnam funds' shareholders.

This first set of transactions were followed by two more transactions, differently designed but also at the expense of other Putnam funds' shareholders. The result was to offset about $3 million of the $4 million loss. The remaining $1 million in loss, which was due to delayed investment in the Franklin Small Cap Fund--a non-Putnam mutual fund--went uncompensated. Hogan and Durgarian both contacted Franklin and attempted to persuade it to execute similar as-of trades, but Franklin refused.

At a later meeting or meetings attended by all six of the officials identified above, Durgarian told McCracken to use various accounting adjustments so as to increase recorded expenses for certain of the adversely affected Putnam funds. The purpose was to mask the apparent effect of the as-of transactions. The adjustments were designed to appear on the books at the same time as the as-of trades themselves.

-5-

On January 18, 2002, and February 7, 2003, PFTC's outside auditor conducted audits of PFTC's internal controls in the defined contribution plan servicing unit for the years 2001 and 2002. As part of the audit, certain senior managers were required to sign statements (the "audit letters") stating that they were "unaware of any uncorrected errors, frauds or illegal acts attributable to" PFTC that had affected its clients. Crain, Childs and Papa all signed these statements for both audits.

These events came to light in early 2004 when Crain, having been fired by PFTC for other reasons, told PFTC's internal auditor that the January 5, 2001, events had the "fingerprints" of "financial fraud." Ultimately PFTC terminated Durgarian, Papa and Hogan and converted McCracken's 2002 resignation into a termination for cause. PFTC made compensatory payments to the affected Putnam mutual funds and to others who had redeemed shares or withdrawn from the Putnam funds or combined plan.

On December 30, 2005, the SEC filed a civil complaint in the district court alleging that all six of the PFTC officers had violated section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (2006), section 10(b) of the Exchange Act, id. § 78j, and its implementing regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5 (2008), and that each had aided and abetted PFTC's uncharged primary violations of section 10(b) and Rule 10b-5, thus violating section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

Section 10(b) of the Exchange Act, which is central to this case, makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate." Id. § 78j. Rule 10b-5 identifies false, misleading or incomplete statements as violations and proscribes the use of devices, schemes, or artifices to defraud. 17 C.F.R. § 240.10b-5.

On motions by the defendants to dismiss for failure to state a claim, the district court denied the motions as to Durgarian, McCracken, and Hogan in light of their actions in ordering or carrying out the pertinent transactions. SEC v. Durgarian, 477 F. Supp. 2d 342, 350, 353-54 (D. Mass. 2007). By contrast, the district court found that none of the counts stated a claim against Papa, Crain, and Childs, id. at 360, and entered final judgment in favor of each, Fed. R. Civ. P. 54(b), permitting an immediate separate appeal by the SEC, Fed. R. App. P. 4(a).

The district court, in dismissing claims against the appellees as primary violators, stressed that Papa, Crain, and Childs were not charged with ordering or executing any of the wrongful transactions in January 2001; the complaint merely asserted in general terms that they had "agreed" on January 5, 2001, to the overall plan. This, the district court said, was insufficient to make them "substantial" participants in a

potentially wrongful scheme directed by Durgarian and carried out by Hogan and McCracken.

The appellees' signing of the audit letters over a year after the transactions (and then again a year after that) were affirmative acts but, as to them, the district court said:

> [T]he alleged false [audit letters] bearing their signatures are too attenuated to link them to the fraudulent scheme. The SEC provides no allegation linking the signatures to the fraud other than its general assertion that the defendants attended the meeting. The referenced certification letters are the only overt acts alleged in the Complaint against these defendants and, therefore, the only basis on which their substantial participation in the scheme, and thus their liability as primary violators, is predicated.

Durgarian, 477 F. Supp. 2d at 355.   For similar reasons, the district court also found inadequate the aiding and abetting claims against Papa, Crain and Childs.  Id. at 357.[1]

On appeal, the dispute has been narrowed.   The SEC no longer asserts that Papa, Crain, and Childs are liable as primary violators under sections 10(b) and 17(a).  It claims only that they aided and abetted PFTC's uncharged primary violations of section 10(b), as implemented by Rule 10b-5, by signing the 2002 and 2003

---

[1]In addition, the district court said that the complaint failed to plead facts sufficient to create a strong inference that Papa, Crain and Childs acted with scienter in signing the audit letters.  Id. at 355. However, the "strong inference" requirement relied on by the court has recently been held inapplicable to SEC actions, SEC v. Tambone, 550 F.3d 106, 119-20 (1st Cir. 2008), petition for reh'g filed, so we bypass this alternative holding.

audit letters while knowing that the allegedly wrongful es-of transactions and accounting adjustments had occurred and not been disclosed.

Appellees say that this is a theory that the SEC never squarely presented to the district court and so cannot be argued on appeal as a basis for reversal. The SEC's theory of appellees' liability in the district court rested on the alleged agreement by the Papa, Crain and Childs to the overall scheme, and their later signatures on the audit letters were treated merely as acts in furtherance of that scheme. Thus, the SEC's emphasis in the district court was different than its emphasis on this appeal.

Still, the SEC's complaint included at the end a general aiding and abetting count including all defendants without specifying conduct, and the SEC's opposition to the motion to dismiss did refer to the audit letters as furthering the initial plan. True, the SEC's argument now depends upon treating the audit letters as the only wrongdoing by appellees. But, while this sharpens the focus, it is not an entirely new argument.

The civil aiding and abetting offense was added to the Exchange Act as an amendment in 1995, Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, § 104, 109 Stat. 737, following Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994). In Central Bank, the Supreme Court rejected aiding and abetting as a basis for liability for section

10(b) violations; and, in response, Congress added section 20(e),
15 U.S.C. § 78t(e), to the Exchange Act, to provide--for SEC
enforcement but not private actions--that

> any person that knowingly provides substantial
> assistance to another person in violation of a
> provision of this chapter, . . . shall be
> deemed to be in violation of such provision to
> the same extent as the person to whom such
> assistance is provided.

The question, then, is whether the conduct charged in
this case can comprise substantial assistance, and the first issue
is assistance of what wrong.  The SEC's brief--like its original
complaint--variously refers to two different notions of the
"wrong": one is of a set of transactions in January 2005 which, to
an outsider, might seem dubious; the other is a notion that the
wrong pertinent to this appeal lay in PFTC's failure as a fiduciary
to disclose the initial loss and the remedial steps that followed.[2]

The initial delay and the transactions themselves
(whether or not wrongful) seemingly caused concrete financial loss;
namely, the net loss (after partial compensation) to the combined
Cardinal-Allegiance fund and the reduction in value for other
shareholders.  If this were the focus, the difficulty for the SEC

_____

[2] Paragraph 1 of the complaint describes the offense as
follows: "[Defendants] engaged in a fraudulent scheme to conceal
and cover up an error that had occurred in a client's account.
Instead of disclosing the error to the client and facing the
consequences, Defendants engaged in a fraudulent course of conduct
to transfer the loss from one client to others and then to conceal
the error and the fraudulent transfer from the affected clients and
from PFTC's auditors."

-10-

would be that the transactions, including the accounting adjustments masking them, were completed in or around January 2005, long before the audit letters by appellees. One cannot aid and abet a fraudulent scheme that is already complete, United States v. Hamilton, 334 F.3d 170, 180 (2d Cir.), cert. denied, 540 U.S. 985 (2003), so the issue would be one of duration.

In Krulewitch v. United States, 336 U.S. 440 (1949), and Grunewald v. United States, 353 U.S. 391 (1957), the Supreme Court refused to treat conspiracies (a close counterpart to "schemes") as continuing crimes once the initial wrong is completed, even though continuing concealment was alleged or implicit.[3] Other courts have extended Grunewald and Krulewitch to civil conspiracies. See, e.g., Pyramid Sec. Ltd., 924 F.2d at 1117-18; Hampton v. Hanrahan, 600 F.2d 600, 622 (7th Cir. 1979), rev'd in part on other grounds by 446 U.S. 754 (1980).

Of course, an agreement to conceal after the fact could be viewed as inherent in a conspiracy or any wrongful fraudulent scheme; but then all covert joint wrongdoing would be a permanently continuing offense, Krulewitch, 336 U.S. at 456 (Jackson, J.,

---

[3] "[T]he Supreme Court held long ago that a conspiracy generally ends when the design to commit substantive misconduct ends; it does not continue beyond that point "merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished." Grunewald v. United States . . . ." Pyramid Sec. Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1117-18 (D.C. Cir.), cert. denied, 502 U.S. 822 (1991).

-11-

concurring), an approach that the Supreme Court has rejected. Similarly, "[t]hough the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one." Fiswick v. United States, 329 U.S. 211, 216 (1946).

Admittedly, a borderland of uncertainty exists as to how far the Grunewald approach extends where, for example, the statutory offense is inherently a continuing one or an objective to take continuing action to conceal is part of the central plan. The problem is complicated by new case law after Grunewald, especially in the tax area, e.g., Forman v. United States, 361 U.S. 416, 422-24 (1960), overruled on other grounds by Burks v. United States, 437 U.S. 1 (1978), and by variations as to the offense, the facts, and various contexts (e.g., statute of limitations, hearsay) in which duration questions occur.

At least on appeal, the SEC sidesteps the problem of scheme duration. The ongoing wrong that it says was aided and abetted by appellees was not the transactions themselves nor the scheme that embodied them but arose out of an ongoing fiduciary duty by PFTC to disclose the original loss and the subsequent partial transfer of loss to the clients adversely affected. The SEC argued below that all of the defendants including appellees had such a fiduciary duty, but it no longer maintains that position on appeal.

-12-

Instead, the SEC argues that, given PFTC's continuing duty as a fiduciary to make this disclosure, which is at least arguable, Restatement (Third) of Agency § 8.11 (2006), the appellees' audit letters "assisted" PFTC in continuing to breach its duty because--the SEC claims (appellees say this is speculative)--accurate answers to the audit letters would have revealed PFTC's conduct to auditors and eventually to the combined plan and Putnam funds. An underlying necessary premise is that the non-disclosure was not only a breach of fiduciary duty but also a violation of section 10(b), so invoking SEC jurisdiction.

A breach of fiduciary duty can sometimes be central to a section 10(b) violation; an example would be a purchase or sale that is deemed fraudulent or manipulative because it is based on undisclosed inside information in breach of a fiduciary duty. E.g., United States v. O'Hagan, 521 U.S. 642 (1997). Possibly the securities transactions in this case, if they were violations, are so partly because of fiduciary duty to manage them in the clients' interest.

But, by contrast to the usual bilateral purchase or sale involving a material misstatement or omission, the non-disclosures did not cause either the transactions or the concrete losses resulting from them. See Loss & Seligman, Securities Regulation 3710-12 (3d rev. ed. 2003). Even if the non-disclosures were regarded as a continuing breach of fiduciary duty, it is perhaps

arguable but not crystal clear in this case that the non-disclosures themselves constitute a securities law violation.

Admittedly, the boundary lines are not sharply etched: in SEC v. Zandford, 535 U.S. 813 (2002), the Supreme Court mingled concepts of fiduciary duty and non-disclosure in extending section 10(b) to a broker who embezzled client proceeds derived from the sale of securities. Id. at 820-23. But even there the Court did not suggest that the wrongdoing could be treated as a continuing securities violation after the embezzlement and could be used to make liable for it those who learned of the wrong but did not disclose it.

The SEC's attempt to do so here would extend the supposed wrong indefinitely and until its disclosure--not just as a common law breach of duty but as a federal securities violation. Then, through the aiding and abetting device, the SEC's approach would create new liability under section 10(b), long after the original transactions, for individuals like appellees otherwise assumed to be not liable for those transactions. And it would do so based solely on general denials of knowledge of wrongdoing.

Whether or not the January 2001 transactions were violations of section 10(b) has not been briefed to us; but they occurred in the same time frame as the original purchases for Cardinal and the as-of adjustments and they affected the value of holdings both of Cardinal-Allegiance and others. The mere denials

-14-

of knowledge by appellees a year or more later may be wrongful, but the wrongs were not in our view the aiding and abetting of ongoing securities fraud merely by dint of some other fiduciary to disclose its errors or wrongs.

False statements that impede discovery of a crime or fraud that has already been completed may well be punished in some circumstances--for example, as perjury or obstruction of justice. But those who lied do not thereby become responsible for the crime or fraud itself unless it is then ongoing and assisted by the lie. Cf. 18 U.S.C. § 1621 (2006); 2 LaFave, Substantive Criminal Law § 13.6 (2d ed. 2003). The distinction can greatly affect the consequences for the offender; obstruction is one thing; liability for the original wrong, another.

Ironically, the SEC's complaint might have sustained an aiding and abetting claim based directly on appellees' alleged agreement at the January 5, 2001, meeting. Where a wrongful act is proposed, there is some precedent for treating as aiding and abetting a bystander's contemporaneous assurance that no repercussions will follow, and this might even be inferred from silence where consciously intended to further a planned or an ongoing violation.[4]

_____

[4]See State v. Conde, 787 A.2d 571, 579-82 (Conn. App. 2001), cert. denied, 793 A.2d 251 (2002); see also State v. Doody, 434 A.2d 523, 529-30 (Me. 1981); LaFave, supra, § 13.2(a), at 340. Compare Armstrong v. McAlpin, 699 F.2d 79, 92 (2d Cir. 1983) (finding that "[a]wareness and approval, standing alone, do not

But the SEC has not relied upon such a theory in this
court; and the appellees have therefore had no reason to answer it.
And, of course, it depends on viewing the original transactions
themselves as violations of section 10(b) which is the argument
that the SEC seemed to make in its complaint but has not developed
on this appeal. So we mention this alternative only to make clear,
for future cases, that we have not considered and rejected it.

Affirmed.

---

constitute substantial assistance" to securities fraud where the
approval did not cause the underlying conduct).