UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br><br>v.<br><br>KARNIG H. DURGARIAN, JR.,<br>DONALD F. MCCRACKEN,<br>RONALD B. HOGAN,<br>VIRGINIA A. PAPA, KEVIN F. CRAIN and<br>SANDRA G. CHILDS,<br>Defendants. | Civil Action No. 05 CA 12618 NMG<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT DONALD F. MCCRACKEN'S MEMORANDUM
OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This case arises from a series of transactions executed in January of 2001 which the plaintiff, the Securities and Exchange Commission, ("SEC") asserts were consummated to conceal an error in the execution of trades by employees of Putnam Fiduciary Trust Company ("Putnam"). In substance, the SEC alleges that on January 2, 2001, Putnam received client funds belonging to a defined contribution plan maintained for employees of Cardinal Health, Inc. and Allegiance Health, Inc. (the "Combined Plan"). The Complaint alleges that Putnam was supposed to invest those funds for its client on that date, but delayed until the next day, January 3, 2001. On January 2, 2001, domestic markets experienced a significant increase, and the Combined Plan missed out on substantial appreciation. According to the SEC, each of the defendants, including Donald F. McCracken ("McCracken"), participated in meetings during which they agreed on a course of action to hide the delay and the Combined Plan's lost opportunity by engaging in a series of transactions that benefited the Combined Plan at the

expense of other Putnam investors and concealed from the Combined Plan and others the existence of the delay and its impact.

On March 6, 2007, this Court dismissed the SEC's complaint against defendants Virginia Papa, Sandra Childs and Kevin Crane, determining that, as to each of them, the activity in which they were alleged to have engaged did not constitute "substantial participation" so as to make them principal violators of the federal securities laws and did not constitute "substantial assistance" so as to render them liable as aiders and abettors. The Court ruled with respect to the dismissed defendants that merely attending meetings and expressing agreement to the course of action that the SEC alleges constitutes a fraudulent scheme was, without more, insufficient involvement in the alleged scheme to give rise to liability as primary actors. This Court also determined that that same conduct did not amount to substantial assistance to violations by Putnam so as to give rise to aider and abettor liability. *See S.E.C. v. Durgarian*, 477 F.Supp.2d 342, 354-355 (D.Mass. 2007) (Gorton, D.J.).

The Court denied the motion to dismiss as to McCracken because the Complaint alleged that McCracken, in addition to engaging in the same conduct alleged against Papa, Childs and Crain, directed an employee to make expense adjustments to cover up dilution[1] in a Putnam mutual fund. *Id.* at 353. The SEC asserts that that dilution was caused by "as of" trades[2] executed as part of the fraudulent conduct alleged in the Complaint. *Id.* In connection with that allegation, the Complaint alleges that the defendants agreed to delay recording of the expense adjustments so that they would "hit the books" at the same time as the "as of" trades, thus

---

[1] Dilution is the reduction in value to all shares of a mutual fund caused by permitting some investors to purchase at a price lower than the current days price. *Complaint ¶ 39*.

[2] "As of" trades are purchases or sales of securities that use the price from a prior day rather than the price of the day on which the transaction is executed. They are used to correct trading errors. *Complaint ¶ 39*. Such trades are not in and of themselves illegal. *SEC v. Papa*, 555 F.3d 31, 33 (1st Cir. 2008).

2

concealing the dilution.[3] The allegations concerning the expense adjustments were all that distinguished McCracken from the defendant as to whom the Complaint was dismissed.

On March 31, 2009, McCracken, through his counsel, deposed Mark Ward ("Ward") the SEC's designated expert witness. In the course of the deposition, Ward testified that the expense adjustments alleged in the Complaint had "no cover-up value" and that they in no regard concealed or masked the dilution that occurred in the Putnam fund. *Ward Tr. 127-129*. Moreover, he testified that the expense adjustments did not affect any public shareholder's ability to determine whether dilution occurred or not. *Id. 67*.

The testimony of the SEC's expert makes the expense adjustment allegations -- the only allegation that distinguished McCracken from the dismissed defendants -- irrelevant. Even if this Court must accept, for purposes of this motion, the assertion by the SEC that McCracken directed the expense entries and that all defendants agreed to coordinate the recording of those adjustments with the "as of" trades, Ward's testimony establishes, as an uncontradicted fact, that the adjustments did nothing to advance or hide the scheme. The testimony of the SEC's expert, thus establishes as an undisputed fact that McCracken had no meaningful involvement in the alleged scheme beyond that of the dismissed defendants. Consistent with this Court's prior ruling, as affirmed by the First Circuit, *S.E.C. v. Papa*, 555 F.3d 31 (1st Cir. 2008), McCracken cannot be liable as either a principal violator or an aider and abettor because he took no

---

[3] As discussed in note 7, *infra*, the allegations that: (i) McCracken directed an employee to make the adjustments, (ii) sent her back to make more when a first round did not yield the desired result and (iii) reported those adjustments to several Putnam employees at a meeting, Complaint, ¶¶ 55-57, are based on the testimony of a single witness. The testimony of that witness is contradicted by several witnesses not affiliated with McCracken. So, too, is the allegation that defendants and others agreed to coordinate the timing of the adjustments to coincide with "as of" trades. *See, Ward Tr. 113-114, 120-121* (stating he reviewed all transcripts and that only Knowlton's testimony supports the contention that there was an agreement to coordinate the timing of the "as of" trades and the expense adjustments ). The witness testimony implicating McCracken in the expense adjustments and alleging that there was an agreement to coordinate timing, is certainly false. It constitutes, however, sworn testimony that would preclude this Court from ruling that the expense adjustment activity did not happen as alleged and so McCracken does not move on that basis.

3

meaningful action that furthered the alleged scheme. McCracken, accordingly, seeks summary judgment dismissing the Complaint against him.

## I. FACTS

### A. Background Facts

For purpose of providing context, McCracken provides this summary of key background facts. Many of the background facts will be disputed at trial, where the SEC will bear the burden of proof on all elements, but are accepted as true solely for the purposes of this motion. McCracken is entitled to summary judgment based on facts which are attested to by the SEC's designated expert witness or have otherwise been admitted, and, therefore, can no longer be genuinely disputed by the SEC. The background facts are as follows:

In 1999, Cardinal Health and Allegiance Health ("Cardinal") merged, and as a result, at the end of 2000 created a new combined 401k plan for their combined employees. *Complaint ¶ 25*. Certain of the investments held in their old plans were liquidated on January 2, 2001 and the proceeds of the liquidation were placed in Putnam's hands for investment on that day. *Complaint ¶¶ 29-31*. The funds were not invested, however, until January 3, 2001. *Complaint ¶ 31*. On January 2nd, the domestic markets experienced a significant rise and the Combined Plan missed that market appreciation. *Complaint ¶ 32*.

On January 3, 2001, a Putnam employee learned that Cardinal believed that the Combined Plan's assets had been invested on January 2, 2001. Ronald Hogan ("Hogan"),[4] an employee in Putnam's Defined Contribution unit, convened one or more meetings on January 4th to address the issue of Cardinal expectations. *Complaint ¶¶ 35-36*.[5] Hogan thereafter

---

[4] Hogan is a named defendant in this action. He settled with the SEC in 2008.
[5] There can be no genuine dispute that McCracken did not attend the meetings on January 4, 2001, but that fact is not necessary for resolution of this motion. *Admit 3*. Plaintiff Securities and Exchange Commission's Response and Objections to Defendant McCracken's Request for Admissions are referred to herein as "*Admit___.*"

4

"concocted a series of transactions" to address the impact of the delay in executing the trade for Cardinal. *Complaint ¶¶ 36-37*. Those transactions included purchasing shares of Putnam's Research Fund "as of" January 2nd to give Cardinal the benefit of the market gains. *Complaint ¶ 47*. Without remediation, the proposed "as of" transaction in the Research Fund would have resulted in dilution of approximately 1.9 cents per share. *Complaint ¶ 48*. According to the Complaint, Putnam policy required that if an "as of" trade resulted in dilution of greater than a penny per share, the Putnam unit responsible for the error that led to the "as of" trade had to compensate the affected fund for the dilution. *Complaint ¶ 40*.

Hogan concocted two transactions to mitigate the dilution of value that would be suffered by shareholders of the Research Fund upon the execution of an "as of" purchase for the Combined Plan. First, some Cardinal funds had been invested in international securities. International markets had declined on January 2, 2001, resulting in Cardinal getting more shares of international funds by investing a day late. Hogan conceived that the excess international shares held by the Combined Plan (those in excess of the number of shares that would have been purchased had the purchase occurred on January 2, 2001) could be sold, with the proceeds used to purchase Research Fund shares for the Combined Plan. *Complaint ¶¶ 37, 46*. Next, he came up with the idea of redoing the Cardinal liquidation. As noted above, certain investments held by the Cardinal plan prior to 2001 were liquidated on January 2, 2001 with the proceeds going to the Combined Plan. Hogan's idea was to redo the liquidation "as of" January 3, 2001 with the extra cash generated by selling the prior Cardinal holdings at the higher January 3rd prices to be used to purchase for the Combined Plan additional Research Fund shares. *Complaint ¶45*. Executing these two transactions would reduce the dilution arising from the "as of" purchases of Research Fund shares by .6 cents. *Complaint ¶¶ 48-49*. On January 5, 2001, Hogan effected (i) the re-liquidation, (ii) the sale of the excess international shares and (iii) the "as of" purchase of

5

Research Fund shares. The combined effect of those transactions resulted in the Combined Plan recouping some of the lost appreciation but also caused approximately 1.3 cents of dilution in the Research Fund. *Complaint* ¶¶ *45-46*.

The price of mutual fund shares is expressed as net asset value ("NAV"). The NAV is computed by subtracting the expenses owed by the fund from the total value of the assets the fund holds, then dividing by the number of outstanding shares. *Complaint* ¶¶ *20, 53*. The expenses that are carried on the accounting records of a fund are accrued estimates that, from time to time, are "trued up" so as to render the estimates more accurate based on current information. *Id.* For example, the amounts accrued for auditing expenses will be adjusted once the actual billing information permits a more accurate estimate.

The SEC maintains that after a brief meeting on the morning of January 5, 2001, attended by a standing-room only assembly of Putnam employees, McCracken directed Michelle Knowlton ("Knowlton") to identify potential accounting expense adjustments that would reduce accrued expenses for the Research Fund by an amount that would bring the net change in the Research Fund's NAV to less than a penny per share. *Complaint* ¶¶ *52, 55*.[6] It alleges that Knowlton reported to McCracken that the adjustments she was able to identify were not sufficient to offset the .3 cent of dilution, that McCracken then told her that that was the "wrong answer" and directed her to go back to find more adjustments. Knowlton then identified additional adjustments. *Complaint* ¶¶ *55, 57*. According to the Complaint, McCracken and Knowlton reported back to the group at a second meeting on January 5th that sufficient adjustments had been found. Karnig Durgarian ("Durgarian"), Putnam's chief of operations, proclaimed that "accountants are magicians." *Complaint* ¶ *56*. The Complaint then alleges that

---

[6] Knowlton is not mentioned by name in the Complaint as the employee who received the alleged directive. The investigative record reflects that she is the person who claims to have been so directed.

all of the defendants agreed to the transactions concocted by Hogan, and agreed that those transactions and the expense adjustments would all be booked simultaneously. *Complaint* ¶ 56. The SEC asserts that the expense adjustments were implemented to hide the remaining dilution. *Complaint* ¶ 52.

The allegations asserting that McCracken directed Knowlton to locate expense adjustments, that he sent her back to find more adjustments and that the collection of Putnam employees agreed to coordinate the timing of the entry of the expense adjustments and "as of" trades are based on the uncorroborated testimony of Knowlton and are very much in dispute.[7] As shown below, however, facts that cannot be genuinely disputed establish as false the SEC's allegation that the expense adjustments concealed the dilution.

**B.  Undisputed Facts Which Serve As The Basis For This Motion.**

McCracken stands accused of attending meetings at which the scheme alleged in the Complaint was discussed, assenting to the securities trades that make up the scheme and directing expense adjustments to cover-up the dilution brought about by the scheme. *Complaint* ¶¶ *42-43, 55-56*. It is undisputed that he played no role in directing or executing the securities trades that are at the core of the scheme alleged by the SEC. *Complaint* ¶¶ 44-47; *Admit* 6.[8] It is

---

[7] That testimony has been contradicted by the testimony of witnesses who are not affiliated with McCracken, and in the case of the assertion that there was an agreement to cause the expense adjustment and the "as of" trades to occur at the same time, by multiple witnesses. Indeed, none of the other members of the standing-room only crowd testified that there was a report back of expense adjustments and an agreement to coordinate the booking of the expense adjustments to coincide with the Research Fund "as of" trades. *Ward Tr. 113-114,120-121*. Ward also testified that the coordination did not happen. The Research Fund "as of" trades and the resulting dilution occurred on January 5, 2001. The expense adjustments were recorded on January 8, 2001. *Ward Tr. 109-13*. The expense adjustment assertions, nonetheless, serve as the basis for the majority of the allegations against McCracken, and are the only basis for this Court's decision to not dismiss the complaint against McCracken. The existence of sworn, albeit discredited testimony with respect to those allegations preclude summary judgment premised on refutation of those allegations.

[8] In *Admit* 6, (admitted in part, denied in part) cited to support the fact that McCracken played no role in directing or executing the securities trades that are at the core of the scheme alleged by the SEC, the SEC denied that McCracken did not participate in entering the "as of", re-liquidation and international shares transactions, but goes on to explain that McCracken's involvement was the expense adjustment activity discussed above and the fact that he was senior to unspecified PFTC employees who executed the transactions. The response, therefore, constitutes

7

also established, beyond challenge, that the expense adjustments alleged in the Complaint did <u>not</u> in any regard <u>conceal</u> <u>the</u> <u>dilution</u> (or anything else) and, therefore, did nothing to advance or conceal the scheme. When these undisputed facts are considered in light of this Court's rulings on the prior motions to dismiss in this case and the controlling authorities, it is clear that McCracken is entitled to summary judgment dismissing the Complaint.

While the SEC has asserted that the January 8, 2001 expense adjustments had been made to conceal the dilution in the Research Fund, it cannot be genuinely disputed that these adjustments <u>did not</u>, and <u>could not</u>, conceal that dilution. As the SEC's expert has testified, those adjustments had "no cover up value." *Ward Tr. 127-129*. SEC expert Ward testified:

> Q. My question is a little bit different. What I am trying to understand is how the implementation of these expense adjustments would have made it more difficult for anybody at Putnam to understand that there was a dilution of greater than a penny a share?
>
> A. It shouldn't have.
>
> Q. So it didn't have any cover-up value?
>
> [Objections and dialogue between counsel.]
>
> A. It had no cover-up value.

*Id.* Ward also testified that the expense adjustments did not make any shareholder any more able or less able to detect dilution. *Ward Tr. 167.*[9]

Accordingly, it is undisputed that McCracken did not direct or execute the securities transactions at issue in this case and that the expense adjustments he is alleged to have ordered

---

an admission that McCracken did not effect the securities trades that constitute the scheme, nor did he direct anyone to effect them.

[9] Moreover, Ward acknowledged a legitimate purpose for making an expense adjustment. The SEC's expert testified that "in theory" an expense error could be offset against dilution to bring the dilution to less than a penny per share. *Ward Tr. 136*. There is no prohibition against an "as of" trade which causes dilution that is less than a penny a share, and no remediation required if the dilution is less than a penny per share. *Complaint ¶¶ 38-40; see also Papa*, 55 F.3d at 33. Had the expense adjustments been proper, and offset against the dilution, the resulting dilution would be less than a penny per share. *Complaint ¶ 57*.

...

did not conceal the dilution from Putnam, the Combined Plan, Research Fund shareholders or anyone else.[10]

## II. ARGUMENT

### A. Standards For Summary Judgment.

Summary judgment is appropriate "where the pleadings, discovery on file and affidavits, if any, show 'there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law.'" *Welsh v. Quabbin Timber, Inc.*, 199 B.R. 224, 226 (D.Mass. Aug. 8, 1996) (Gorton, D.J.), *quoting* Fed. R. Civ. P. 56(c).

> The role of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). The Court must view the entire record in the light most favorable to the plaintiffs and indulge all reasonable inferences in their favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

*Welsh*, 199 B.R. at 226.

"Rule 56(e) mandates that summary judgment be entered against a party who fails to establish the existence of an element essential to that party's case." *FDIC v. Municipality of Ponce*, 904 F.2d 740, 742 (1st Cir. 1990), *quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Thus, the burden is first on the movant, to show 'that there is an absence of evidence to support the non-moving party's case.'" *Id.*, *quoting Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554.

> If the movant satisfies that burden, it shifts to the non-moving party to establish the existence of a genuine material issue. [*FDIC v. Municipality of Ponce*, 904 F.2d at 742 (1st Cir. 1990).] In

---

[10] The SEC alleged that some of the expense adjustments were unwarranted or inappropriate. This is based on Knowlton's acknowledgment that she knowingly caused an improper adjustment to be made with respect to a management fee Knowlton has acknowledged that she never told McCracken or anyone else about the improper entry. *Knowlton Tr. 102-104*. McCracken does not believe it is necessary for this motion, but it cannot be disputed that he was not informed that an improper adjustment was made.

9

> deciding whether a factual dispute is genuine, this Court must determine whether 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The nonmovant's assertion of mere allegation or denial of the pleadings is insufficient on its own to establish a genuine issue of material fact. Fed. R. Civ. P. 56(e).

*Welsh*, 199 B.R. at 226.

### B. Facts Not In Dispute Establish That McCracken Cannot Be Held Liable As A Primary Violator Of Section 17(a) Of The Securities Act Of 1933, Section 10(b) Of The Securities Exchange Act of 1934 Or Rule 10b-5 Thereunder.

McCracken is charged in Count I of the Complaint with violating Section 17(a) of The Securities Act of 1933, 15 U.S.C. § 77q(a), and in Count II with violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b-5 thereunder.

Considering the record in the light most favorable to plaintiff, and accepting as true the discredited testimony of Knowlton, McCracken's involvement in the Cardinal events included only attending meetings, agreeing to the transactions that Hogan concocted and directing the identification and recording of expense adjustments for the purported purpose of concealing the Research Fund dilution. This Court has already ruled that the attendance at meetings and agreeing to the plan of action, without more, is as a matter of law insufficient to establish substantial participation so as to render a defendant a primary actor subject to primary liability under the above referenced provisions. *Durgarian*, 477 F.Supp. 2d at 354. The issue presented by this motion is whether directing expense adjustments that could do nothing to advance the scheme could make McCracken a principal violator. The answer must be that it cannot.

McCracken maintains that the evidence will show that he did not order the search for expense adjustments nor did he direct their entry, but assuming the truth of those allegations, it is clear beyond doubt that the expense adjustments played no role in advancing the purpose of the

scheme alleged by the SEC and had no connection to the injury to the investors affected by the scheme. *Ward Tr. 127-129, 167.*

As this Court observed, in order for a defendant to be a primary violator, his actions must both have the purpose "*and effect* upon creating a false appearance in fact in furtherance of the scheme to defraud." *Durgarian,* 477 F.Supp. 2d at 353 (emphasis added). Even if the purpose of recording the expense adjustments was to further the scheme, McCracken's alleged involvement in recording expense adjustments did not meet the second prong of the test because, as a matter of uncontested fact, the adjustments did not conceal the dilution caused by the "as of" trades from anyone inside or outside of Putnam. It thus did not further the scheme. The SEC contends that the expense adjustment contributed to the scheme by concealing the Research Fund dilution, but the SEC's own expert concedes those adjustments had no capacity to do so and concealed nothing.

Moreover, even if the expense adjustments could have promoted the scheme, directing the making of expense adjustments whose impact was to cover-up the fact of the dilution would not have been sufficiently connected to the securities transactions (the trading in Putnam fund shares) to have rendered McCracken a principal violator. McCracken did not direct or execute any of the securities transactions involved in the scheme. *Admit 6, Complaint ¶¶ 44-47.* "[A]ny defendant who ... does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting..." *In re Charter Communications, Inc., Securities,* 443 F.3d 987, 992 (8th Cir. 2006) *aff'd sub nom., Stoneridge Investment Partners v. Scientific Atlantic, Inc.,* 128 S.Ct. 761 (2008). Accepting the SEC's contentions as true, McCracken played no role in any of the securities trading alleged in this case. Moreover, in adding to the Eight Circuit's articulation as it affirmed *Charter*, the Supreme Court in *Stoneridge* held that a defendant cannot be held liable as a primary violator unless his actions bear a proximate relation to the investor

11

harm caused by the scheme involved. *Id.* at 769. *See also, Pugh v. Tribune Company*, 521 F.3d 686, 697 (7th Cir. 2008) ("Without allegations establishing the requisite proximate relationship between the [defendants] fraud and the Tribune investors harm, we cannot uphold the complaint"). Because the expense adjustments did nothing to promote or hide the impact of the scheme, it has no relationship at all to any harm to investors.

Indeed, assisting in concealing a scheme would be no more than aiding and abetting under *Stoneridge* even if the concealment was effective. That case involved a revenue recognition scheme pursuant to which the principal defendant recorded false sales to inflate revenues. The secondary defendants knowingly participated in transactions that were intended to create the impression that the primary defendant's revenue numbers were correct. Among other things, the conduct of the secondary defendants enabled the primary defendants to fool its auditors into approving the financial statements with inflated revenue results. The Court concluded that this effort to assist the primary violator in concealing its scheme could only render the secondary party an aider and abettor. *Stoneridge*, 128 S.Ct. at 766-767, 770. The conduct of the secondary party was not something that the injured investors relied on and, therefore, was not conduct proximate to the harm inflicted. *Id.* The expense adjustments alleged in this case are said by the SEC to have the same purpose and effect as the conduct of the secondary defendants in *Stoneridge*: to avoid detection. They can, thus, only give rise to aider and abettor liability.

The only difference between the conduct of the defendants as to which the Complaint in this case was previously dismissed and McCracken are allegations of expense adjustments, that could do nothing to hide or advance the scheme and that bore no relationship, proximate or otherwise, to the investor harm involved in the present case. Under the law of this case and

controlling authority, these ineffective expense adjustments cannot render McCracken a primary violator.

### C. Facts Not In Dispute Establish That McCracken Did Not Substantially Assist The Alleged Scheme And He Therefore May Not Be Held Liable For Aiding And Abetting Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 Thereunder.

McCracken in Count V is charged with aiding and abetting Putnam's violation of Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b) and Rule 10b-5 thereunder.[11]

Once it is established that McCracken can only be charged as an aider and abettor, it is a quick analysis that leads to dismissal of the entire case. It is an indispensable element of an aiding and abetting claim that the defendant's actions rendered substantial assistance to the primary violators' efforts to effect the fraudulent scheme. *Durgarian*, 477 F. Supp. 2d at 357. The facts not in dispute establish that the SEC cannot meet that element.

"To establish a claim of aiding and abetting liability under the securities laws, the Commission must prove: (1) a primary violation was committed; (2) the defendant was generally aware that his role or conduct was part of an overall activity that was improper; and (3) the defendant knowingly and substantially assisted in the primary violation." *S.E.C. v. Tambone*, 550 F.3d 106, 144 (1st Cir. 2008), citing *Cleary v. Perfectune, Inc.*, 700 F.2d 774, 777 (1st Cir. 1983). The third element, providing knowing and substantial assistance, requires a showing that the culpable act of the aider and abettor was the proximate cause of the primary violation of Rule 10b-5. *Tambone*, 550 F.3d at 145, citing *Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir. 1985) (requiring a showing that "the secondary party [has] proximately caused the violation"). The First Circuit held in *Tambone* that this requires a showing of a "substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm." *Id., quoting in*

---

[11] None of the other counts of the Complaint apply to McCracken.

13

*paren. Mendelsohn v. Capital Underwriters, Inc.*, 490 F.Supp. 1069, 1084 (N.D. Cal. 1979) (emphasis added). In addition to the First Circuit in *Tambone*, several other courts have adopted the *Mendelsohn* Court's articulation of the substantial assistance element. *E.g., Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991), *Metge*, 762 F.2d at 624, *Halo Tech Holdings, Inc. v. Cooper*, 2008 WL 877156, *20 (D.Conn. March 26, 2008), *In re American Principals Holdings, Inc. Securities Litigation*, 1987 WL 39746, *4 (S.D. Cal. July 9, 1987); *Barker v. Lee County Bank*, 1985 WL 2529, *10, Fed. Sec. L. Rep. P 92,404, 92404 (N.D. Ill. Sep 13, 1985); *Kaliski v. Hunt Intern. Resources Corp.*, 609 F.Supp. 649, 652 (N.D. Ill. 1985); *In re Comptronix Securities Litigation*, 831 F.Supp. 1563, 1576 (N.D. Ala. Aug. 31, 1993).

Ward's testimony makes it clear, as a matter of undisputed fact, that making the expense adjustments did not and could not provide any assistance whatever to the primary violators or the scheme they conducted. As the adjustments did not conceal the scheme (as the SEC asserted it had), there is <u>no</u> causal connection between the allegedly culpable act attributed to McCracken and the harm suffered by Putnam's investors, let alone a "substantial" connection. Absent substantial assistance, the aiding and abetting claims must be dismissed.

## CONCLUSION

The Complaint should be dismissed as against McCracken because, based on facts that are not in dispute, he cannot be charged as a primary violator and the acts in which he is alleged to have participated do not constitute substantial assistance, necessary to support liability as an aider and abettor.

DONALD F. MCCRACKEN
By his attorneys,

/s/ Gary S. Matsko
Gary S. Matsko, BBO # 324640
Joshua S. Grossman, BBO #643939
**DAVIS, MALM & D'AGOSTINE, P.C.**

One Boston Place
Boston, MA  02108
(617) 367-2500

Dated:  April 15, 2009

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 15th day of April, 2009.

          /s/ Gary S. Matsko
          Gary S. Matsko

503702v.1