UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                        :
SECURITIES AND EXCHANGE COMMISSION, :
                                                        :
                                    Plaintiff,          :          Civil Action No. 05 CA12618 NMG
                      v.                                :
                                                        :
DONALD F. McCRACKEN,                                    :
                                                        :
                                    Defendant.          :
_____:

**SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO
DONALD F. McCRACKEN'S MOTION FOR SUMMARY JUDGMENT**

   The Securities and Exchange Commission ("Commission") hereby opposes Defendant

Donald F. McCracken's Motion for Summary Judgment ("Motion").  This case, like virtually all

securities fraud cases, is about money.  It is about how PFTC management schemed to use its

clients' money to resolve its own potential liability problems.  Specifically, PFTC's management

team devised a scheme (1) to provide its defined contribution client Cardinal Health with as-of

trades in Putnam's Research Fund, partially resolving PFTC's potential liability for delaying

Cardinal's retirement plan investment, and (2) to pay for the cost of those trades by stealing cash

from other Putnam Funds, selling off market gains of a select portion of Cardinal Health's

defined contribution plan participants, and ultimately by having the shareholders of the Putnam

Research Fund shoulder the bulk of the cost through unreimbursed dilution.

   McCracken participated in devising the fraudulent scheme.  He planned with Karnig

Durgarian to use adjustments to the Research Fund's expense accruals as part of the scheme to

increase the net assets of the fund in order to circumvent PFTC's internal controls that required

PFTC management (a) to pay for the as-of trade; and (b) to report to fund representatives that

PFTC caused the Research Fund to issue a price diluted by a more than a penny per share.  He

then led the Fund Accounting department's portion of the scheme by managing his unit's effort

to identify expense accruals to adjust for the purpose of increasing the fund's net assets.  He then

coordinated with Durgrian and the rest of the management team to time entry of adjustments so

that they would impact the Research Fund's per share Net Asset Value[1] ("NAV") calculation on

the same day as the dilution caused by management's as-of securities trades.

I.      **Factual Background**

McCracken uses discovery "excerpts" to gloss over the facts of this case, particularly the

facts and circumstances surrounding the dilution of the Putnam Research Fund, which are

important to understand his participation in the fraudulent scheme.  The full picture, set out

below, brings the misleading nature of McCracken's excerpts into relief.

A.      <u>Cardinal/Allegiance Plan Conversion and Funds of Funds Product—Undisputed</u>

In 1999, Cardinal Health, Inc. ("Cardinal") entered a corporate merger with Allegiance

Healthcare, Inc. ("Allegiance").  At the time of the 1999 merger, Cardinal and Allegiance each

had its own employee retirement plans.  Cardinal's retirement plans were serviced by Putnam

Fiduciary Trust Company ("PFTC"), and Allegiance's retirement plan was serviced by State

Street Bank.  Following announcement of the merger, the newly combined Cardinal entity

formed a Profit Sharing and Retirement Savings Plan Committee to, among other things, review

options with respect to how to manage its multiple employee retirement plans, which, together,

totaled approximately $1 billion.  *See* SEC's Local Rule 56.1 Statement of Facts ("**Facts**"), ¶ 1.

---

[1.]  Net Asset Value per share ("NAV") is the dollar value of a single mutual fund share on a specific day.  It is calculated based on the value of underlying assets of the fund minus its liabilities on that day, divided by the number of shares outstanding on that day.  For retail mutual funds in the United States, it is calculated at the end of each business day.  *See*, SEC Appendix ("SEC App."), Exhibit 2, Affidavit of Mark Ward, ¶ 5.

After working with industry consultants and receiving marketing presentations from retirement plan industry providers, the Committees decided to merge the Allegiance retirement plan into the Cardinal retirement plan with a single service provider and to invest the total combined plan assets, of approximately $1 billion.  The Committees believed that they could achieve significant plan savings by negotiating a discount of service fees based on the significant size of the Combined  Plan's assets.  *Id.,* ¶ 2.

Following a competitive bidding process, the Committees decided to engage Putnam as Cardinal's plan service-provider.  As part of the new Combined Plan, Cardinal directed PFTC to create new investment products called the Funds of Funds ("FoFs").  A "fund of funds" is a mutual fund whose holdings are not stocks and bonds, but shares of retail mutual funds.  For Cardinal, PFTC created four FoFs, each representing a different risk strategy: Growth, Balanced, Conservative and International.  The underlying retail funds included two Putnam retail funds, the Putnam Research Fund ("Research Fund") and the Putnam International Growth Fund ("International Growth Fund"), and three third-party funds, the PIMCO Total Return Fund, the Franklin Small Cap Growth Fund ("Franklin Fund"), and the Janus Overseas Fund.  *Id.,* ¶¶ 3-5.

On January 2, 2001, the separate Cardinal and Allegiance retirement plans were liquidated and their proceeds transferred into an account for the new Combined Plan.  Cardinal appointed PFTC as trustee of the Combined Plan assets.  For the purpose of mapping the FoFs investments into the retail mutual funds, PFTC separated the cash holdings on an Excel spreadsheet.  PFTC did not purchase the underlying retail fund shares for each FoF, however, until the end of the next business day, January 3, 2001.  Therefore, the cash designated for the

FoFs was not invested in the market until the close of business on January 3, and missed out on the market activity for that day. *Id.,* ¶¶ 6-9.

B.    Acknowledgement of Potential Liability For Cost Of Delay In Investment—Undisputed

On January 3, 2001, George Rand, a Vice-President in PFTC's New Business Implementation Unit and Cardinal's primary contact in the conversion process, sent an email to Pam Hannon, a representative of Cardinal, informing her that the plan assets had been "invested" in the FoFs on January 2nd.  Ms. Hannon responded, exclaiming: "Fantastic news! The market is up and we look great being invested on the upswing."  Around the time of this email exchange, Rand identified a potentially explosive client issue:  Cardinal expected that its Combined Plan participants received January 3rd's market gains when in fact the Combined Plan was out of the market on January 3. *See,* **Facts**, ¶ 10.

The size of the missed gains was enormous.  At the close of business on January 3, 2001, PFTC purchased the following amounts of shares of each retail fund for the FoFs[2]:

| Fund | Amount Invested | Price Per Share | Shares Bought |
|------|-----------------|-----------------|---------------|
| Research Fund | $47,289,651.71 | $16.61 | 2,847,059 |
| Franklin Growth | $11,716,915.94 | $39.45 | 297,006 |

*Id.*, ¶ 11.  Prior to the close of business on that day, the Standard & Poor's Index rose from 1,283.27 to 1,347.56, or 5 percent.  As a result of this increase in the securities market, during the day on January 3, two of the retail funds in which the Combined Plan was to be invested, the

---

2 As mentioned in the text, the FoFs included three other retail funds.  The Janus Oversees Fund shares were transferred in-kind, and were therefore never out of the market. *See,* SEC App., Ex. 15, Hogan IT2, 99:3-10.  On January 3, 2001, PFTC did make initial purchases in the International Growth Fund and the PIMCO Total Return Fund ("PIMCO fund"), but these two funds declined in value on January 3. *Id., Ex. 2,* Ward Aff., ¶ 7.  As will be explained, *infra,* with respect to the International Growth Fund, PFTC management used the decrease in price an excuse to sell off the plan participants' benefit (of receiving the cheaper price) to pay partially for the as-of trades it made in the Research Fund.

Research Fund and the Franklin Fund, increased in value.  The following table shows how the NAVs for these retail funds changed from January 2 and January 3, 2001.  *Id.*, ¶ 13.

| Fund | 1/2/2001 | 1/3/2001 |
|------|----------|----------|
| Research Fund | $15.70 | $16.61 |
| Franklin Fund | $36.25 | $39.45 |

This change in prices meant that, at the time of the Combined Plan's investment at the end of January 3, the Plan (a) bought fewer shares in these funds than it would have if it had been invested on January 2; and (b) missed out on approximately $3.8 million of market gains.

### 1.   Fewer Research Fund And Franklin Fund Shares

If PFTC had invested the FoF proceeds on January 2 instead of January 3, 2001, the Combined Plan would have received 165,020.623 more shares of the Research Fund for a total of 3,012,079.727 shares.  In addition, the Combined Plan would have received 26,218.526 more shares of the Franklin Fund.  The following table shows the number of shares Cardinal would have purchased if PFTC had made its investment on January 2, 2001.  *Id.*, ¶ 14.

| Fund | Amount Invested | Price 1/2/01 | Shares |
|------|-----------------|--------------|--------|
| Research Fund | $47,289,651.71 | $15.70 | 3,012,079.727 |
| Franklin Fund | $11,716,915.94 | $36.25 | 323,225.267 |

### 2.   Missed Market Gains

In addition, if PFTC had invested the Combined Plan in these funds on January 2, 2001, their shares would have experienced market appreciation of almost $3.8 million.  In the Research Fund, each of the Plan's 3,012,079.727 shares would have increased in value by $0.91 for a total gain of $2,740,992.55  For the Franklin Fund, each of the Plan's 323,225.267 shares would have increased in value by $3.20 for a total gain of $1,034,320.85  The total market appreciation on January 3, 2001, therefore, would have been $3,775,313.40. *Id.*, ¶ 15.

5

Recognizing that Cardinal Health was an important client with approximately $1 billion in plan assets with Putnam, Rand raised the client issue to his boss, settled defendant and Senior Vice President, Ron Hogan.  On January 4, 2001, Hogan, in turn, sent an email calling for an "Urgent Cardinal Fund of Funds" meeting of management peers at PFTC in operations and client service to discuss the potential client issue.  Hogan called this group together for the purpose of figuring out, among other things, what should be done about the fact that Cardinal's money had been out of the market on January 3.  Hogan explained to the group that Cardinal experienced a two-day delay in investment, when Cardinal believed that it had been out of the market only one day.  Hogan provided the group with an explanation of the potential financial exposure.  The group then discussed how the FoF process worked and whether Cardinal understood that its FoF investment would be out of the market two days, instead of just one.  Kathy Higgins, Putnam's Vice-President of Trust Operations (the group responsible for investing the FoFs) explained that the two-day investment process worked exactly as designed.  Rand, as Cardinal's primary contact for the conversion, explained that, despite whatever internal process PFTC had, Cardinal expected its money to be invested on January 2.  *See*, **Facts**, ¶¶ 16-23.

At this meeting, the PFTC managers argued over whether there was a client issue to be resolved.  One side argued that the FoF procedures worked exactly as designed, and therefore Cardinal was not entitled to January 3rd's market gains.  The other side argued that Cardinal had a reasonable expectation to be invested on January 2 and to have benefited by the January 3rd market gains.  The only resolution from this meeting, however, was that the issue was important enough to escalate it to the highest management level of PFTC, including Karnig Durgarian ("Durgarian"), PFTC's Chief Operating Officer, and defendant Donald McCracken

6

("McCracken"), PFTC"s Head of Global Operations Services.  The Cardinal issue was presented to Durgarian and McCracken at another group meeting the next day, January 5, 2001.  *Id.*, ¶¶ 24-28.

As the Head of Global Operations in January 2001, McCracken was the senior-most accountant at PFTC, reporting directly to Durgarian.  In this role, McCracken presided over PFTC's mutual fund accounting and custody services.  Durgarian relied on McCracken to keep him informed on mutual fund accounting issues.  In particular, Durgarian relied on McCracken to keep him informed on mutual fund pricing error issues.  *Id.,* ¶ 29.

Up to this point of the Cardinal time line, the facts are completely undisputed.  The Commission will now review the further undisputed facts of (a) what exactly happened in the books and records of the company on January 5 and January 8, 2001, and (b) what Putnam's internal controls were concerning the handling of material as-of trades and threshold for material pricing errors.  We will then return to the disputed facts over McCracken's role in this scheme to defraud.

C.      Shareholder Transactions Entered on January 5, 2001--Undisputed

PFTC management resolved to, among other things, give the Combined Plan its additional Research Fund shares without any payment coming from PFTC.  *See*, **Facts**, ¶ 30.  To understand how they accomplished this goal, you have to understand the specific shareholder transactions PFTC management orchestrated and entered on behalf of the Combined Plan.

1.      **Research Fund**

On January 5, 2001, PFTC entered shareholder transactions that had the effect of giving the Combined Plan the additional 165,020 shares it would have had if PFTC had made the Plan's

initial investment on January 2nd.  First, PFTC completely reversed the Combined Plan's January 3, 2001 investment in the Research Fund, regenerating the Plan's original cash investment in the amount of $47,289,651.71.  Second, PFTC bought 3,012,077.799 Research Fund shares with prices as of January 2, January 3, and January 5, 2001, at a total cost of $48,155,646.75.  *See*, **Facts**, ¶¶ 31 to 33.

By making this series of as-of trades PFTC management (1) diluted the shareholder value of the Research Fund; and (2) spent approximately $865,995 more in cash than it had generated by unwinding Combined Plan's initial investment.

### i.      *PFTC Management Diluted The Fund By $0.0127 Per Share*

Dilution is the reduction in value to all shares of a mutual fund caused by permitting investors to trade at prices more favorable than the current day's price.  Dilution occurs when mutual fund investors are allowed to trade at prices that are more favorable than the current day's price.  Dilution can occur by permitting investors to buy shares at a price lower than the current day's price.  Dilution can also occur by permitting investors to redeem (or sell) shares at a price higher than the current day's price.  *Id.*, ¶ 34.

As explained above, on January 5, 2001, PFTC entered trades reversing PFTC's initial investment as of the price Cardinal paid on January 3, 2001, and then buying shares as of the prices for the fund on January 2, 3 and 5.  The net effect of these trades was a total dollar dilution of $1,813,908.59.  With 142,935,320 shares outstanding on January 5, 2001, the per share impact was $0.0127.  *Id.*, ¶ 35.

ii.     *PFTC Spent $865,995 More Than The Combined Plan's Initial Investment*

PFTC's unwinding of the Combined Plan's January 3 investment generated cash in the amount of its initial investment:  $47,289,651.71.  On the same day, however, PFTC bought 3,012,077.799 shares of the same fund at a cost of $48,155,646.75.  PFTC therefore spent $865,995.04 more than it generated from unwinding the Plan's initial investment.  As will be explained below, this money came, not from PFTC, but from its clients.  *See*, **Facts**, ¶ 36-38.

### 2.     Cash Generation Shareholder Transactions

PFTC generated this extra cash from two sources:  (1) Putnam mutual funds, and (2) Combined Plan's participants who held International Growth Fund shares.  *Id.*, ¶ 39.  The transactions described herein will be called, collectively, the "Cash Generation Transactions."

i.     *Mutual Fund Clients--$456,499*

Prior to the merger of Cardinal's and Allegiance's defined contribution plans, Cardinal had maintained its own retirement plan assets at Putnam.  To effect the plan conversion on January 2, 2001, PFTC liquidated Cardinal's existing plan holdings in four Putnam mutual funds, the George Putnam Fund of Boston, the Putnam Asset Allocation Fund—Growth Portfolio, the Putnam Asset Allocation Fund—Balanced Portfolio, and the Putnam Asset Allocation Fund—Conservative Portfolio.  This initial liquidation generated cash of $55,107,460.87.  *Id.*, ¶¶ 40-41.

On January 5, 2001, three days after the original plan conversion, PFTC management reversed the January 2, 2001 liquidation, returning Cardinal to its shareholder status in these pre-conversion funds as of January 2.  PFTC then re-liquidated the same holdings on January 5, but as of the price for those funds on January 3, 2001.  From January 2 to January 3, the price of

each of these funds had risen.  The result of re-liquidating these funds a day forward was to give

the Combined Plan the higher, January 3 price, generating cash in the increased amount of

$55,563,959.67.  The net effect of these backdated transactions, which actually moved the date

of the transaction forward, was to generate an additional $456,498.80 at the expense of these

funds. *See*, **Facts**, ¶¶ 42-45.

> ii.     *Plan Participants Holding Putnam International Growth--$409,527*

The second Cash Generation Transaction involved the International Growth Fund.  When

PFTC made the Combined Plan's initial investment in the International Growth Fund on January

3, 2001, the price of those shares was $24.43.  On that date, the Combined Plan invested $38

million and purchased 1,582,797.307 shares.  On the prior day, January 2, 2001, the International

Growth Fund shares had been valued higher, at $24.69.  If the Combined Plan had been invested

on January 2, its $38 million dollar investment would have purchased only 1,566,129.535, or

16,667.772, fewer shares.  Thus, the Combined Plan's participants had benefited by the day's

delay in investment.  *Id.*, ¶¶ 46-47

On January 5, 2001, PFTC management generated cash by selling off the 16,667.772

International Growth Fund shares that the plan participants had owned by virtue of being

invested at the cheaper price.  The sale of these shares generated cash in the amount of

$409,527.16. *Id.*, ¶¶ 48.

**3.     Using Cash Generated From Clients Reduced The Research Fund's Dilution
To $0.0127 Per Share**

By using the proceeds from the Cash Generation Transactions in making the January 5,

2001 Research Fund reinvestment, PFTC reduced the amount of the Research Fund's dilution.  If

PFTC had simply reversed the January 3 Research Fund investment, taken the Plan's initial

investment of $47 million, and reinvested the Plan as-of January 2, PFTC would have purchased

3,012,079.727 shares, but the dilution to the fund would have been $2,679,934.92 or $0.0187 per

share.  By generating additional cash from other clients, and buying shares as of prices on

January 3 and January 5, PFTC management reduced the Research Fund's dilution to

$1,813,908.59 or $0.127 per share.  *See*, **Facts**, ¶ 49.

D.      Putnam Internal Controls for Material As-of Trading and Pricing Errors—Undisputed

In 2001, PFTC had internal controls for both as-of trades and pricing errors.

1.      **Material As-of Policy and Procedure**

Putnam's internal control for as-of trades was called the "Material As-of Policy and

Procedure" ("Material As-of Policy").  According to this policy, if management authorized an

as-of trade that caused a financial impact diluting the shareholders' interest by more than a

penny per share, the policy required PFTC to book a receivable from PFTC to the fund to

reimburse the fund for the loss.  The financial impact of an as-of trade is measured by taking the

financial cost of the trade and dividing it by the number of outstanding shares.  In the event of a

financial impact greater than a penny per share, the booking of a receivable prevents a pricing

error by reimbursing the fund for the loss.  The receivable represents money out of PFTC's

pocket into the pocket of the mutual fund.  In addition to requiring the booking of a receivable,

the policy specifically requires a follow-on step:  that fund accounting "verify" that money

moves from PFTC to the fund to pay for the loss.  In 2001, McCracken was aware of this policy

and the fact that it was in place for the protection of Putnam's mutual fund shareholders.  *Id.*, ¶¶

51-56, 65.

### 2.       Procedures with Respect to Fund Pricing Errors

Putnam's internal control for pricing errors was called, "Procedures with Respect to Fund Pricing Errors" ("Pricing Policy").  According to Pricing Policy, a material pricing error occurs if fund accounting determines that there is an error that affects the fund's net asset value by a penny per share or more.  PFTC's accounting department went to great lengths to prevent pricing errors.  If a material pricing error occurred, however, PFTC's Fund Accounting department was required to notify the Chief Compliance Officer of Putnam Investment Management, who in turn was required to review the facts and circumstances of the pricing error with the Executive Vice President of the Funds.  This reporting was typically done in a "post-mortem" memorandum.  In practice, the post-mortem memorandum was then included a "pricing book" presented to the fund trustees.  In 2001, McCracken was aware of the pricing policy and its penny-per-share threshold, and was routinely copied on post-mortem memoranda concerning pricing error issues as well as the trustee's pricing book.  *See*, **Facts**, ¶¶ 57-63.

E.       <u>Expense Adjustments Entered on January 8, 2001—Undisputed</u>

The Research Fund, like most retail funds, is priced on a "trade plus one" basis, which means that the financial impact of trades is calculated in the fund's price or NAV calculation on the next business day.  Therefore, although the Research Fund was diluted by $0.0127 per share as soon as PFTC made the re-investment trades on Friday, January 5, 2001, the financial impact of these trades would not be calculated into the price of the fund in its NAV calculation until the next business day, Monday, January 8, 2001.  *Id.*, ¶ 64.

### 1.      The Way Things Should Have Been Done—Book a Receivable From PFTC

As called for by PFTC's Material As-of Policy, the proper way to resolve a material

dilution caused by an as-of trade was to book a receivable from PFTC to the fund on the day

following the trade.  In effect, the receivable resolves the dilution by reimbursing the fund for its

loss using money coming from PFTC.  Once the dilution is resolved, a pricing error does not

occur because the reimbursement of the fund extinguishes the dilution.  *See*, **Facts**, ¶ 65.

### 2.      The Way It Was Done—Increase Net Assets Through Expense Adjustments

Instead of booking a receivable, on January 8, 2001, PFTC adjusted the expense accruals

of the Research Fund in such a way as to increase the fund's net assets by $500,608.[3]  These

adjustments to expense accruals, like a receivable, were calculated into the price of the Research

Fund on the day they were made, January 8th.  Unlike a receivable, however, adjustments to

expense accruals did not reimburse the Research Fund for the as-of trade dilution.  As

McCracken and his expert have acknowledged, mutual funds pay their own expenses.  To the

extent that accrued expenses are adjusted, up or down, these adjustments represent increased or

decreased payment out of fund's own net assets.  It's the fund's own money.  Mutual fund

shareholders are entitled to accurate expense accruals regardless of whether they have been

diluted by PFTC management's allowance of an as-of trade.  These expense adjustments do not

have any relation to reimbursing the fund for an as-of trade loss, which is a payment from PFTC

to the fund.  *Id.*, ¶¶ 66, 69-74.

---

[3] Typically, expense adjustments to the Research Fund were made on a periodic basis, by low-level mutual fund
accounting analysts and approved by their supervisors.  By contrast, on January 8, 2001, the search for expense
adjustments in this case came from the most-senior management, not the typical lower-level analyst review.  *See, id.*,
¶¶ 67-68.

What the adjustments to expense accruals did do, however, was to increase the Research Fund's net assets during the January 8th NAV calculation for the Research Fund. Because they were entered on January 8, the adjustments' increase of net assets, $500,608, offset against the financial impact of the January 5th as-of trades, $1,813,908.59, reducing its effect *on the NAV calculation* to only $1,313,300.59, which was less than a penny per share. Due to the "trade plus one" pricing process, the offsetting effect of the adjustments would have worked only if they were entered the next business day after the as-of trades—that is, on the same day that the as-of trades were considered for pricing purposes. If the adjustments were entered on any other day, they would not have been included in the January 8, 2001 pricing process and would not have been offset against the as-of dilution. *See*, **Facts**, ¶¶ 75-78.

Importantly, as explained above, the increase to net assets caused by the adjustment to expense accruals in no way represented reimbursement from PFTC for the dilutive impact of the as-of trades. The Material As-of Policy required that PFTC book the receivable to reimburse the Research Fund for its loss regardless of any adjustment to expense accruals. By increasing net assets through adjustment of expense accruals, PFTC management boosted the NAV calculation so that management's conduct would reflect dilution of only $1,313,300.59 in the January 8th NAV calculation, where in fact the Fund's shareholders had been diluted by $1,813,908.59 or $0.0127 per share. Because this boost in net assets had nothing to do with reimbursing the fund for the as-of trade dilution as required by the Material As-of Policy, on January 8, 2001, McCracken and his team caused PFTC to release a price that was inaccurate by $1,813,908.59 or $0.0127 cents per share. *Id.*, 79-82.

14

F.     McCracken Participated In Orchestration of Matching Securities Trades With Expense
       Adjustments, And Then Managed The Entry of Expense Adjustments—Disputed

On or about January 5, 2001, McCracken attended at least two meetings, and likely more,

with Karnig Durgarian and other senior management concerning the Cardinal Combined Plan

and the Research Fund.  At the first meeting or meetings, Hogan made a presentation to

Durgarian, McCracken, and the other senior managers who had not been part of the January 4

meetings, walking them through the client issue, including an explanation of the cost of fixing

the delay in the Combined Plan's investment.  Durgarian then led the management discussion,

starting with a proclamation that any resolution of this matter would not include PFTC reaching

into its own pocket to pay for anything.  *See*, **Facts**, 83-85.

The management team then began discussing how it could do as-of trades to fix the

problem.  With respect to the Franklin Fund, which was a mutual fund "outside" the Putnam

organization, any possibility of obtaining an as-of trade required the cooperation of Franklin.

The management team decided that Franklin would be called and asked to make the trades as-of

January 2.  PFTC management made the request, but Franklin declined because of the size of the

$1 million dollar loss that the as-of trade would cause to its shareholders.[4]  *Id.*, ¶¶ 86-88.

With respect to the Research Fund and the other Putnam funds, the management team

similarly discussed as-of trades, but here PFTC served as the investor servicing agent for these

funds.  As the investor servicing agent, PFTC acted as the agent of the funds in performing

accounting and transfer agency services.  Accordingly, all of the executives necessary to execute

---

4  In a telling admission to the perniciousness of the as-of trading solution, Hogan testified that PFTC management
did not expect Franklin to honor the request for a $1 million dollar dilutive trade.  "Q:  What was the answer from
Franklin?  A:  No.  I mean, it was the answer we knew it was going to be.  I mean, we laid it right on the line and,
you know, we almost laughed.  We said thank you."  *See* SEC App., Ex. 3, Hogan IT1, 62:5 to 8.

as-of trades in the Research Fund were sitting in the room together.  The management team discussed "reversing and reposting trades that were out there to get back to the [January 2] NAVs."  The management team discussed that the cost to the Research Fund would be approximately $2 million and that this cost would be material to the Research Fund.  Hogan distributed a spreadsheet outlining proposed as-of trades, including the Cash Generation Transactions, and "it was something discussed at the meeting sort of as a way to sort of have the fund accounting folks look at where this was heading from the [R]esearch [F]und perspective in terms of the impact."  As this spreadsheet shows, the projected impact to the Research Fund, even after the Cash Generation Tansactions, was still $0.013 or greater than a penny per share. *See*, **Facts**, ¶¶ 89-93.

Durgarian then turned to the fund accounting group to see if there was a way they could adjust the fund's accounting records so that PFTC would not have to pay for the dilution.  *Id.*, ¶ 94. Witnesses have provided the following sworn testimony about McCracken's participation in these meetings:

- McCracken was "very involved also in the discussions, you know, sort of what the options were that were available here.  On specific ways related to the Putnam funds, that he had purview over from a pricing perspective."
- McCracken was "aggressive, …, in a sense, to Mr. Durgarian about being, you know, wanting to look at this, he can look at it, he can, you know, take charge of this."
- McCracken was "someone who was very active in the meeting."
- With respect to correcting Putnam funds with as-of transactions and the dilutive effect, McCracken stated "he could find a way to make it work."
- McCracken and Durgarian discussed mutual fund expenses.
- McCracken stated, "Karing, we're going to go look at," the Research Fund.
- McCracken had a set of "to-dos" coming out of the meeting, which included "looking at the mutual fund side of this."

16

- "[O]ne of [McCracken's 'to do's' [was to] go back to take a look at what could be done within the Research Fund to sort of make the 'as-of' transaction, you know, I guess the best word is work."
- McCracken gave impression that he was going to have a hands-on role on the mutual fund area of fixing the Cardinal conversion problem.

*See*, **Facts**, ¶ 95.

Following this first meeting or meetings of PFTC's most-senior management, McCracken then directed Michele Knowlton to find expense accounts in the Research Fund to adjust for the purpose of increasing the fund's net assets so that the material as-of trading dilution would be offset in the NAV calculation to bring it under a penny per share.  Knowlton knew how much adjustment of the Research Fund's expenses was necessary to offset the management-caused dilution to bring it under a penny in the NAV calculation.  Knowlton followed McCracken's direction and started to look for expense adjustments to be used to increase the fund's net assets.  Knowlton and McCracken talked again later that day.  During this meeting, Knowlton told McCracken that she and her staff had not found sufficient expense adjustments to increase the fund's net assets above the point necessary to offset the dilution in the NAV calculation to bring it under a penny per share.  McCracken responded, "Wrong answer.  Go back.  Look harder.  You can always find something with expenses."  Following the "wrong answer" meeting, but later the same day, Knowlton met with McCracken again.  During this meeting, Knowlton informed McCracken that she had found a management fee entry to adjust that, when combined with the other expense adjustments, was large enough to hide the Research Fund's dilution.  McCracken responded by saying, "That's great."  *Id.*, ¶¶ 96-101.

McCracken and Knowlton then attended another group meeting with Durgarian and other PFTC employees.  During this meeting, McCracken told Durgarian that there were expense

accounts for the Research Fund that could be adjusted for the purpose of increasing the fund's net assets. McCracken then told Knowlton to explain the adjustments to the group, which she did. Then McCracken, Knowlton, Hogan, and Durgarian, and others discussed how the entry of the expense adjustments would need to be timed to coincide with the as-of securities trades to achieve the goal of the plan. *Id.*, ¶ 102.

## II.    Argument

Summary adjudication is appropriate "only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Langlois v. Abington Housing Auth., 234 F. Supp.2d 33, (D. Mass. 2002) (quoting Fed. R. Civ. P. 56(c)). In reviewing this factual record, the court is required to view the facts in the light most favorable to the Commission, and draw all reasonable inferences in its favor. Id. Here, there is ample record evidence of McCracken's participation in the orchestration and execution of the fraudulent scheme.

### A.    Record Facts Support McCracken's Liability As Primary Violator

McCracken's argument boils down to four points. McCracken contends (1) that he did not participate in devising or orchestrating the scheme, (2) that the expense adjustments did not advance the purpose of the scheme, (3) that there is no connection in the fraudulent scheme between the securities trades and the expense adjustments, and (4) that he cannot be liable as a principal violator because the Commission cannot prove a causal connection between his conduct and "investor harm." None of these arguments are supported by the factual record or the law.

1.      *McCracken Actively Devised And Led The Fraudulent Scheme To Circumvent*
        *Putnam's Internal Controls For The Purpose Of Misusing Client Funds.*

McCracken would have this Court believe that, other than his direct supervision of the

expense adjustments and ensuring that they were coordinated with the securities trades, he was

merely a meeting attendee, like Childs, Crain or Papa, who only listened to others talk about a

fraudulent scheme and then passively agreed by remaining silent.  *See* Motion at 10.  This

characterization is simply not supported by record.  The evidence in this case shows McCracken

attended a meeting where Hogan explained both the proposed securities trades that would

generate additional cash to be used to buy Research Fund shares, and also that these Cash

Generation Transactions would still leave the Research Fund diluted by well more than a penny

per share.  *See* **Facts**, ¶¶ 83-93.  A discussion then ensued about how to handle this dilution in

the Putnam mutual fund.  *Id.*, ¶¶ 94-95.  In this discussion, McCracken was no mere wallflower.

He was a leader.  Sworn testimony describes McCracken as "very involved . . . in the discussions

. . . of what the options were that available here.  On specific ways related to the Putnam funds,

that he had purview over from a pricing perspective."  *See*, **Facts**, ¶ 95.  He was "someone who

was very active in the meeting," and was "aggressive . . . wanting to take a look at this" and

"take charge of this" issue.  *Id.*  Moreover, following this active and aggressive participation,

McCracken told his boss, Durgarian, that he would look at the Research Fund's accounting and

"could find a way to make it work."  *Id.*  Leaving the planning meeting or meetings, McCracken

took on a responsibility of going back and looking at the Research Fund's accounting and make

the proposed scheme "work."  *Id.*

These facts are corroborated by the further fact that, as discussed *infra*, the entire scheme

required the securities trades to be coordinated with the expense adjustments in order accomplish

the goal of having the increase to net assets offset the management-caused dilution in the

Research Fund's NAV calculation on January 8, 2001.  And, consistent with that fact, the record

shows that McCracken supervised Knowlton to ensure that the expense adjustments were

sufficiently large and entered on the correct day to have their desired effect.  *See*, **Facts**, ¶¶ 96-

102.  Considering all these facts together, it is nonsense for McCracken to contend there is no

evidence that he had a role in orchestrating the scheme.[5]

> 2.     *The Expense Adjustments Advanced The Purpose Of The Scheme By Circumventing PFTC's Internal Controls And Hiding The Dilution From The Research Fund And Its Representatives—The Fund Trustees*

McCracken's next argument is that the expense adjustments did not play role in the

advancing the purpose of the scheme.  McCracken makes this argument by citing to an excerpt

from Mark Ward's testimony that the expense adjustments did not have "cover-up value."  In

making this argument, however, McCracken mischaracterizes the nature of the fraud in this case

and omits Mr. Ward's further testimony which explains how the expense adjustments advanced

the fraudulent scheme.

As explained in Ward testimony omitted by McCracken, the nature of the deception in

this case is "how controls were circumvented to allow the dilution to go undetected."  *See*, SEC

App., Ex. 29, Ward Depo., 157:16 to 21.  Thus, the fraud here is how McCracken used expense

accounting adjustments to circumvent internal controls that were in place for the protection of

PFTC's clients: the Putnam Funds.  With respect to material as-of trades (those resulting in

---

5  For the reasons stated in the Commission's response to McCracken's statement of undisputed facts, the Commission disputes McCracken's unfounded claim that the Commission has somehow admitted that he "played no role in the direction or execution" of the securities trades.  *See* Plaintiff's Response to Defendant's Statement of Facts, ¶ 1.  McCracken did not make such a broad request to admit, and the Commission thereafter partially denied his much narrower request by referencing McCracken's knowledge of the entire scheme and the fact that his management direction facilitated the entry of the securities trades.

dilution of more than a penny per share) these internal controls required PFTC:  (a) to reimburse

the fund; and (b) if PFTC did not reimburse the fund, to notify the representatives of the fund that

PFTC released a fund price that was incorrect by a penny per share or more.[6]  As explained by

Ward, his comment that the expense adjustments did not have cover-up value reflects his opinion

as a professional accountant that it was obvious that increasing expenses had nothing to do with

PFTC reimbursing the fund for the material as-of trade, as required by the Material As-of Policy.

*Id.*, 158:8 to 159:1.  This is a fact with which McCracken's expert not only agrees, but believes is

a matter of "basic accounting."  *See*, *Id.*, Ex. 18, Kaplan Depo., 187:15 to 24; 188:22 to 190:6;

194:10-195:22.  The expense adjustments entered on the books and records of the fund did not,

from a professional accountant's standpoint, cover up the fact that the Material As-of Policy

required the fund to be reimbursed for the as-of dilution.

The cover-up here is how McCracken used these accounting entries as a professionally

unsupportable basis for circumventing PFTC's controls.  As McCracken's own expert

acknowledges, auditors in the mutual fund industry place heavy reliance on the fund's internal

controls.  *See* SEC App., Ex. 18, Kaplan Depo., 219:13 to 18.  They also place heavy reliance on

the Code of Ethics that is meant to support the internal controls.  *Id.*, 219:19-22.  It is

inappropriate for a professional accountant to use expense adjustments as a means for covering up

management's willful failure to follow internal controls.  *Id.*, 73:12 to 74:1.  McCracken, as the

senior-most accountant in PFTC's management, was supposed to be upholding and enforcing the

---

6 The notification piece is based on the Pricing Policy, which was drafted to deal with pricing errors determined
after the fact.  *See*, SEC App., Ex. 22, Healy Depo. Nov., 185:1 to 187:12.  In the proper application of the Material
As-of Policy, a pricing error never occurs because the booking of the receivable reimburses the fund for the loss.  *Id.*
   Here, obviously, management premeditated the dilution of greater than a penny per share, despite the mandate of
both internal controls, and had no intention of complying with either one.

company's internal controls, not coming up with professionally unsupportable reasons for

evading them.  McCracken, however, did not make the ethical or professionally appropriate

choice.  Instead, he used his position and authority to have his staff book expense adjustments

that had nothing to do with reimbursing the fund as required by the Material As-of Policy, but

everything to do with increasing net assets to ensure that the fund's NAV calculation would not

reflect the full amount of the dilution caused by his management team.

Putnam's Material As-of Policy, an internal control of PFTC, required the fund

accounting group to book a receivable from PFTC to the fund to reimburse the fund for the

January 5, 2001 as-of trading dilution.  *See*, **Facts**, ¶ 51.  McCracken was aware of this internal

control and he was aware that it was in place for the protection of Putnam's mutual fund

shareholders.  *Id.*, ¶ 56.  Nevertheless, McCracken participated in the execution of a scheme

substituting the receivable required by the control with expense adjustments that had absolutely

nothing to do with reimbursing the fund for that loss.  *Id.*, ¶¶ 66-82, 83-102.  Furthermore,

Putnam's Pricing Policy, another PFTC internal control, required the fund accounting group to

notify Research Fund representatives in the event that the group became aware of a price that was

incorrect by a penny per share or more.  *Id.*, ¶ 60.  McCracken was also well aware of the

existence of this policy.  *Id.*, ¶¶ 60-63.  Yet, on January 8, 2001, he organized a scheme by which

his group would increase the fund's net assets so that the fund's NAV calculation would not

reflect the full extent of the $1,813,908.57 loss that was, on a per share basis, well over the

material error standard of the pricing policy.  *Id.*, ¶¶ 66-82, 83-102.  In doing so, McCracken

premeditated a scheme that would violate the text and the spirit of Putnam's Pricing Policy and,

through his management of the scheme's execution, caused PFTC to release a price for the Research Fund that was materially erroneous.

Far from exonerating McCracken, the books and records of the company are proof of his complicity in orchestrating and leading the circumvention of (1) Putnam's Material As-of Policy and (2) Putnam's Pricing Policy.

> 3.    *The Shareholder Transactions And Expense Adjustments Were Both Essential And Related Components Of The Same Scheme To Circumvent PFTC's Internal Controls At The Expense Of PFTC Clients.*

McCracken next argues that "directing the making of expense adjustments . . . would not have been sufficiently connected to the securities transactions . . . to have rendered McCracken a principal violator." *See* Motion at 11. This argument is also not supported by the record. The shareholder transactions and the expense adjustments were used in combination to achieve the goal of subverting the Material As-of Policy and the Pricing Policy. As detailed above, in discussing the Cash Generation Transactions and their use in the Research Fund reinvestment, Hogan distributed a spreadsheet of the proposed securities transactions so that the fund accounting group would understand the extent of remaining dilution. *See*, **Facts**, ¶¶ 90-93. The entire conversation about expense adjustments occurred because Durgarian, McCracken and the other senior managers recognized that they needed fund accounting to come up with a way to relieve PFTC of the obligation of complying with the Material As-of Policy's requirement that PFTC book a receivable to pay for the loss. *Id.*, ¶¶ 90-95. Without the expense adjustments, in combination with the securities transactions, the scheme would not have been accomplished. *Id.*, ¶ 102.

The relation of securities trades to expense adjustments is further shown by what Knowlton and McCracken did after their initial meeting(s) with Durgarian and Hogan. After the first group meeting(s) discussing the goal of matching accounting adjustments to dilution, Knowlton understood exactly how much of an adjustment was necessary to offset the management-caused dilution. *See*, **Facts**, ¶ 97. McCracken also knew that the expense adjustments correlated to the securities trades because he managed the process to ensure (a) that there was a sufficient increase in net assets to offset the management-caused dilution ("Wrong answer. Go back. Look again."), and (b) that the expense adjustments would be entered on the precise day that the management-caused dilution would be factored into the Research Fund's pricing procedures. *Id.*, ¶¶ 99-102. In orchestrating and facilitating the adjustment of expense accruals to increase net assets in this precise manner, McCracken provided the final piece of the scheme, which, together with the securities transactions, facilitated the goal of the entire scheme: to circumvent the Material As-of Policy (and its requirement that PFTC reimburse the fund for its material dilution), and to obscure the management-caused, unreimbursed loss in the pricing of the Research Fund, allowing a materially-erroneous price to issue despite Putnam's Pricing Policy. Contrary to McCracken's argument, these record facts show McCracken's direction of the expense adjustments was directly connected to the securities transactions.

    4.    *As A Matter Of Law, The SEC's Enforcement Of The Securities Laws Does Not Require Proof Of Investor Harm; And As A Matter Of Fact, McCracken's Circumvention Of Internal Controls Was Directly Related To The Harm Suffered By PFTC's Clients.*

Citing *Stoneridge Investment Partners v. Scientific-Atlanta*, 128 S.Ct. 761 (2008), McCracken next argues that he cannot be held liable as a primary violator because his conduct was not something "investors" relied on and therefore his conduct "bore no relationship . . . to

investor harm." *See* Motion at 12.  This argument is inapposite as a matter of both law and fact.

First, as a matter of law, in SEC enforcement actions asserting primary violations, the

Commission is not required to "allege any of the elements required to establish a direct link

between a defendant's misrepresentation and an investor's injury-including reliance by the

investor on an explicit misstatement, economic loss, and loss causation."  <u>SEC v. Tambone</u>, 550

F.3d 106, 130 (1st Cir. 2008); *see also* <u>SEC v. Wolfson</u>, 539 F.3d 1249, 1256 (10th Cir. 2008);

<u>SEC v. Rana Research</u>, 8 F.3d 1358, 1364 (9th Cir. 1993).  These elements apply only to actions

brought by private plaintiffs, and therefore have no application to this case.

Second, as a matter of fact, the Commission's primary violation claims against

McCracken are based on his participation in a scheme to defraud.  The harmed clients were

mutual funds and a defined contribution trust beneficiary, fiduciaries of PFTC who entrusted the

company with managing their assets.  *See*, **Facts**, ¶¶ 6, 89.  In performing services for these

clients, PFTC acted owed them a fiduciary obligation.  *See* <u>United States v. Chestman</u>, 847 F.2d

551, 568 (2d Cir. 1991) (recognizing inherent fiduciary nature of agency and trust relationships);

<u>Sabel v. Mead Johnson & Co.</u>, 737 F. Supp. 135, 138 (D. Mass. 1990) (under Massachusetts law,

an agent has a fiduciary relationship "toward the principal with respect to matters within the

scope of the agency.").  In working with Durgarian to orchestrate the matching of expenses

adjustments to dilution, and in carrying out the precise execution of the expense adjustments in

accordance with that plan, McCracken facilitated the entry of the securities trades that diluted the

Research Fund, stole money from the George Putnam Fund of Boston and the Putnam Asset

Allocation Funds, and sold off the market gains of the Cardinal plan participants holding shares

of the International Growth Fund.  *Id.,* ¶¶ 83-102.  McCracken was advised of the entire scheme,

and was asked to provide the professionally unsupportable accounting adjustments to "make it work." *Id.*, ¶¶ 83-95.  McCracken did so, and thereby became the direct and proximate cause of the financial harm caused to all of these clients.  *Id.*, ¶¶ 96-102, 66-82.

Moreover, with specific regard to the Research Fund, McCracken admits that he knew in January 2001 that PFTC's Material As-of Policy was in place for protection of these mutual fund shareholders.  *See*, SEC App., Ex. 19, McCracken Depo., 62:16 to 63:4.  Under this policy, if the management of PFTC authorized an as-of trade that caused a material dilutive impact (of a penny per share or more), then this internal control required that a receivable be booked to reimburse the fund.  *See*, **Facts**, ¶¶ 51-52; SEC App., Ex. 19, McCracken Depo., 63:6 to 64:4. When McCracken and his management team implemented the scheme, they did so for the purpose of preventing the booking of a receivable at the expense of PFTC's principal, the Putnam Research Fund shareholders.  *See*, **Facts**, ¶¶ 64-102.  In causing PFTC to ignore its obligation to reimburse the fund, McCracken's actions were both the direct and proximate cause of the harm to the Research Fund shareholders.  Moreover, in boosting the fund's net assets through expense adjustments, McCracken obscured the unreimbursed, management-caused dilution in Putnam's pricing procedures, ensuring that PFTC would issue an erroneous price that would go uncorrected and undisclosed, in violation of the Pricing Policy.  *Id.*, ¶¶ 80-82.  By facilitating the surreptitious release of a materially erroneous price, McCracken was both the direct and proximate cause of the circumvention of the Pricing Policy, which covered up the management's misconduct by avoiding PFTC's reporting obligations.

      **B.**      Record Facts Support McCracken's Liability For Aiding And Abetting PFTC's Primary Violations.

Citing the First Circuit's recent decision in *SEC v. Tambone*, 550 F.3d 106 (1st Cir. 2008), McCracken argues that he cannot be an aider and abettor because the SEC cannot show a causal connection between McCracken's conduct and the primary violation. *See* Motion at 13. As explained in section II.A.4 above, however, McCracken's conduct was directly related to PFTC's willful subversion of internal controls that caused (a) implementation of the scheme causing financial injuries to PFTC's clients; (b) the Research Fund to remain unreimbursed; and (c) prevention of disclosure of the entire scheme to defraud to the Putnam Funds' representatives. These actions, at the heart of the scheme to defraud, constitute "affirmative acts" in substantial assistance of PFTC's primary violations. *See* Tambone, 550 F.3d at 145-46.

Moreover, in addition to the scheme to defraud, McCracken still faces aider and abettor liability for PFTC's failure to disclose the fraud to the Putnam mutual funds and Cardinal Health. *See* SEC v. Durgarian, 477 F. Supp.2d 342, 357 (2007) ("[T]he Complaint sufficiently alleges Putnam's relationship to the Combined Plan (as agent and Trustee) and the Putnam mutual funds (as agent)."). It is undisputed that PFTC acted as trustee for the Combined Plan and as investor servicing agent for the Putnam Funds, owing each client a fiduciary duty. *See*, **Facts**, ¶¶ 6, 89; *see also* Chestman, 947 F.2d at 568 (recognizing inherent fiduciary nature of agency and trust relationships); Warsofsky v. Sherman, 326 Mass. 290, 292 (1950) (observing trust relationship as "well recognized" form of fiduciary relation). In light of these fiduciary relations, PFTC had an obligation to disclose its fraudulent conduct to each client. McCracken provided substantial assistance to PFTC's primary violations (committing the fraudulent scheme and keeping silent about it) not only by his affirmative acts, *but also* by his inaction in the face of known

obligations to disclose PFTC's violations.  As noted by the First Circuit in *Tambone*, "[a]

defendant's silence or inaction may satisfy the 'knowing and substantial assistance' standard if

such silence or inaction was consciously intended to further the principle violation." Tambone,

550 F.3d at 144 (citing Cleary v. Perfectune, 700 F.2d 774, 777 (1st Cir. 1983).  McCracken was

aware of Putnam's Pricing Policy, its penny-per-share standard, and his mutual fund accounting

department's obligation to report any fund prices that were incorrect by a penny per share or

more to fund representatives.  See, Facts, ¶ 63.  The mandated disclosure included an obligation

to detail the facts and circumstances leading to the pricing error. *Id.*, ¶¶ 60-63.  McCracken

therefore not only took affirmative actions to subvert PFTC's Pricing Policy, but also thereafter

remained silent in the face of his obligation to disclose this error and the circumstances

surrounding it to the Putnam Funds' representatives.  Either way, through affirmative action or

through silence, McCracken's conduct amounted to substantial assistance of PFTC's primary

violations.

## III.    Conclusion

McCracken's Motion is an attempt to mislead this Court with excerpts of incomplete

facts and inapplicable legal standards.  After reviewing the additional facts and appropriate legal

standards set forth above, this Court should deny the Motion.

Dated: May 15, 2009                       Respectfully submitted,
        Boston, Massachusetts

                                         /s/  R.M. Harper II
                                         Richard M. Harper II (BBO # 634782)
                                         Rachel E. Hershfang (BBO #  631898)
                                         ATTORNEYS FOR PLAINTIFF
                                         SECURITIES AND EXCHANGE COMMISSION
                                         33 Arch Street, 23rd Floor
                                         Boston, Massachusetts 02110
                                         (617) 573-8979 (Harper)
                                         HarperR@sec.gov
                                         (617) 573-8987 (Hershfang)
                                         HershfangR@sec.gov

29

## **Certificate of Service**

       I, Richard M. Harper II, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on May 15, 2009.


Dated: May 15, 2009                    /s/ R.M. Harper II _____
                                       Richard M. Harper II